DAJ

FILED
DECEMBER 5, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

883553/DRCreagh/DJRichards/JDN

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**07 C 6863**

| | |
|---|---|
| MARILYN MIGLIN, | ) |
| Plaintiff, | ) |
| v. | ) Case No.: |
| | ) Judge: |
| JAMES JOSEPH "TED" MELLON, | ) |
| Defendant. | ) |

**JUDGE KENDALL
MAGISTRATE JUDGE VALDEZ**

### NOTICE OF REMOVAL

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that Defendant, JAMES JOSEPH "TED" MELLON, by and through his attorneys, David R. Creagh and David J. Richards of HINSHAW & CULBERTSON LLP, hereby file this Notice of Removal of the action brought in the Circuit Court of Cook County, Illinois, by MARILYN MIGLIN under Case No. 2007 L 9263 to the United States District Court for the Northern District of Illinois, Eastern Division pursuant to 28 U.S.C. §§1332, 1441 and 1446. In support of this Notice, Defendant states:

1. On October 25, 2007, an action was commenced in the Circuit Court of Cook County, Illinois, County Department, Law Division, entitled <u>Marilyn Miglin v. James Joseph "Ted" Mellon</u>, Case No. 2007L009263. (A true and accurate copy of the Plaintiff's Complaint is attached hereto as Exhibit "A").

2. The first date upon which Defendant Mellon received a copy of the Complaint was November 6, 2007. Attached hereto as Exhibit "B" is a copy of the Proof of Service and Summons. Therefore, Defendant's Notice of Removal is timely filed under 28 U.S.C. 1446(b). See <u>Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.</u>, 526 U.S. 344, 347-48 (1999).

3. 28 U.S.C. § 1441 (b) provides the following:

> Any civil action of which district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

28 U.S.C. § 1441(b). The Seventh Circuit Court of Appeals has held that jurisdiction exists in a removal action if the case might have originally been brought in federal court. Shaw v. Dow Brands, Inc., 994 F.2d 364, 366 (7th Cir. 1993).

4. This case could have originally been brought in the United States District Court because diversity of citizenship exists between the parties, and because the amount in controversy exceeds $75,000.00. 28 U.S.C. § 1332 provides:

> (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between –
>
> (1) citizens of different States . . . .

28 U.S.C. §§ 1332(a).

5. The Plaintiff is a citizen of the State of Illinois. (See Plaintiff's Complaint, attached hereto as Ex. "A," ¶1). The Defendant is a citizen of the State of California. (Id. ¶2). Accordingly, under Section 1332, complete diversity of citizenship exists between the parties in this case.

6. In the Plaintiff's Complaint, the Plaintiff seeks compensatory damages in excess of $2,500,000.00, plus punitive damages. Accordingly, it is the Defendant's good faith belief that the amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs.

7. Because diversity of citizenship exists between the parties, and because the amount in controversy exceeds $75,000.00, this case is properly removable to the United States District Court, pursuant to 28 U.S.C. §§ 1441 and 1446.

8. Pursuant to 28 U.S.C. §1446(a), true and correct copies of the Complaint (Ex. "A") and other process (Ex. "B") served upon the Defendant are attached to this Notice.

9. Pursuant to 28 U.S.C. §1441(a), removal to the United States District Court for the Northern District of Illinois is proper because that District embraces the Circuit Court of Cook County, Illinois, the place where this action is currently pending. *See* 28 U.S.C. §93(c).

10. Pursuant to 28 U.S.C. §1446(d) Defendant will promptly file a copy of this Notice of Removal in the Circuit Court of Cook County, Illinois, and give written notice of the removal of the action to counsel for Plaintiff.

11. By removing the action to this Court, Defendant does not waive any defenses, objections or motions available to it under state or federal law. Defendant expressly reserves the right to move for dismissal of Plaintiff's claims pursuant to Rule 12 of the Federal Rules of Civil Procedure.

WHEREFORE, pursuant to 28 U.S.C. §§1332, 1441, and 1446, the Defendant, JAMES JOSEPH "TED" MELLON, respectfully removes to this Court the action docketed under Case No. 2007 L 9263 in the Circuit Court of Cook County, Illinois.

