IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARILYN MIGLIN,                    )
                                   )
            Plaintiff,             )
                                   )    Case No. 07 C 6863
v.                                 )
                                   )    Judge Kendall
JAMES JOSEPH "TED" MELLON,         )
                                   )    Magistrate Judge Valdez
            Defendant.             )

**MOTION OF DEFENDANT MELLON TO TRANSFER THIS MATTER TO
THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**

COMES NOW Defendant, James Joseph "Ted" Mellon ("Mellon"), by and through his attorneys, David R. Creagh and David J. Richards of the law firm of HINSHAW & CULBERTSON LLP,  and pursuant to 28 U.S.C. § 1404(a) moves this Court to transfer this matter to the United States District Court for the District of Nevada.  In support thereof, Mellon states as follows:

## I. *FACTS*

Prior to calendar year 1999 Dennis P. Gordon, MD, an orthopedic surgeon, invented a device which promised to be a breakthrough in the cosmetic treatment of spider veins.  The device consists of a needle designed to "straddle" the spider veins and permanently destroy them when the needle is rotated.  In keeping with the "spider" terminology, the device was named the Arachnophlebectomy Needle (hereafter the "APN").

On September 8, 1999, Gordon and Jason Landess, Esq., an attorney in Las Vegas, Nevada, entered into a joint venture agreement whereby APN would be exploited through a corporation they named "Advanced Medical Products, Inc." ("AMP). Gordon transferred all of his right, title, and interest in the APN to AMP.  Gordon agreed to seek patent protection for the APN; Landess agreed to seek approval of the APN from the FDA and undertake any legal-related tasks necessary to accomplish the foregoing objectives.

During late 1999 or early part of 2000 Landess was introduced to Ted Mellon

("Mellon"), who represented himself to Landess as an entrepreneur with an interest in the APN. Landess had discussions with Mellon regarding the need for capital contributions to develop and market the APN.

Mellon thereafter contacted Marilyn Miglin ("Miglin"), a cosmetics and real estate investor from Chicago, as a possible investor of $2.5 Million in the enterprise. Miglin was known to be interested in the development and marketing of new beauty products and procedures for the financial gain associated therewith. During June of 2000, discussions ensued between Landess, Mellon, Gordon, and Miglin regarding the possibility of Miglin traveling from Chicago to Las Vegas to examine the APN and to have the procedure done on her as part of her due diligence. Miglin came to Las Vegas and the procedure was performed on July 19, 2000 by Dr. Linda Woodson.[1]

On or about August 15, 2000, Miglin agreed to purchase 25% of AMP's stock from Landess for $2.5 Million Dollars. Landess, Mellon, Miglin, and Jonathan Crain then proceeded to capitalize AMP and made remarkable progress in bringing the APN to market. They obtained a patent, contracted for and obtained various favorable clinical studies, contracted for marketing representatives, and refined the APN through trial and error.

During the later part of 2000, AMP entered into negotiations for the possible sale of the APN to global medical devices company out of Fort Lauderdale, Florida, GMP, Inc. ("GMP"). The sales price for the APN fluctuated between $25-30 Million, depending on whether or not AMP would retain a residual royalty. During this time period Larry Siggelkow--one of Landess' former clients and a former Metro police officer and now the president of Las Vegas Jet-- purchased 2% of AMP's stock for $200,000. The APN purchase discussions with GMP subsequently died when the U.S. stock market crashed in March of 2001.

During the summer of 2001, AMP's initial capitalization was expended. In November of

---

[1] Linda Woodson was, and is, a dermatological physician practicing in Las Vegas, Nevada.

6283899v1 883553

2001, AMP's two primary employees, Crain and Cameron Stuart ("Stuart") resigned for non-payment of salaries. That financial crisis led to a pivotal meeting at the Orleans Hotel in Las Vegas, Nevada on January 11, 2002.

The Orleans Hotel meeting in Las Vegas, Nevada involved basically all of the board members, officers, and shareholders of AMP including Miglin. The meeting resulted in an agreement whereby AMP would sell the APN to WMD, a separate company formed by Miglin and others. One of the important conditions precedent to that asset purchase agreement ("APA") was that Landess would agree to sell his AMP stock back to AMP and his WMD stock back to WMD, and that Mellon would agree to sell his AMP stock back to AMP.

Landess was then a director and the CEO of AMP, with Miglin and Gordon being the other two directors. Due to a conflict of interest between Landess, Mellon, and AMP, Miglin hired her personal legal counsel in Chicago to negotiate the AMP stock redemption agreement with Landess and Mellon. WMD also hired legal counsel to negotiate the WMD stock buyout with Landess. The negotiations for those contracts took approximately two months, resulting in executed agreements for Mellon and AMP, and Landess and AMP and WMD.