David R. Creagh, Esq. (ARDC No. 6191452)　　Respectfully submitted,
David J. Richards, Esq. (ARDC No. 6230119)
**HINSHAW & CULBERTSON LLP**　　**HINSHAW & CULBERTSON LLP**
222 North LaSalle Street
Suite 300
Chicago, IL 60601-1081
Phone: (312) 704-3000
Fax:　(312) 704-3001　　By:　s/David R. Creagh
　　　　　　　　　　　　　　　　One Of The Attorneys For Defendant,
　　　　　　　　　　　　　　　　JAMES JOSEPH "TED" MELLON

6258704v1 883553

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| MARILYN MIGLIN, | ) | |
| Plaintiff, | ) ) ) | No. 2007L009263 CALENDAR/ROOM TIME 00:00 Fraud |
| v. | ) ) | |
| JAMES JOSEPH "TED" MELLON, | ) ) | JURY DEMAND |
| Defendant. | ) ) | |

## COMPLAINT FOR FRAUD AND OTHER RELIEF

Plaintiff, Marilyn Miglin, by and through her counsel, Cohon Raizes & Regal LLP, for her complaint against Defendant James Joseph "Ted" Mellon alleges as follows:

1. Plaintiff, Marilyn Miglin ("Plaintiff" or "Marilyn") is a resident of the City of Chicago, County of Cook and State of Illinois.

2. Defendant James Joseph "Ted" Mellon ("Defendant" or "Mellon") is a resident of the City of Palm Desert, California.

3. A significant portion of the acts complained of herein occurred in the City of Chicago, Illinois and involved the use of instruments of interstate commerce.

4. During the period between late 1999 and June of 2000, Defendant and others targeted Marilyn in a scheme to defraud her. In pursuit of the scheme to defraud, Mellon befriended Plaintiff and induced that friendship by falsely representing that he was an acquaintance of Plaintiff's late husband, Lee Miglin, as well as a member of the wealthy Pittsburgh Mellon family. Defendant and Plaintiff met several times in Chicago, Illinois, and in February of 2000, while meeting in Chicago, Illinois, Defendant told Plaintiff about an invention by Dr. Dennis P. Gordon of a needle which had the potential to be successfully utilized in the treatment of spider



veins and about the company which had purchased Dr. Gordon's patent, namely Advanced Medical Products Inc. ("AMP").

5. Defendant, knowing that Plaintiff was involved in the cosmetics business, induced her interest in the needle invention of Dr. Gordon and in fact arranged for her to meet Dr. Gordon and officials of AMP.

6. In June of 2000, Defendant advised Plaintiff that AMP needed Five Million dollars of additional capital to develop and promote the needle and advised her that if she would invest $2,500,000 in said company, he would simultaneously invest the same amount. Defendant also advised Plaintiff that the monies that would be invested by them would be utilized to pay Dr. Gordon the amount owing to him for the invention and would be otherwise utilized solely for the promotion and production of the needle.

7. Based upon the representations of Defendant as set forth in paragraph 4 and 6 heretofore, and in reliance thereon, Plaintiff invested $2,500,000 in AMP by purchasing stock of the company and paid additional sums into AMP in order to promote and market the needle.

8. In 2006 Plaintiff discovered that Defendant had not invested any money in AMP. Plaintiff also discovered that Defendant had personally, or for his own benefit, withdrawn the following sums from the money Plaintiff invested in AMP: $553,635 to himself and $403,125 to a company in which he had an interest.

9. Had Plaintiff known that out of the sums Marilyn invested Defendant was going to pay $553,635 to himself and $403,125 to a company in which he had an interest, she would not have made such investment.

10. Had Plaintiff known that Defendant was not going to and had not invested $2,500,000 in AMP, or that Mellon falsely represented himself as member of the Mellon banking family, she would not have made such investment.

11. On information and belief, Mellon made no genuine effort to sell the needle and ceased all involvement with AMP upon his receipt of a share of Marilyn's investment in AMP.