The AMP agreements were signed by Miglin as Chairwoman of the Board. Landess and Mellon were promised $3 Million each in royalty payments from the subsequent sale of the APN through the combined efforts of AMP and WMD. Miglin personally promised to put her enormous wealth and influence behind the contemplated business venture. Landess also negotiated a term of his AMP agreement that when he turned over all of AMP's business records and personal property that he would be paid the cash sum of $125,000 in repayment of Landess' initial loan to AMP.

During February and March of 2002, Gordon and Miglin and Miglin's son, Duke Miglin ("Duke"), began discussing plans as to how they could push Landess and Mellon out of AMP without having to honor the terms of the stock buyout agreements that were then being finalized.

After Miglin breached her agreement to purchase the stock of Landess and Mellon, a number of lawsuits were filed on behalf of Landess and AMP against Miglin and others. A trial

3

took place in early 2007 in the Eighth Judicial District Court in and for the County of Clark, State of Nevada lasting approximately nine (9) weeks. The result of that trial was a verdict in the amount of $16.8 million against Miglin and in favor of Landess and the other shareholders of AMP (including Mellon). The jury found that Miglin had engaged in fraud, breach of fiduciary duty, intentional interference with contracts and intentional interference with prospective business advantage. During the course of that trial, Miglin sought to raise some or all of the issues that she now pleads in her Complaint against Mellon. Those claims and arguments were obviously dismissed by the jury. The jury's various verdicts against Miglin will be the subject of issue preclusion and/or claim preclusion in this litigation.

Other than Miglin and her attorneys, all of the important witnesses are residents of the County of Clark, State of Nevada including Landess, Dennis P. Gordon, MD, Cameron Stuart, Jonathan Crain, and Linda Woodson, MD.

All of the evidence, including the original signed documents, books and records of AMP, computer data bases of AMP, and the depositions and other documents produced during the earlier litigation are located in Clark County, Nevada and can only be obtained by subpoena.

The Agreement for Sale and Transfer of Stock prepared at the direction of, or with the assistance of, attorneys representing Miglin provides for litigation concerning enforcement of the agreement to take place only in the County of Clark, State of Nevada. Further, the agreement calls for the application of Nevada law to these facts.

It is submitted that each and every factor cited by this Court, and other federal courts concerning the transfer of venue, weighs in favor of transferring venue in this matter to the United States District Court for the District of Nevada.

## II. *ARGUMENT*

This Motion to Transfer Venue is governed 28 U.S.C. § 1404(a), which provides that "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought."

4

**A FORUM SELECTION CLAUSE CONTAINED IN AN ENFORCEABLE CONTRACT IS PRESUMED VALID AND WILL GENERALLY BE ENFORCED**

In <u>HAB Carriers, Inc. v. Arrow Truck Sales, Inc., et al</u>, 2007 U.S. Dist. Lexis 62525 at *5, this Honorable Court held as follows:

> "...a forum selection clause contained in an enforceable contract is presumed valid and will generally be enforced. *AGA Shareholders LLC, v. CSK Auto, Inc.*, 467 F. Supp. 2d 834, 843 (N.D. Ill. 2006); *Hugel v. Corp. of Lloyd's*. 999 F.2d 206, 210 (7th Cir. 1993); see *M/S Bremen v. Zapata Off-Shore Company*. 4-7 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed. 2d 513 (1972); *IFC Credit Corporation v. Aliano Brothers General Contractors, Inc.*, 437 F.3d 606, 610 (7th Cir. 2006) (forum selection clauses are subject to invalidation only in circumstances showing contractual infirmities "such as fraud and mistake"). However, the court may decline to enforce a valid form selection clause if the resisting party demonstrates that enforcement will be unreasonable or unjust, *see Cont'l Ins. Co. V. M/V ORSULA*, 354 F.3d 603, 607 (7th Cir. 2003) (quoting *M/S Bremen*, 407 U.S. at 10), or where its enforcement would result in significant costs to third parties or to the judicial system. *Northwestern National Ins. Co. v. Donovan*, 916 F.2d 372, 376 (7th Cir. 1990."

This Court further held:

> "This deferential approach to form selection clauses is '...premised on the notion that parties resisting their enforcement after the fact were 'compensated in advanced for bearing the burden of which they now complaint, and will reap a windfall if they are permitted to repudiate' them.'"

2007 U.S. Dist. Lexis 62525 at *5.

Further, this Court described the burden on Miglin as follows:

> "...There is a heavy burden on the party challenging the form selection clause to show that if it is upheld, 'the contractual form will be so gravely difficult and inconvenient' that he will for 'all practical purposes be deprived of his day in court.' <u>Heller Financial, Inc. v. Midwhey Powder Company</u>, 883 F.2d 1286, 1290-1291 (7th Cir. 1989)."