12. Plaintiff's investment in excess of $2,500,000 in AMP has been lost.

13. Mellon continues to be engaged in a scheme to further defraud Plaintiff by, among other things, sending a letter to Marilyn on April 19, 2007 (the "Mellon Letter") making demand for $3,500,000 from Marilyn by falsely alleging that "Marilyn you and I have a contract for three and half million dollars ($3.5) for my stock in AMP." The falsity of the alleged claim against Marilyn personally is evident by the Stock Purchase Agreement accompanying the Mellon Letter which clearly states that it is an agreement "dated March 13, 2002 by and between Advanced Medical Products, Inc., a Nevada corporation (the 'Corporation') and Ted Mellon, an individual resident of California ('Stockholder')." Mellon's alleged contract is with AMP, not Marilyn.

14. The Mellon Letter, sent in violation of the automatic stay afforded to Marilyn while she was in a Chapter 11 bankruptcy proceeding relating to her interest in AMP, also demands that Marilyn pay an alleged Promissory Note given by AMP to Mellon. Again, Mellon demands money from Marilyn for an obligation that, if owed, is due from AMP, not Marilyn personally.

15. On information and belief, the Mellon Letter is part of a conspiracy with others to "dip into the same well twice" by initiating further litigation in Las Vegas, Nevada, against Marilyn related to Mellon's alleged interest in AMP, which claim will mirror similar litigation recently dismissed in Las Vegas, Nevada in which Mellon participated "behind the scenes" but

will now feign lack of knowledge of the suit or the negotiated settlement, notwithstanding the fact that he communicated with at least one of the participants to the settlement conference via cell phone throughout the entire settlement process mediated by the Las Vegas court.

16. On information and belief, Mellon "pleaded guilty to one count of mail fraud" for engaging in similar fraudulent conduct against other third parties. (*See* copy of an article published April 22, 2007 by the Chicago Tribune detailing Mellon's fraudulent schemes against Marilyn and others attached hereto as Exhibit A.)

17. On information and belief, Mellon and his co-conspirators intend to engage in a malicious campaign against Marilyn, utilizing the Las Vegas court system, to convert any and all assets Marilyn may own to their own use and benefit by making false claims and forcing Marilyn to choose between paying exorbitant settlements to "buy her peace" or pay great legal expenses to defend herself. Such conduct entitles Marilyn to punitive damages against Mellon in an amount to be determined by the trier of fact.

WHEREFORE, by virtue of the acts and actions of Defendant, Plaintiff has suffered damages in the amount in excess of $2,500,000 and prays for judgment for said sum, plus punitive damages in an amount to be determined by the trier of fact.

MARILYN MIGLIN

By: _____
One of Her Attorneys

Cornelius P. Brown
Carrie A. Dolan
Rafey S. Balabanian
COHON RAIZES & REGAL LLP (90192)
208 South LaSalle Street, Suite 1860
Chicago, Illinois 60604
312/726-2252

Chicago cosmetics maven Marilyn Miglin has settled a lawsuit filed by a Las Vegas businessman over a failed company, but only after declaring personal bankruptcy and facing a $16.8 million judgment

# Needle deal still stinging

**CAUGHT IN A WEB OF DECEIT**

A 'magnetic personality' helped James Joseph 'Ted' Mellon, who later pleaded guilty to mail fraud, persuade a number of investors to fork over big money to back shady deals. One of those backers left in his wake was Marilyn Miglin.

By Ameet Sachdev
Tribune staff reporter



Shirley MacLaine is escorted by James Joseph "Ted" Mellon on Jan. 23, 2000, to the Golden Globe Awards in Beverly Hills. The actress, in a statement released by her publicist, says Mellon "belongs in the slammer" and that the night of the Golden Globes was the first time she met him.



Marilyn Miglin met Mellon in 1999 not long after her second husband died. She says she "followed her heart," but her friendship with him cost her millions of dollars.



Gary Thompson/Las Vegas Review-Journal
Jason Landess is a lawyer and president of Advanced Medical Products Inc., which planned to sell the specialized needle (below).



Gary Thompson/Las Vegas Review-Journal
Advanced Medical Products was supposed to market this double-tipped needle to eliminate spider veins in legs.

LAS VEGAS—On July 19, 2000, Marilyn Miglin walked into a dermatologist's office here to treat some unsightly spider veins on her legs using a newly-invented needle.

Less than a month later the former model-turned-Chicago-beauty-products-maven agreed to invest $2.5 million in a company to market the needle, lured into the deal by a con artist.