2007 U.S. Dist. Lexis 62525 at *7.

In this case, the agreement Miglin attacks was negotiated at length by Miglin's attorneys and attorneys representing Mellon and Jason Landess. The parties expressly agreed that any action concerning the enforcement of said agreement, or the relationships of the parties thereto, would be instituted in Clark County, Nevada and would be interpreted under the laws of the State of Nevada. Miglin cannot now seek to repudiate what she agreed to in writing with the presumed careful and prudent advice of her attorneys.

6283899v1 883553

## CONVENIENCE OF THE PARTIES AND WITNESSES WEIGHS IN FAVOR OF TRANSFER

The attached affidavit of Ted Mellon describes the importance of the evidence and witnesses located in Clark County, Nevada and who are not subject to the subpoena power of this Court. The most important witness is Jason Landess, Esq., who has personal knowledge of all aspects of Mellon's defense to this action. Landess was present and will testify regarding the discussions and negotiations that resulted in Miglin's investment, the discussions with Miglin's attorneys regarding the formation and preparation of the Agreement for Sale and Transfer of Stock, and will testify at length that Marilyn Miglin sought to raise the same arguments she made in her Complaint in the jury trial that took place in early 2007 in Las Vegas, Nevada. The testimony of Landess is the most important testimony in this case and cannot be obtained by subpoena in the Northern District of Illinois.

The affidavit of Ted Mellon also sets forth that the documents that show Miglin's claims are false are located in Clark County, Nevada. The original Agreement for Sale and Transfer of Stock is in the possession of Landess and/or his attorneys. The Receipt and Agreement signed by Marilyn Miglin acknowledging that Mellon was contributing stock in Mellon Investments International as his capital contribution is located with Landess' attorney and/or the Eighth Judicial District Court for the County of Clark, State of Nevada and can only be obtained by subpoena. Further, the books, records and correspondence of AMP are located in Las Vegas, Nevada, the principal place of business for AMP. The other shareholder witnesses who will provide testimony regarding Miglin's capital contribution and the basis for the verdict against Miglin for breach of fiduciary duty, fraud, and intentional interference with prospective business advantage are **all** located in Clark County, Nevada including Jonathan Crain, Cameron Stuart, Larry Siggelkow, and Dennis P. Gordon, MD. The only witnesses residing in the Northern District of Illinois would be Miglin, Miglin's son, and her attorneys who would presumably cooperate and appear as necessary at trial, wherever it may be. Miglin clearly has the wherewithal to participate in a trial in Las Vegas, Nevada concerning this matter and cannot be

6

heard to suggest that it would constitute a financial hardship.

In Flexicorps, Inc. v. Benjamin & Williams Debt Collectors, 2007 U.S. Dist. Lexis 38618, this Honorable Court said:

> "Whenever the plaintiff and defendant are in different states, as is the case here, there will inevitably be an inconvenience to one side; 'and when the inconvenience of the alternative venues is comparable there is no basis for a change of venue.' *In Re: Nat'l Presto Industries*, 347 F.3d at 665."

2007 U.S. Dist. Lexis 38618 at *14.

In Petersen v. Union Pacific Railroad, 2006 U.S. Dist. Lexis 25061, this Honorable Court stated that the availability of non-party witnesses is important wherein this Court said:

> "On the other hand, issues related to non-party witnesses implicate aspects of each of the *§ 1404(a)* factors. The cost of obtaining attendance of willing witnesses involves the convenience of the parties; the need for such witnesses to travel to the courthouse to testify relates to the convenience of the witnesses; and finally, the availability of compulsory process for attendance of unwilling witnesses speaks to the interest in justice."

In this case, the totality of non-party witnesses resides in or near Clark County, Nevada. The federal courthouse in Chicago is 1,800 miles distant from the residences of these witnesses. The documents necessary to defend Mellon in this action are located in Clark County, Nevada as outlined in the affidavit of Mellon.    The books and records of AMP, including the correspondence, are located in Clark County, Nevada.

In Petersen, *supra*, this Court recognized that it is not the number of the witnesses that is important, but it is the quality of their testimony and the importance of the testimony in relationship to the issues raised by the pleadings.   In this case, the inconvenience of alternative venues is not comparable.  Mellon would be severely prejudiced by having to defend this action in the Northern District of Illinois when the totality of the non-party witnesses and all of the evidence is located in Clark County, Nevada.