Miglin and victims of earlier schemes had one thing in common: friendships with James Joseph "Ted" Mellon, who falsely portrayed himself as a member of the wealthy Mellon family. Known for having beautiful women draped on his arm in posh hotels and resorts across the country, he accompanied actress Shirley MacLaine to the Golden Globe awards in 2000.

"Ted has this magnetic personality," said Maureen Holasek, a victim of one of Mellon's frauds. "The problem with Ted is that he does not have the skill set or knowledge or business experience to make something happen."

MacLaine is far more blunt. "He belongs in the slammer," she said through her publicist last week.

For her part, Miglin's financial losses far surpassed those of a handful of people Mellon scammed before her, according to court documents. And a $16.8 million preliminary judgment against her as a result of legal squabbles related to her needle investment forced her to declare personal bankruptcy at the end of March.

"I believed so strongly in the promise of this needle to help both women and men, I followed my heart instead of the advice of my family and my advisors," Miglin, 68, said in a statement in response to a Tribune interview request. "That was my mistake."

**Chapter 1: The Miglin meeting**

Miglin first met Mellon in 1999 at a ski resort in Telluride, Colo. He was a dashing man in his mid-50s, muscular with blond hair turning gray around the temples.

He told her that he was related to the Mellons, the Pittsburgh family that made its fortunes in banking, oil and aluminum. Mellon also said he had known her first late husband, and he and the widow struck up a friendship.

Mellon occasionally flew to Chicago, and on one visit in February 2000 he told her about a
PLEASE SEE MIGLIN, PAGE 12

EXHIBIT A

**Needle deal still stinging; Chicago cosmetics maven Marilyn Miglin has settled a lawsuit filed by a Las Vegas businessman over a failed company, but only after declaring personal bankruptcy and facing a $16.8 million judgment**
Ameet Sachdev
*Chicago Tribune*
April 22, 2007

LAS VEGAS

On July 19, 2000, Marilyn Miglin walked into a dermatologist's office here to treat some unsightly spider veins on her legs using a newly-invented needle.

Less than a month later the former model-turned-Chicago-beauty-products-maven agreed to invest $2.5 million in a company to market the needle, lured into the deal by a con artist.

Miglin and victims of earlier schemes had one thing in common: friendships with James Joseph "Ted" Mellon, who falsely portrayed himself as a member of the wealthy Mellon family. Known for having beautiful women draped on his arm in posh hotels and resorts across the country, he accompanied actress Shirley MacLaine to the Golden Globe awards in 2000.

"Ted has this magnetic personality," said Maureen Holasek, a victim of one of Mellon's frauds. "The problem with Ted is that he does not have the skill set or knowledge or business experience to make something happen."

MacLaine is far more blunt. "He belongs in the slammer," she said through her publicist last week.

For her part, Miglin's financial losses far surpassed those of a handful of people Mellon scammed before her, according to court documents. And a $16.8 million preliminary judgment against her as a result of legal squabbles related to her needle investment forced her to declare personal bankruptcy at the end of March.

"I believed so strongly in the promise of this needle to help both women and men, I followed my heart instead of the advice of my family and my advisors," Miglin, 68, said in a statement in response to a Tribune interview request. "That was my mistake."

Chapter 1: The Miglin meeting

Miglin first met Mellon in 1999 at a ski resort in Telluride, Colo. He was a dashing man in his mid-50s, muscular with blond hair turning gray around the temples.

He told her that he was related to the Mellons, the Pittsburgh family that made its fortunes in banking, oil and aluminum. Mellon also said he had known her first late husband, and he and the widow struck up a friendship.

Mellon occasionally flew to Chicago, and on one visit in February 2000 he told her about a company that planned to market a medical device to treat spider veins, similar to but smaller than varicose veins. Miglin was intrigued, apparently believing such a treatment could complement her cosmetics business.

"This introduction came at a time when I was terribly vulnerable, and I thought this would help me focus on helping women feel better about themselves rather than thinking about my own problems," she said in her statement. She declined to be interviewed for this article.

Miglin was a widow for the second time. Naguib Mankarious died six months after they were married in June 1999. Her first husband, Lee Miglin, a prominent real estate developer, was murdered in May 1997, part of a killing spree that claimed four others, including fashion designer Gianni Versace. The killer, Andrew Cunanan, a 27-year-old gay gigolo, took his own life as law enforcement authorities closed in on him.