## THE INTEREST OF JUSTICE COMPONENT ALSO WEIGHS IN FAVOR OF TRANSFER

This Court in <u>Petersen v. Union Pacific Railroad</u>, *supra*, also discussed the importance of the interest of justice component in determining whether to transfer venue. This Court stated that:

> "The interest of justice component focuses on the efficient and fair administration of the courts more than on the interests of the litigants themselves. *See Coffey*, 796 F.2d at 220-21. Relevant to this component is the relative speed with which the case will get to trial, having a judge familiar with the applicable law try the case, the relationship of the parties and claims to the forum and access to sources of proof including the possibility of viewing the premises. *See Heller*, 883 F.2d at 1293; *Zalutsky, Pinski & DiGiacomo, Ltd. v. Kleinman*, 747 F.Supp. 457, 462-63 (N.D. Ill. 1990)."

2006 U.S. Dist. Lexis 25061 at *12.

Miglin and Mellon, by and through their separate counsel, negotiated an arms-length Agreement for Sale and Transfer of Stock that contains a choice of law clause requiring the application of Nevada law. The interest of justice component would suggest that a United States District Court Judge sitting in the District of Nevada would be "a judge familiar with the applicable law to try the case..."

The factor of the relationship of the parties and claims to the forum also weighs in favor of transfer. The forum of the State of Nevada has already hosted a trial concerning these same facts. The jury verdict against Miglin for breach of fiduciary duty, fraud, and intentional interference with prospective business advantage concerns her investment in a corporation having its principal place of business in Clark County, Nevada and the operation of that business by Miglin after her capital contribution. The only connection to the City of Chicago and the Northern District of Illinois is that Miglin resides there. There is no interest in the jurisdiction of the Northern District of Illinois in the capitalization and operation of a corporation having its principal place of business in Las Vegas, Nevada.

Finally, access to sources of proof is conclusively in favor of transfer. All of the witnesses except for Miglin, her son, and her attorneys are located in or near Clark County, Nevada. All of the physical evidence consisting of the original agreements, books and records of

8

AMP, and the computer data base and files are located in Clark County, Nevada. There is no question but that each and every factor concerning the interest of justice favors transfer of venue in this matter to the United States District Court for the District of Nevada.

### III. *CONCLUSION*

Defendant, Ted Mellon, prays that this matter be transferred to the United States District Court, District of Nevada for the reasons set forth herein above.

Dated this 14th day of February, 2008.

David R. Creagh, Esq. (ARDC No. 6191452)          Respectfully submitted,
David J. Richards, Esq. (ARDC No. 6230119)
**HINSHAW & CULBERTSON LLP**                      **HINSHAW & CULBERTSON LLP**
222 North LaSalle Street
Suite 300
Chicago, IL  60601-1081
Phone: (312) 704-3000
Fax:    (312) 704-3001                     By:    s/David R. Creagh _____
                                                  One Of The Attorneys For Defendant,
                                                  JAMES JOSEPH "TED" MELLON

6283899v1 883553

## PROOF OF SERVICE

I, the undersigned, a non-attorney on oath, certify that I filed and served the above and foregoing Motion to Transfer Venue via electronic delivery pursuant to the Court's electronic filing and service system, addressed to the persons referenced below, on the 14th day of February, 2008:

| | |
|---|---|
| Rafey S. Balabanian, Esq.<br>Cohon Raizes & Regal LLP<br>208 South LaSalle Street<br>Suite 1860<br>Chicago, IL  60604<br>Phone:  (312) 726-2252<br>Fax:      (312) 726-0609 | Cornelius P. Brown, Esq.<br>Cohon Raizes & Regal LLP<br>208 South LaSalle Street<br>Suite 1860<br>Chicago, IL  60604<br>Phone: (312) 726-2252<br>Fax:      (312) 726-0609 |
| [x]Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, I certify that the statements set forth herein are true and correct. | s/Joseph D. Niemeier |

10

6283899v1 883553

### AFFIDAVIT OF TED MELLON IN SUPPORT OF
### MOTION TO TRANSFER VENUE

STATE OF CALIFORNIA    )
                       ) SS:
COUNTY OF _____     )

James Joseph "Ted" Mellon, being first duly sworn, deposes and says:

I am a resident of the City of LaQuinta, State of California.

I became aware of a needle developed by Dennis P. Gordon, MD ("Gordon") in Las Vegas, Nevada for the cosmetic treatment of "spider veins" during calendar year 1999.

I became acquainted with Jason Landess, Esq. ("Landess"), an attorney in Las Vegas, Nevada, who, along with Gordon, owned stock in American Medical Products, Inc. ("AMP"), the entity owning the patent and rights to the spider vein needle ("the needle").

My discussions with Landess and Gordon concerning the needle took place in Las Vegas, Nevada in calendar year 1999 and early 2000. Las Vegas, Nevada is the principal place of business of AMP.

On being advised that the marketing and distribution of the needle would require significant capital investment, I contacted Marilyn Miglin ("Miglin"), a wealthy and well known owner of a cosmetics company in Chicago, Illinois. I had been acquainted with Miglin for several years and I knew that she is interested in new beauty products and treatments for the goal of development and financial gain.