In July 2000 Miglin flew to Las Vegas and through Mellon met Jason G. Landess, a lawyer and president of Advanced Medical Products Inc. Landess showed her the needle invented by Las Vegas orthopedic surgeon Dennis P. Gordon, an amateur inventor who had applied for a patent on the device.

Most of Gordon's tinkering in his garage led to small inventions, like a device that could be attached to a picture frame to keep the picture level. But an off-hand comment from his wife that he should come up with a treatment for her spider veins inspired the doctor's needle invention. When the small, two-pronged needle was inserted into the skin and twisted, it severed the vein. After several such twists, the spider vein was destroyed.

The method is more invasive and painful than laser treatment in which flashes of light collapse the vein. Another common treatment is sclerotherapy in which a saline solution is injected into the vein, causing it to dry out and shrink.

In exchange for the rights to the needle, Gordon received a chunk of stock in Advanced Medical from Landess. Landess retained an equal amount of company stock, gave 5 percent to a paralegal and put 20 percent into the corporate treasury to be used to raise capital, according to court documents. Gordon, who had no interest in running a business, asked Landess to find a buyer for the company.

Chapter 2: Selling the needle

On June 20, 2000, Mellon agreed to buy the company for $400,000; Gordon was to receive $190,000 from the sale, according to the agreement. " ... He was ecstatic because he had never before received such an amount for anything he had invented," Landess would later state in court documents.

What Gordon didn't know, he claimed in court documents, was that Mellon was pitching the needle idea to Miglin at the same time. And she didn't know that her cash would

mostly go into the pockets of Landess and Mellon, rather than be used to market the needle.

Here's what happened, according to documents that later were entered into evidence:

-On Aug. 15 Miglin agreed to buy 625 shares, or 25 percent of Advanced Medical Products, for $2.5 million, theoretically valuing the company at $10 million. She purchased 600 shares from Landess and 25 shares from the paralegal and became company chairman. The parties also agreed to market the needle procedure as the "Miglin Method."

-Landess and the paralegal also agreed to sell another 25 percent stake in the company to Mellon for $2.5 million. The next day, however, Mellon, Landess and the paralegal terminated Mellon's stock purchase agreement without telling Miglin.

According to court documents filed by Gordon, Landess, now 61, used some of Miglin's money to pay the $190,000 Gordon was owed. But then Landess split the remaining Miglin money with Mellon, writing a check to him dated Sept. 20 for $553,635 and another in April 2001 for $403,125, to a company where Mellon was listed as treasurer and Mellon's wife, Patricia Smith, was listed as president.

As a condition of buying her stake in the company, Miglin wanted assurance that the needles worked.

She brought some needles back to Chicago and persuaded four doctors and researchers at Northwestern Medical School to conduct a small clinical study. Researchers treated 25 patients for spider veins with the devices. Most of the subjects did not complete their three-month follow-up visits to determine results. But doctors in a preliminary report said the needle "appears to be a safe, cost-effective, and patient acceptable approach to the treatment of spider veins of the lower extremities."

Landess also paid a Las Vegas dermatologist $25,000 to conduct a pilot study on 14 patients, and more than half showed improvement three months later, according to the doctor.

While the needle showed promise, the company had no marketing expertise, much less a marketing plan, which began to frustrate Miglin, according to people familiar with the business.

To appease her, Landess told Miglin in January 2001 that he had signed a distribution agreement with a California company. At that time that company didn't exist; it would be incorporated six months later and would play a key role in the multimillion-dollar judgment against Miglin and Gordon.

Chapter 3: Fish & Chips

The needle deal was not the first time Mellon had enticed investors into a business. A few years earlier he was pitching a restaurant concept called Scotty's Fish & Chips.

One investor was Maureen Holasek, a 46-year-old Florida physician.

Holasek and Mellon bumped into each other at the Beverly Hills Hotel in early 1998. She was there for a medical conference and went to the hotel to have an early dinner, a chicken Caesar salad and a glass of wine. She ate at the bar because the restaurant had not opened yet.

Mellon and another man struck up a conversation with her, and they all exchanged business cards.