Marilyn Miglin indicated to me that she would be interested in investing in AMP and needle.

My discussions with Marilyn Miglin took place in Chicago, Illinois and in Las Vegas, Nevada where the needle was located and AMP has its principal place of business.

Miglin traveled to Las Vegas, Nevada to conduct her own "due diligence," which



Page 1

included having the spider vein procedure performed on herself on July 19, 2000.  The procedure was performed on Miglin by Dr. Linda Woodson, a physician who was, and today still is, practicing in Las Vegas, Nevada.

On being very satisfied with the results of the procedure, Marilyn Miglin contacted her attorneys in Chicago, Illinois and directed them to assist in the preparation of an Agreement for Sale and Transfer of Stock memorializing her investment of $2.5 million in AMP.  An unsigned copy of the Agreement for Sale and Transfer of Stock is attached as Exhibit B to this motion.[1]

The agreement called for Miglin to invest $2.5 million in AMP.  Your affiant's investment in AMP was made in the form of $2.5 million in stock transferred from Mellon Investments International.

Miglin acknowledged that I was contributing stock as my capital investment by signing a Receipt and Agreement in or about August, 2000 in which she acknowledges my transfer of stock into AMP as my investment.[2]

Marilyn Miglin, Duke Miglin, and the other shareholders of AMP had several meetings in Las Vegas, Nevada, the principal place of business for AMP, and in Chicago, Illinois.

The transfer of venue to the United States District Court for the District of Nevada in this circumstance is critical for several reasons.

First, the forum selection provision contained in the agreement negotiated and prepared by Marilyn Miglin's attorneys states that:

---

[1]    The signed copy of this Agreement is in the possession of Landess' attorney in Las Vegas, Nevada and can only be obtained by subpoena.

[2]    The Receipt and Agreement is a document in the possession of Landess' attorney or the state court in Las Vegas, Nevada that can only be obtained by subpoena.

1  **"This agreement and the legal relations between the parties hereto shall be**
2  **governed by and construed in accordance with the internal laws of the State of**
   **Nevada applicable to contracts made and to be performed wholly in such state.**
3  **Any legal action or other proceeding for the enforcement of this agreement**
   **shall be only in the County of Clark, State of Nevada."** (See Exhibit "B").
4
5      A review of the applicable law and forum selection provision, together with the
6  attorney fee provision which states:
7      "In the event that legal action is brought with respect to this agreement, or the rights
   and obligations of any party thereto, the prevailing party in said action shall be
8  entitled to costs and reasonable attorney's fees..." (See Exhibit "B").
9  shows that the parties bargained for and agreed that disputes between the parties to the
10
11 agreement for sale and transfer of stock must be filed in Clark County, Nevada.
12     Further, the most important witness concerning the stock transfer and dealings
13 between Miglin and myself is Jason Landess, Esq. Landess is a resident and attorney in the
14 State of Nevada and he has expressed to me that he has no desire or intent to travel to the
15 State of Illinois or the City of Chicago to testify voluntarily. A subpoena would be
16 necessary to require Landess' attendance and testimony at trial.
17
18     Jason Landess' testimony would be critical to the initial acquisition of the APN by
19 AMP, the initial efforts to capitalize AMP, the discussions had by and between myself,
20 Landess and Miglin prior to her investment $2.5 million pursuant to the written agreement
21 drafted by her attorneys. Jason Landess will also testify regarding the nefarious conduct
22 and activities of Marilyn Miglin while she was a director of AMP that subsequently
23 resulted in at least five (5) lawsuits concerning her conduct. Jason Landess will testify that
24 those lawsuits resulted in a nine (9) week jury trial in the Eighth Judicial District Court in
25 and for the County of Clark in calendar year 2007. Jason Landess will testify that Marilyn
26 Miglin, by her testimony, sought to raise the issues that she now seeks to raise in this
27 action, in the context of the jury trial in Las Vegas, Nevada and her testimony was
28

summarily rejected by the jury wherein they awarded $16.8 million against Marilyn Miglin for fraud, breach of fiduciary duty, intentional interference with prospective business advantage with regard to Jason Landess and the other shareholders of AMP, including your affiant. Jason Landess will testify and support your affiant's contentions with regard to issue preclusion that should be effective to limit or eradicate Marilyn Miglin's claims in this action. As such, the testimony of Jason Landess is essential to presentation of Mellon's defense to Marilyn Miglin's claims.

The testimony of Landess is indispensable to the presentation of your affiant's defense to the claims raised by Marilyn Miglin. Not only does Landess have personal knowledge of my dealings with Miglin prior to her investment, Landess will provide the essential testimony supporting issue preclusion arising out of the jury verdict against Miglin and in favor of Landess and the other shareholders (including your affiant). The $16.5 million verdict was compromised by a confidential settlement prior to the jury's consideration of punitive damages against Miglin arising out of her conduct with regard to AMP and its shareholders. Landess is not amenable to subpoena in the Northern District of Illinois and failure to transfer this matter will result in irreparable harm to your affiant's defense of this action.