A few days after she flew home, Holasek received a phone call from Mellon. "He said he was checking up on me. He was very charming."

They started dating. "He had muscles like you would not believe," said Holasek, who added that he always seemed to have a perfect tan. They would meet in different cities, including Beverly Hills and Chicago.

"On one of our trips to Chicago, we went to Tiffany's," she said. "We looked at a $200,000 diamond ring. It was actually $212,000. I remember it very well."

Mellon also showed her a 30-page brochure touting the restaurant concept. The cover had a silhouette of a Scottish Terrier wearing a plaid bow tie; the company's edge, he explained, was a Scottish recipe for the fish batter.

Holasek gave him $50,000, and inadvertently helped him land another investor.

During one Chicago trip they went to a Greektown restaurant called Estia where they met Dimitri Kermelis, a part-owner. "He was a distinguished-looking man," Kermelis, 63, said of Mellon. "He came in with a beautiful woman. He had a limo waiting outside."

On a later visit to Estia, Mellon brought the Scotty's Fish & Chips brochure. "It was very professional looking," Kermelis said. Mellon told him the company was planning a restaurant in downtown Chicago. The goal was to go public by the end of 1998, and Mellon promised that investors would make six to seven times their original outlay.

Kermelis wrote a $25,000 check to Mellon on June 19, 1998.

Afterward, Kermelis tried contacting Mellon to see how the business was doing. "He was always hunting or fishing or on his private jet," Kermelis said.

Holasek, who also had trouble getting details on her investment in Scotty's, became suspicious and hired an investigator to do a background check on Mellon. She said she

felt sick upon hearing the investigator's report. "They pointed out a lot of red flags," she said, adding that she began to suspect Scotty's was "a con from the get-go."

Chapter 4: A fishy scam

Holasek hired a private investigator in Palm Springs, Calif., where Mellon had told her he lived, and she called the FBI in Orlando. That office directed her to the Denver FBI office where she ended up dealing with agent Kevin Knierim.

No longer with the FBI, Knierim declined to comment for this story. However, the Tribune pieced together what happened from federal and state court documents and interviews with people who participated in the FBI's investigation.

The FBI gave Holasek permission to secretly record her phone calls with Mellon.

In January 2000, Mellon boasted to her that he was going to the Golden Globe Awards with Shirley MacLaine.

"I watched the show and sure enough, I see Ted walking down the red carpet with Shirley," Holasek said.

MacLaine, photographed holding hands with Mellon, said through her publicist that it was the first time they met and declined to be interviewed about her "slammer" comment.

Later that year, Mellon pitched the needle company to Holasek, explaining that he was looking for minimum investments of $50,000. Holasek was not interested but said she pretended she was to maintain their relationship.

She also contacted Landess in November about investing in the business, according to e-mail records she provided to the Tribune.

In an e-mail dated Dec. 7, 2000, Landess responded: "I have already made enough money from this invention that I really do not need to do anything else but work on my golf game if that is what I choose to do." He later added: "I have been blessed with a virtual goose that is laying as many golden eggs that I care to take from that goose."

Meanwhile, FBI agent Knierim in March 2001 asked Tawanna K. Crabb to help in the probe. Crabb had introduced her friend Landess to Mellon in 1999.

"Ted [Mellon] was one of my closest friends," Crabb said in an interview last week with the Tribune. "When the FBI called, now I'm thinking who the hell is this person."

In April 2001, Crabb glimpsed another side of Mellon.

That month Mellon left an angry message on her voice mail. He said he believed she had been talking to the FBI about him and specifically mentioned that he had seen his "302s," a reference she didn't understand until calling Knierim in a panic.

The FBI agent explained that a 302 is a form agents fill out after interviewing witnesses. He encouraged her to try to find out what else Mellon knew about his FBI file.

In a June 2001 conversation with Crabb, Mellon mentioned a private investigator named Michael Levin. That same month, Levin was arrested in Long Island with numerous classified FBI documents in his possession.

Levin later pleaded guilty to paying government employees for secret FBI files and selling them to organized and white-collar crime figures in New York and elsewhere. He made about $100,000 selling such documents. His cooperation with the FBI led to several arrests. He ultimately was sentenced to 30 months in prison.

There is no evidence that Mellon purchased any FBI reports.