Beyond Landess, Dennis Gordon, MD is a physician practicing in Las Vegas, Nevada and he is, therefore, not amenable to subpoena in the Northern District of Illinois. Other AMP shareholders including Jonathan D. Crain, Larry Siggelkow, and Cameron Stuart are all residents of the County of Clark, State of Nevada and are not subject to subpoena in the Northern District of Illinois.

It is my understanding that this Court has previously recognized that the presentation of live witnesses at trial, rather than by deposition or videotape, is a significant

Page 4

benefit that should be considered by this Court in determining whether to grant a transfer of venue.

The books and records of AMP and the computer hard drive and data base are located in Clark County, Nevada in the possession of Landess, Landess' attorney and/or Larry Siggelkow, who is the president and chairman of the board of AMP at the present time. These items will only be available to Mellon by subpoena issued from a Court of general jurisdiction in Clark County, Nevada.

To your affiant's knowledge, the only witnesses located in Chicago, Illinois consist of Miglin, Miglin's son, Duke Miglin, and her attorneys. It can only be presumed that these witnesses would cooperate with Miglin and appear for trial in Las Vegas, Nevada if this matter were to proceed.

It is also my understanding that this Court has previously considered the applicable law and important feature in terms of a decision regarding transfer of venue. In this matter, the Agreement for Sale and Transfer of Stock (Exhibit "B") negotiated and prepared with the assistance of Miglin's attorneys indicates that the parties agreed to apply Nevada law to a dispute concerning the respective rights of these parties. Your affiant would submit that a United State District Court Judge sitting in the State of Nevada would have more experience and insight into the application of Nevada such that the interest of justice would counsel in favor of granting this motion.

Other than the fact that Miglin is a resident of Chicago, Illinois and her son and attorneys are located there, there is no compelling evidence or witness located in the Northern District of Illinois and your affiant respectfully requests that this Motion to Transfer Venue to the United States District Court for the District of Nevada be granted.

///

1

FURTHER YOUR AFFIANT SAITH NAUGHT.

2

3 

Ted Melton

4

SUBSCRIBED AND SWORN to before me,
a Notary Public, this _16th_ day of February, 2008.

5

6

7

8

Notary Public

9

10    CAROL A. HEISS
      COMM. #1557464
11    NOTARY PUBLIC-CALIFORNIA
      RIVERSIDE COUNTY
      My Comm. Expires March 8, 2009

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>AGREEMENT FOR SALE AND TRANSFER OF STOCK</u>

THIS AGREEMENT FOR SALE AND TRANSFER OF STOCK (this "Agreement") is made and entered into on the __ day of August, 2000, by and between JASON G. LANDESS and JONATHAN D. CRAIN (hereinafter collectively the "SELLERS"), MARILYN MIGLIN, an individual, and/or her nominee ("MIGLIN"), and TED MELLON, an individual ("MELLON").

W I T N E S S E T H :

WHEREAS, JASON G. LANDESS ("LANDESS") is the holder of 2,375 shares of stock in Advanced Medical Products, Inc., a Nevada corporation ("Corporation") evidenced by Stock Certificate No. 1, which represents 95% of the issued and outstanding shares of the Corporation;

WHEREAS, JONATHAN D. CRAIN ("CRAIN") is the holder of 125 shares of stock in the Corporation evidenced by Stock Certificate No. 2, which represents 5% of the issued and outstanding shares of the Corporation;

WHEREAS, SELLERS desire to sell a portion of the Corporation's stock (hereinafter the "Stock") to MIGLIN by LANDESS transferring 600 shares of his Stock in the Corporation to MIGLIN, and by CRAIN transferring 25 shares of his Stock in the Corporation to MIGLIN, and MIGLIN desires to buy the Stock from SELLERS;

WHEREAS, SELLERS desire to sell a portion of the Stock to MELLON by LANDESS transferring 600 shares of his Stock in the Corporation to MELLON, and by CRAIN transferring 25 shares of his Stock in the Corporation to MELLON, and MELLON desires to buy the Stock from SELLERS; and

WHEREAS, MIGLIN, MELLON and SELLERS have reached an agreement upon terms and conditions by which SELLERS are willing to sell and MIGLIN and MELLON are willing to buy the Stock;

NOW, THEREFORE, subject to the following conditions and in consideration of the promises and agreements set forth below, SELLERS, MIGLIN, and MELLON hereby agree as follows:

1.    <u>MIGLIN'S PURCHASE PRICE AND PAYMENT</u>.  Subject to the terms and conditions set forth below, SELLERS hereby agree to sell the Stock to MIGLIN, and MIGLIN hereby agrees to buy the Stock from SELLERS, for a total Purchase Price (hereinafter the "Purchase Price") of TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00), to be paid as follows:

A.    MIGLIN shall on or before August 20, 2000, pay the sum of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00) by personal check dated August 20, 2000.