On July 25, 2001, Mellon sent a letter to Advanced Medical Products to resign as a director. Two months later the FBI arrested Mellon near Palm Springs on five counts of mail fraud related to people scammed in the bogus restaurant business. Mellon had received $110,000 from investors, according to his plea agreement, and used it for personal expenses.

In May 2002, Mellon pleaded guilty to one count of mail fraud and was sentenced to three years' probation, his sentenced reduced in exchange for cooperating in an investigation in another federal district, according to his plea agreement. He was fined $1,000.

Chapter 5: Advanced Medical

By the end of 2001, Advanced Medical was running out of money, and in January 2002 the directors proposed merging it with Western Medical Devices, the California company that was supposed to be distributing Advanced Medical's needles.

Western Medical was incorporated in June 2001. Its president was a building contractor and friend of Landess. As part of the proposed merger, Landess agreed to sell his stock back to Advanced Medical in exchange for royalty payments of up to $2 million for future needles sold.

Ultimately, the merger proposal crumbled because parties could not agree to terms. That triggered a lawsuit by Landess against Miglin and her son Duke, whom she installed as a corporate officer, and Gordon, claiming they conspired to remove Landess from the company and steal corporate records. Also, California-based Western Medical filed suit against the Miglins and Gordon, claiming that they breached the merger agreement.

The California case went to trial June 12, 2006. Sixteen days later, the judge dismissed the suit with prejudice, barring any future suit on the same claim.

But the Landess suit, which contained many of the same allegations as the California suit, went to trial on Jan. 5 of this year in Nevada. Two months later the jury delivered a verdict in Landess' favor. The preliminary judgment meant the Miglins and Gordon were potentially liable for $16.8 million plus punitive damages.

"It is inexplicable that a jury now blames the investors for the failure of the executives to develop and execute a successful business strategy," Miglin said in her statement. "I am shocked and hurt by this lawsuit, and stunned by the opinion of the jury in Las Vegas."

On April 6, Miglin and Gordon settled with Landess for an undisclosed amount. The settlement came a week after she filed for bankruptcy in Chicago in an effort to protect her real estate and cosmetics businesses.

In an April 2 interview at the Orleans Hotel in Las Vegas, Landess said, "Their argument was that [I] pulled a fast one." They're wrong, he said. "Marilyn was represented by legal counsel. Her legal counsel was involved in the transaction from Day One."

Between 2000 and 2001, Mellon walked away with about $1 million of Miglin's money from his involvement with Advanced Medical Products. But he agreed to return the $110,000 he reaped in the Scotty's scam, according to his plea agreement.

Holasek said she got back her $50,000 in two checks Mellon sent to her in September 2001.

"I think the money he gave me was Miglin's money," Holasek said in an interview.

Mellon, now 62, also is one of the only key people who was not sued in connection with Advanced Medical Products; he was not even called as a witness in the civil litigation. In fact, Mellon wasn't interviewed by any of Miglin's attorneys. Miglin switched attorneys just before the start of Las Vegas trial.

The Tribune's repeated attempts to interview Mellon were unsuccessful.

Miglin's current counsel, Paul Jacobs of Jacobs & Dodds in California, does not understand why Mellon was not pursued. "I would have tracked that man down if I had more time," he said. "He's the missing link."

Miglin has built her name on business, social scene, Marilyn Miglin has come a long way from her modest childhood in Pilsen.

Early in her career she was a model and dancer at Chez Paree, once one of Chicago's most glamorous nightclubs.

In 1959 she married prominent real estate developer Lee **Miglin** and for many years they appeared at every A-list social gathering. While he was developing skyscrapers, he also helped her build a cosmetics business from a small salon they opened in 1963.

In the late 1990s, she began appearing as a pitchwoman on the Home Shopping Network for her line of skin-care products, cosmetics and fragrances. The Marilyn **Miglin** salon remains a fixture on tony Oak Street off Michigan Avenue. "Marilyn **Miglin** Way" is Oak Street's honorary name.

Over the years, **Miglin** has been lauded for her good works as a civic booster and longtime benefactor of burn victims.

Her life also has been filled with tragedy. She discovered her husband's body after his brutal murder at the hands of a serial killer in 1997. Two years later she remarried, but her second husband, Naguib Mankarious, died six months into the marriage.