1



EXHIBIT

B

    B.     MIGLIN shall on or before September 20, 2000 pay the sum of ONE MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($1,250,000.00) by cashier's check and/or wire transfer to Jason G. Landess, P.C.'s Trust Account, Bank of America Account Number 014434096, ABA Routing Number 122400724.

    C.     MIGLIN shall on or before June 20, 2001 pay the additional sum of ONE MILLION DOLLARS ($1,000,000.00) by cashier's check and/or wire transfer to Jason G. Landess, P.C.'s Trust Account, Bank of America Account Number 014434096, ABA Routing Number 122400724. As evidence of this obligation, MIGLIN agrees to execute and deliver a promissory note in favor of SELLERS in the sum of ONE MILLION DOLLARS ($1,000,000.00) (the "Note"). The Note shall bear interest at the rate of 11.5% simple interest per annum and the entire balance of unpaid principal and interest shall be paid on or before June 20, 2001.

2.   <u>MELLON'S PURCHASE PRICE AND PAYMENT</u>. Subject to the terms and conditions set forth below, SELLERS hereby agree to sell the Stock to MELLON, and MELLON hereby agrees to buy the Stock from SELLERS, for a total Purchase Price (hereinafter the "Purchase Price") of TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00), to be paid as follows:

    A.     MELLON shall on or before August 15, 2000, pay the sum of TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00) by cashier's check and/or wire transfer to Jason G. Landess, P.C.'s Trust Account, Bank of America Account Number 014434096, ABA Routing Number 122400724.

3.   <u>EXECUTION, DELIVERY AND TRANSFER OF STOCK</u>. Upon payment of the consideration recited in Paragraph 1(A), SELLERS shall execute Stock Certificate No. 1 and Stock Certificate No. 2 and turn those certificates over to the Corporation. The Secretary/Treasurer of the Corporation shall then be authorized and directed to issue Stock Certificate No. 3 for 625 shares to MIGLIN, which certificate shall represent 25% of the issued and outstanding stock of the Corporation. Upon issuance of Certificate No. 3 to MIGLIN, the Secretary/Treasurer shall deliver that certificate to Southwest Escrow Company ("Southwest") in Las Vegas, Nevada to be held in escrow until MIGLIN pays all the amounts due under Paragraph 1. SELLERS shall execute a Safekeeping Agreement with Southwest for the purpose of escrowing Certificate No. 3 until MIGLIN has paid all of the sums described in Paragraph 1. Upon payment of all sums MIGLIN is required to pay under Paragraph 1, SELLERS shall immediately direct Southwest to release and deliver Certificate No. 3 to MIGLIN. MIGLIN shall enjoy all voting rights and other rights and privileges attendant to common stock ownership in the Corporation during the time Certificate No. 3 is in escrow. Upon payment of the consideration recited in Paragraph 2(A), SELLERS shall authorize and direct the

2

Secretary/Treasurer of the Corporation to issue Stock Certificate No. 4 for 625 shares to MELLON, which certificate shall represent 25% of the issued and outstanding stock of the Corporation. The Secretary/Treasurer shall thereafter issue the remaining 50% of the stock as directed by SELLERS.

4. <u>SELLERS' REPRESENTATIONS</u>: The following are representations, warranties and covenants of SELLERS to MIGLIN and MELLON, it being understood and agreed that MIGLIN and MELLON'S obligations hereunder are and shall be fully conditioned upon the truth and completeness of any representations and warranties set forth as follows:

> (a)   That the Stock as represented by the Certificates has been duly authorized and validly issued and is fully paid and non-assessable, with no personal liability attaching to ownership thereof;

> (b)   That there are only 2,500 shares of authorized stock in the Corporation;

> (c)   That the Stock is being sold to MIGLIN and MELLON is free and clear of all liens, claims and encumbrances of any kind whatsoever;

> (d)   That they are not a party to any agreement, arrangement or understanding with respect to the authorization, issuance, sale, redemption or other disposition of any shares of the Stock, including, without limitation, any options, warrants, calls, rights or other commitments relating thereto; and

> (e)   That the Corporation is the owner of all right, title, and interest in and to that certain medical device used for the treatment of spider veins known as the "Arachnophlebectomy Needle", and all of the patent rights appurtenant thereto.