In 2000 she invested $2.5 million in a Las Vegas firm to market a needle treatment for spider veins in legs.

In March she declared personal bankruptcy after a Las Vegas jury returned a verdict against her, her son Duke, and the inventor of the needle. Facing a potential liability of $16.8 million plus punitive damages, she settled for an undisclosed amount.

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): Cohon Raizes & Regal LLP 208 South LaSalle St. Suite 1860 Chicago, IL 60604-1166 E-MAIL ATTORNEY FOR (Name): Marilyin Miglin | Telephone (312) 726-2252 FAX | FOR COURT USE ONLY FILED 2007 NOV 13 PM 4:00 |
|---|---|---|
| Cook County Circuit Court - Out of State STREET ADDRESS: Richard J. Daley Center MAILING ADDRESS: 50 W. Washington Rm. 801 CITY AND ZIP CODE: Chicago, IL 60602 BRANCH NAME: Out of State | | |
| PLAINTIFF: Marilyin Miglin | | CASE NUMBER |
| DEFENDANT: James Joseph 'Ted' Mellon | | 2007L009263 |
| PROOF OF SERVICE | | FILE NUMBER 2007032191 |

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of the:
   f. other (specify documents):    **Alias Summons, Complaint for Fraud and other Relief, Exhibit A**

3. a. Party served:    **James Joseph 'Ted' Mellon**

4. Address where party was served:    81230 Agave Court
   La Quinta, CA 92253

5. I served the party
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of the process for the party (1)on: 11/6/2007 (2)at: 9:15 AM.

7. Person who served papers:
   a. Name: S. Jahnsen, Deputy
   b. Address: Sheriff's Civil Division - East 46200 Oasis St., Rm. B15 Indio, CA 92201
   c. Telephone number: (760) 863-8255
   d. The fee for service was: $30.00

9. I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: November 7, 2007

Sheriff's Authorized Agent
Stanley Sniff, Sheriff - Coroner

Hearing: <No Information>



Judicial Council form POS-010

49603

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| SUMMONS | ALIAS - SUMMONS |

CCG N00*C-10M-1-07-05* ( )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, _____LAW_____ 2007 NOV 13 PM 4:00 DIVISION

(Name all parties)

MARILYIN MIGLIN,

v.

JAMES JOSEPH "TED" MELLON,

No. 2007 L 009263

Please serve Defendant at:
James Joseph "Ted" Mellon
81230 Agave Court
La Quinta, California 92253

ALIAS SUMMONS

To each Defendant:   2121   11-16-07

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room ___801___, Chicago, Illinois 60602

☐ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

☐ District 4 - Maywood
1500 Maybrook Ave.
Maywood, IL 60153

☐ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ District 6 - Markham
16501 S. Kedzie Pkwy.
Markham, IL 60426

☐ Child Support
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 90192

Name: Rafey S. Balabanian/Cohon Raizes & Regal LLP

Atty. for: Plaintiff - Marilyn Miglin

Address: 208 South LaSalle Street, Suite 1860

City/State/Zip: Chicago, Illinois 60604

Telephone: 312/726-2252

WITNESS, _____OCT 2 5 2007_____

_____
Clerk of Court

Date of service: _____,_____
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: _____
(Area Code)   (Facsimile Telephone Number)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## PROOF OF SERVICE

I, the undersigned, a non-attorney on oath, certify that I served Defendant James Joseph "Ted" Mellon's Notice of Removal, Defendant James Joseph "Ted" Mellon's Jury Demand, Attorney Appearance form for David R. Creagh, Esq., Attorney Appearance Form for David J. Richards, Esq., and Civil Cover Sheet by depositing true and accurate copies of same in the U.S. Mail, 222 North LaSalle Street, Chicago, Illinois, addressed to:

Rafey S. Balabanian, Esq.
Cohon Raizes & Regal LLP
208 South LaSalle Street
Suite 1860
Chicago, IL  60604
Phone:  (312) 726-2252
Fax:    (312) 726-0609
E-Mail:  rbalabanian@cohonraizes.com

by 5:00 p.m. on the 5th day of December, 2007.

[x] Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, I certify that the statements set forth herein are true and correct.

s/Joseph D. Niemeier