5. <u>DEFAULT</u>: Should MIGLIN and/or MELLON default in payment of the amounts due under Paragraph 1 or Paragraph 2, MIGLIN and/or MELLON agree that any and all amounts previously paid to SELLERS shall be forfeited and belong to SELLERS and that MIGLIN and/or MELLON shall not be entitled to any pro rata interest in the stock of the Corporation. Such a default and resulting forfeiture would in no manner preclude SELLERS from pursuing any and all other remedies at law or in equity as described in Paragraph 13 of this Agreement.

6. <u>SURVIVAL</u>: The parties hereto agree that all of their respective representations, warranties and covenants shall survive the closing of this transaction as well as the delivery of the SELLERS' stock certificates and consideration therefore. All representations and warranties as made herein have been relied upon by MIGLIN and MELLON and MIGLIN and MELLON have made no independent inquiry into the truth and accuracy of such warranties and rely solely

3

upon their truthfulness and accuracy in entering into this Agreement.

7.  INDEMNIFICATION OF MIGLIN AND MELLON:  SELLERS agree to indemnify MIGLIN and MELLON and hold them harmless from and against any and all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, interest and penalties, costs and expenses (including, without limitation, reasonable legal fees and disbursements incurred in connection therewith and in seeking indemnification therefore, and any amounts or expenses incurred as a result of any such proceeding, claim, demand, assessment or judgment) resulting from, arising out of, or imposed upon or incurred by MIGLIN and/or MELLON by reason of:

      a)      Any breach of any representation or warranty of SELLERS set forth in the immediately preceding paragraph of this Agreement; or

      b)      Any other acts or omissions of SELLERS, either before or subsequent to execution of this Agreement, that may cause damages or impose liability upon MIGLIN and/or MELLON as a result of MIGLIN and/or MELLON'S purchase hereunder.

8.  AMENDMENTS:  This Agreement may be amended, modified or supplemented only by a written instrument executed by the parties hereto. This Agreement may not be assigned nor may any of MIGLIN'S rights to purchase the Stock be sold, hypothecated, transferred, pledged, or assigned to anyone without the prior written consent of SELLERS.  SELLERS shall be entitled to sell, hypothecate, transfer, pledge, or assign any of their stock in the Corporation without MIGLIN'S consent and without offering MIGLIN an opportunity to sell any or all of her stock to prospective purchasers of SELLER'S stock.

9.  WAIVER:  The provisions of this Agreement may be waived only by an instrument in writing executed by the party granting the waiver.  No failure on the part of either party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

10.  TIME IS OF THE ESSENCE:  All obligations to be performed under this Agreement including, but not limited to, MIGLIN'S payment under Paragraph 1 must be made in a timely fashion, time being of the essence.

11.  ENTIRE AGREEMENT:  This Agreement and the documents executed pursuant hereto set forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede any prior negotiations, agreements, understandings or arrangements between the parties hereto with respect to the subject matter hereof.

12.  BINDING EFFECT:  This Agreement shall inure to the benefit of and be binding

upon the parties hereto and their respective heirs, legal representatives, successors and assigns.

13.  <u>REMEDIES</u>:  Should any party to this Agreement default in the performance of their obligations, the non-defaulting party shall be entitled to resort to any and all legal and equitable remedies to enforce this Agreement including, but not limited to, specific performance.  Each and every remedy shall be cumulative and shall be in addition to any other remedy given hereunder which now or hereafter exists at law or in equity or by statute or otherwise, and the election by a party of one or more remedies shall not constitute a waiver of that party's right to pursue other available remedies.

14.  <u>APPLICABLE LAW</u>:  This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the internal laws of the State of Nevada applicable to contracts made and to be performed wholly in such state.  Any legal action or other proceeding for the enforcement of this Agreement shall be brought only in the County of Clark, State of Nevada.

15.  <u>ATTORNEYS' FEES</u>:  In the event that legal action is brought with respect to this Agreement, or the rights and obligations of any party thereto, the prevailing party in said action shall be entitled to costs and reasonable attorneys' fees from the non-prevailing party, the amount of which shall be determined by the Court in said action.  For the purposes of this paragraph the "prevailing party" shall be that party which is entitled to an award of his or her costs of suit.

16.  <u>ADDITIONAL DOCUMENTS</u>:  The parties agree to execute such additional documents and to furnish such additional data as may be necessary or desirable to evidence or consummate the transaction provided for herein and specifically vest title or ownership in MIGLIN and MELLON of the Stock which is being acquired by MIGLIN and MELLON under this Agreement.

EXECUTED as of the day and year first above written.

"SELLER"                                   "SELLER"
JASON G. LANDESS                           JONATHAN D. CRAIN


By_____                   By_____
   Jason G. Landess                           Jonathan D. Crain

"MIGLIN"                                    "MELLON"
MARILYN MIGLIN                              TED MELLON


By_____                   By_____
   Marilyn Miglin                             Ted Mellon

5