IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARILYN MIGLIN, ) | |
| ) | |
| Plaintiff, ) | No. 2007 C 6863 |
| v. ) | |
| ) | Judge Kendall |
| JAMES JOSEPH "TED" MELLON, ) | |
| ) | Magistrate Judge Valdez |
| Defendant. ) | |

## MIGLIN'S RESPONSE TO MELLON'S MOTION TO TRANSFER

Plaintiff, Marilyn Miglin ("Miglin"), by and through her counsel, Cohon Raizes & Regal LLP, submits this response to Motion of Defendant Mellon to Transfer This Matter to the United States District Court for the District of Nevada ("Motion to Transfer"), and states as follows:

### FACTS

This case is a fraud action in which Miglin alleges that James "Ted" Mellon ("Mellon") orchestrated a scheme to defraud her of millions of dollars. Initially, Mellon targeted Miglin to invest in a corporation known Advanced Medical Products Inc ("AMP"), which owned the patent on a device names the Arachnophlebectomy Needle (the "APN") that was represented to be a safe and cost effective method for the treatment of spider veins. (Cmplt., ¶¶ 4-6). To induce Miglin to invest in AMP, Mellon represented, among other things, that he was a friend of Miglin's deceased husband, that he (Mellon) was a member of the Pittsburgh Mellon banking family and that he (Mellon) was also investing an equal dollar amount in AMP, all of which, turned out to be false. See Affidavit of Marilyn Miglin ("Miglin Aff..") ¶¶ 3-12 attached to this response as Exhibit A.

1

Miglin met Mellon in 1999. After befriending Miglin, Mellon met with her several times in Chicago, Illinois. (Miglin Aff., ¶5). During one meeting in Chicago, Illinois, in February 2000 Mellon first told Miglin about the APN invented by Dr. Dennis P. Gordon and that the patent for the APN had been purchased AMP. (Miglin Aff., ¶6).

On August 15, 2000, Miglin and Mellon entered into the Agreement for Sale and Transfer of Stock ("Stock Purchase Agreement") in which both Miglin and Mellon each agreed to purchase 625 shares of AMP stock from Jason Landess ("Landess") and Jonathan Crain ("Crain") for $2.5 million. (Miglin Aff. ¶8). Miglin agreed to purchase the stock in AMP based on Mellon's representation that he was also purchasing stock in AMP for $2.5 million. (Miglin Aff. ¶9).

Instead of purchasing stock in AMP for $2.5 million as he represented to Miglin, Mellon instead entered into an agreement with Landess and Crain on August 16, 2000, *one day after* signing the Stock Purchase Agreement with Miglin, purporting to rescind and terminate that portion of the Stock Purchase Agreement that obligated Mellon to purchase stock in AMP ("Mellon Recision Agreement"). (Miglin Aff. ¶10). The agreement dated August 16, 2000 between Mellon, Landess, and Crain was entered into without the knowledge or consent of Miglin. (*Id.*).

Subsequently, on August 21, 2000 Mellon entered into an agreement with Landess to swap 862.5 shares of AMP stock held by Landess in return for Mellon giving 1,250 shares of stock in Mellon Investments Internationale., Inc. to Landess ("Mellon Exchange of Stock Agreement") (Miglin Aff. ¶11). Upon information and belief, Mellon Investments Internationale, Inc. is a shell corporation used by Mellon to defraud investors. (Miglin Aff. ¶13).

AMP's efforts to sell the APN were nationwide and occurred in Chicago, Michigan and California. (Miglin Aff., ¶15). After the Stock Purchase Agreement was executed, Ted Mellon operated a sales office for AMP out of Miglin's office in Chicago, Illinois. (Miglin Aff., ¶15-16). His efforts to sell the APN primarily occurred in Chicago, Illinois and in the state of Michigan. (Miglin Aff., ¶15-16). From 2000 through 2002, AMP held several Board of Directors meetings and shareholders meetings in Chicago, Illinois. (Miglin Aff., ¶17).

A California corporation named Western Medical Devices ("WMD") was the distributor of the APN. Most of WMD's principals are residents of California. (Miglin Aff., ¶18). David Tamayo, Tim Connelly, Michael Torrell, Joe Daniels, M.D. are all California residents and will be able to testify about the business relationship between WMD and AMP and the lack of success in marketing and selling the APN. (*Id.*). Joe Daniels, M.D., and Theodore Teruya, M.D., will also testify regarding tests of the APN performed by Kaiser Hawaii and the viability of the APN. (*Id.*).

Tests of the APN were also performed by doctors in the Department of Dermatology, Northwestern University Medical School in Chicago, Illinois. (Miglin Aff., ¶19). The following individuals, all residents of Illinois, were involved in testing the APN at Northwestern University and can testify to testify to the viability and marketability of the APN: Jean-Christophe Lapiere, M.D., Charles Gambla, M.D., and Dennis West, PhD. (Miglin Aff., ¶20).

Eventually, Miglin discovered that not only had Mellon not invested any money in AMP, but, he obtained Miglin's investment proceeds, or, a significant portion thereof, and used such proceeds for his own benefit and not to promote sales of the APN. (Miglin Aff., ¶22).

On information and belief, Mellon is now part of a larger conspiracy with others to defraud Miglin by planning to initiate further litigation against Miglin related to Miglin's former interest in AMP in order to force Miglin to choose between paying exorbitant settlements to "buy her peace" or paying great sums in legal fees to defend herself against Mellon's false claims. (Miglin Aff., ¶23).

For instance, in a letter dated April 19, 2007, Mellon made demands on three false and malicious claims against Miglin. (Miglin Aff. ¶24, ex. 11). In addition to demanding that Miglin personally pay under two agreements entered between AMP (not Miglin) and Mellon, Mellon also alleged a claim, dating back to 2001, to certain property located in Chicago, Illinois. (Miglin Aff., ¶25-27).

Although Mellon has "reserved" the right to file a counterclaim against Miglin, it is apparent that Mellon has delayed filing such counterclaims against Miglin because one involves real property in Chicago, and could negatively impact his pending motion to transfer venue. (Miglin Aff., ¶28-29). Miglin believes that Mellon is forum shopping and will file counterclaims if this court grants his motion to transfer venue to Las Vegas, Nevada. (Miglin Aff., ¶28-29).

Miglin has been forced to defend herself in connection with the APN in two lawsuits. The first jury trial was in a case brought by Western Medical Devices ("WMD") (and involving Jason Landess) against Miglin and others in the Superior Court of California, case no. 04CC02110. (Miglin Aff., ¶30). A directed verdict in favor of Miglin and all defendants was entered and the suit was dismissed with prejudice in the fall of 2006. (*Id.*).

A second case in which Jason Landess was a plaintiff went to jury trial in early 2007 in Clark County, Nevada. The action was consolidated with four other lawsuits related to the

creation and attempted sale of the APN. (Miglin Aff., ¶31). Mellon was initially named as a defendant in that action but he filed a motion to dismiss that was granted. (*Id.*). The parties settled Clark County case without entry of judgement after the jury had rendered a verdict as to liability but prior to the verdict being entered on the record. (*Id.*). The action was settled before the verdict had been entered. (*Id.*). The court entered the verdict only as an administrative act well after the case had been settled. (*Id.*). Judgement was never entered against any of the defendants and the suit dismissed. (*Id.*).

On August 31, 2007, Miglin filed suit against Mellon in the Circuit Court of Cook County, Illinois, alleging fraud. Thereafter, Mellon removed the case to the Northern District of Illinois pursuant to 28 U.S.C. §1441(b). Defendant has filed an answer to the complaint, in which he purports to assert certain affirmative defenses and in which he expressly reserves his right to assert cross-claims.

## ARGUMENT

Mellon's motion to transfer this action to Clark County, Nevada should be denied because (1) the forum selection clause he relies upon is inapplicable to this action, and (2) transfer to Nevada is not in the convenience of the parties and witnesses or in the interest of justice.

### I. THE FORUM SELECTION CLAUSE IS INAPPLICABLE TO THIS ACTION

Mellon's primary argument for transferring this matter to Nevada is a forum selection clause contained in the Stock Purchase Agreement under which Miglin purchased her shares in AMP. According to Mellon the Stock Purchase Agreement provides that actions to enforce the agreement must be brought in Clark County Nevada. The forum selection clause cannot be the

basis for transfer because Mellon surreptiously cancelled and terminated his obligations under that agreement and because the forum selection clause does not apply to Miglin's fraud claims.

### A.   *Mellon Purportedly Cancelled the Same Agreement He now Wants Enforced*

Ironically, through his motion to transfer, Mellon is seeking to bind Miglin to an agreement that he subsequently cancelled. Within one day of signing the Stock Purchase Agreement, Mellon secretly entered into a separate agreement with Landess[1] and Crain purporting to rescind and terminate their obligations under the exact agreement that Mellon now raises before the court in his motion to transfer. The Mellon Recision Agreement, that was signed without Miglin's knowledge and consent, provides that the Stock Purchase Agreement "is hereby rescinded and terminated in all respects as to the rights, obligations, and duties of Landess, Crain, and Mellon towards one another."

About a week later, on August 21, 2000, without the knowledge or consent of Miglin, Mellon and Landess entered into the Mellon Exchange of Stock Agreement, in which Mellon and Landess agreed to rescind Mellon's obligation to buy Landess' stock in AMP and substitute an exchange of stock. Under this agreement, Mellon received shares in AMP from Landess in exchange for some of Mellon's shares in Mellon Investments Internationale, Inc., which company the U.S. Government alleged in its indictment of Mellon was used by him to defraud investors.[2] Mellon claims that Miglin knew about the exchange of stock and cancellation of

---

[1]   This is the same Landess who is being used as a basis to transfer the case to Nevada because he will not testify voluntarily in Illinois and will not give a signed copy of the Stock Purchase Agreement to his friend Mellon.

[2]   A criminal conviction of said fraud was subsequently entered against Mellon on this indictment. (Miglin Aff., ¶13, ex. 5).

Mellon's obligations because of a receipt she was maneuvered into signing over eight months later is rebutted by Miglin in her affidavit. (Miglin Aff., ¶14).

Mellon is now before this court arguing that, because of a limited forum selection clause in the same agreement that Mellon *rescinded and terminated*, this action must be transferred to Nevada. It is patently unfair and inequitable to allow Mellon to attempt to use against Miglin, the very same agreement that he secretly cancelled with Landess, a personal friend of Mellon, who Mellon claims is a witness in his behalf. Moreover, the cancellation of the Stock Purchase Agreement by all parties except Miglin, and done without her knowledge, evidences the very fraud claims that Miglin has alleged against Mellon.

### B.    *The Forum Selection Clause Only Applies to Actions to Enforce the Contract*

In his motion to transfer, Mellon fails to acknowledge that the plain language of the agreement clearly demonstrates that the forum selection provision would not apply to an action for fraud against Mellon. Rather, the Stock Purchase Agreement provides that:

> This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the internal laws of the State of Nevada applicable to all contracts made and to be performed wholly in such state. Any legal action or other proceeding *for the enforcement of this Agreement* shall be brought only in the County of Clark, State of Nevada.

*See* Stock Purchase Agreement, ¶14, attached as exhibit B to the Motion to Transfer (emphasis added). A true and correct copy of the fully-executed Stock Purchase Agreement is attached as exhibit 2 to the affidavit of Marilyn Miglin.

The plain language of the clause cited by Mellon makes it only applicable to actions "for the enforcement this Agreement." Miglin is not attempting to enforce this agreement, which Mellon cancelled with his key witness Landess the day after he signed it. Nothing in the

language of that clause mandates that Mellon's fraud claims must brought in Clark County, Nevada. "[W]hen construing a contract, every provision should be given effect and the words should be read with their ordinary meaning." *Sompo Japan Ins., Inc. v. Alarm Detection Systems, Inc.*, 2003 WL 21877615, *1 (N.D. Ill. 2003).

The Stock Purchase Agreement contains no language that claims "arising out of" or "related to" the agreement must be brought in Nevada. If the parties intended the forum selection clause to apply to any actions "arising out of" the agreement or "relating to," they could have easily done so. The fact that the parties did not include such language demonstrates that the parties intended the forum selection clause to only apply to actions seeking to *enforce the agreement*.

### C. *This Is Not an Action to Enforce the Agreement*

This is not an action for breach of contract nor is this an action based upon a breach of Mellon's obligation under the agreement. This is an action for fraud. In this action, Miglin alleges she was induced to enter into the Agreement and invest money in AMP based on Mellon's misrepresentations that he was a member of the wealthy Mellon family of Pittsburgh and was himself investing $2.5 million in AMP. (Miglin Aff. ¶9).

Thus, Miglin's claims of fraud against Mellon may be brought in the jurisdiction of her choosing, both because Miglin is not seeking to enforce this agreement and any counterclaim Mellon might file against Miglin cannot be based on an agreement he cancelled behind her back.

## II. MELLON HAS FAILED TO ESTABLISH THAT TRANSFER TO A NEVADA FORUM IS WARRANTED

In the absence of the forum selection clause, Mellon has failed to establish that Nevada is a clearly more convenient forum so that a transfer of is warranted under 28 U.S.C § 1404(a). Section 1404(a) provides that "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

To warrant a transfer under section 1404(a) "[t]he party requesting a transfer to another venue must show that the transferee forum is 'clearly more convenient.'" *Pasulka v. Sykes*, 131 F.Supp.2d 988, 994 (N.D. Ill 2001). To succeed on his motion to transfer venue Mellon must establish that "(1) venue is proper in both the transferor and transferee court; (2) the transfer is for the convenience of the parties and witnesses; (3) transfer is in the interest of justice." *Id.* "A transfer motion will not be granted when it would merely shift inconvenience from one party to another." *Countryman v. Stein Roe & Farnham*, 681 F. Supp. 479, 482 (N.D. Ill. 1987).

### A. *Mellon has Failed to Demonstrate that Nevada is a Proper Forum*

Mellon must first establish that venue is proper in both the transferor and transferee districts. *Pasulka*, 131 F.Supp.2d at 994. Mellon has not objected to venue in the Northern District of Illinois. *See Countryman,* 681 F.Supp at 482, fn. 3. Moreover, Mellon has failed to allege any basis on which Nevada is a proper venue. Mellon's primary argument for transfer is that the forum selection clause in the Stock Purchase Agreement provides that actions to enforce the same agreement should be brought in Clark County, Nevada. As set forth above, that forum selection clause is inapplicable to Miglin's fraud claims.

9

Without the forum selection clause, Mellon must demonstrate a basis for finding that Nevada is a proper venue for this action. A motion to transfer should not be granted when movant fails to establish that the transferee forum is a proper venue.

### B. *Mellon Has Not Shown That Nevada is a Clearly More Convenient Forum*

The next step of the court's analysis is to consider which forum better serves the convenience of the parties and the witnesses. Mellon bears the burden of proving that Nevada is is clearly more convenient and "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum is rarely disturbed." *Flexicorps, Inc. v. Benjamin & Williams Debt Collectors*, 2007 WL 1560212, *5 (N.D. Ill. 2007).

#### 1. *Convenience to the Parties: Miglin's Choice of Forum Should be Given Substantial Weight*

Miglin's choice of forum, the Northern District of Illinois, should be given "substantial weight" particularly because it she is a resident of Chicago, Illinois and the Northern District of Illinois is her home forum. *See Flexicorps*, 2007 WL 1560212, *5.

Moreover, Chicago, Illinois is also where a significant portion of the actions complained occurred. Mellon, a California resident, met with Miglin in Chicago, Illinois several times before Miglin decided to invest in AMP. During his meetings with Miglin in Chicago, Illinois, Mellon made several misrepresentations that induced Miglin to invest in AMP. It was also during a meeting in Chicago, in which Mellon first told Mellon about the new spider vein technology and AMP.

Thereafter, Mellon operated a sales office for AMP in Chicago, Illinois, and admits that he also relocated to Michigan in his nationwide efforts to sell the APN. (See Miglin Aff., ¶26,

10

ex. 11). In 2000 through 2002, AMP has held several Board of Directors meetings and shareholders meetings in Chicago, Illinois. Tests of the APN were also performed by doctors in the Department of Dermatology, Northwestern University Medical School in Chicago, Illinois. Clearly, Illinois has substantial ties to this litigation and a significant portion of events relating to this litigation occurred in Chicago, Illinois.

Comparatively, Mellon has not adequately demonstrated that Nevada is a clearly more convenient forum for him to litigate in. Mellon is a resident of California, not Nevada. Both parties would be litigating in a foreign forum if the matter is transferred to Nevada as Mellon has requested.

Mellon argues that Nevada is more convenient forum for him because "the documents that show Miglin's claims are false are located in Clark County, Nevada." (Motion to Transfer, p. 6). However, this assertion directly contradicts the position that Mellon took in response to Miglin's motion to strike affirmative defenses, where he asserts that "[a]ll of the documentation, depositions, and facts are in the possession of Miglin at the present time and discovery has not yet commenced in this matter." See Mellon's Opposition to Marilyn Miglin's Motion to Strike Defendant's Affirmative Defenses, p. 7, which is attached to this response as exhibit B.

Mellon cannot be allowed to argue at one instance that Miglin, who resides in Chicago, Illinois, is in possession of the documents and then turn around and claim that those same documents are located in Clark County, Nevada. Miglin is in possession of the documents and Mellon will have access to those documents through normal discovery methods issued from this court. The primary documents relating to this lawsuit are in Chicago and California, not Nevada.

  **2.**  *The Convenience to the Witnesses Does Not Weigh in Favor of Transfer*

Several important and key witnesses to establishing Miglin's claims are located in Illinois, including Marilyn Miglin who can testify to all the events alleged in the complaint, and Duke Miglin, Miglin's son who is the former director of AMP. Additionally, there are individuals from the Department of Dermatology at Northwestern University Medical School in Chicago, Illinois, who tested the viability of the needle, including Jean-Christophe Lapiere, MD ("Lampiere"), Charles Gambla, MD ("Gambla"), and Dennis West, PhD ("West"). Lapiere, Gambla, and West are all residents of Illinois.

In the alternative, California is a more convenient forum than Nevada. Mellon is a California resident and California would be his home forum. WMD, the distributor of the APN, is a California corporation and has many of the documents relevant to Miglin's fraud claims. Miglin also intends to call numerous witnesses in California including: David Tamayo, Tim Connelly, Michael Turrell, Joe Daniels, M.D., and Theodore Teruya, M.D. Importantly, a lawsuit related to AMP and the sale of the APN and WMD has already been brought in California against Miglin and others, and a directed verdict was entered in favor of all defendants. If Mellon intends to bring defenses or counterclaims based upon the sale of the APN, Miglin intends to raise issues of res judicata/issue preclusion based on the California litigation.

Mellon's argument that the convenience to the witnesses weighs in favor of transfer to Clark County is not sufficient to satisfy his burden. Mellon alleges his personal friend and business partner Jason Landess, Esq. is Mellon's "most important witness" and "has personal knowledge of all aspects of Mellon's defense to this action." (Miglin Aff. ¶33). Mellon's entire motion turns on the alleged refusal of his key witness to travel to Illinois to testify in this action.

12

Jason Landess is an attorney in the State of Nevada who has been the subject of investigative reports by the Los Angeles Times. (Miglin Aff. ¶33). Mellon alleges that Landess' testimony is important because he will testify regarding issues raised the 2007 jury trial in Clark County between Landess and Miglin. Specifically, Mellon states in his affidavit that Landess will testify as to Miglin's testimony in that action and that Miglin sought to raise the same issues in that trial as she is now raising in this action.

Mellon has failed to demonstrate that Landess' testimony on the 2007 trial in Clark County is critical to his defense. First, the 2007 jury trial in Clark County cannot have preclusive effect because, as Mellon admits in his affidavit, the parties settled the action before a final judgment was entered. See affidavit of Ted Mellon, p. 4 ("The $16.5 million verdict was compromised by a confidential settlement prior to the jury's consideration of punitive damages . . ."). Moreover, Mellon was not a party to the Clark County action, in fact, he was named a defendant and successfully moved to have that action dismissed as to him. Now Mellon seeks to use that same litigation as a basis to transfer venue to Nevada. Moreover, even if the 2007 jury trial was relevant, Landess' testimony is still not critical because the transcripts of proceedings and orders entered by the court would be the best evidence of what occurred in that action.

Mellon also claims that Jonathan Crain, Larry Siggelkow and Cameron Stuart are Nevada residents and will also testify. Not only have some of these witnesses conspired with Mellon to cancel this agreement, but Mellon does not identify what they will testify to. Considering the number of witnesses in Illinois and California, the issue of the convenience to the witnesses does not so heavily weigh in favor of Nevada as to show Nevada is clearly more convenient forum.

### C.     *It is in the Interest of Justice for this Action to be Tried in Illinois*

Mellon has also failed to demonstrate that transfer to Nevada is in the interest of justice. The interest of justice is a separate component of a §1404(a) transfer analysis (*Flexicorps*, 2007 WL 1560212, * 6) which focuses on the efficient and fair administration of the courts. Relevant to this inquiry is the speed with which the case will go to trial, whether the judge will be familiar with the applicable law, the relationship to the parties and the claims and access to sources of proof. *Id.*

It is in the interest of justice that this matter be tried in Illinois because the plaintiff is a resident of Chicago and a significant portion of the acts complained of occurred in Illinois. For instance, Mellon first approached and befriended Miglin in Chicago, Illinois, representing that he was an acquaintance of her late husband and member of the wealthy Pittsburgh Mellon family. Mellon first learned about the APN and AMP during a meeting in Chicago. Many of the negotiations between the parties also occurred in Chicago, Illinois.

Moreover, it is in the interest of justice to keep this matter in Illinois, because Mellon continues his ongoing scheme to defraud Miglin. As part of that scheme Mellon intends to file certain false and malicious counterclaims if this action is transferred to a forum more friendly to his key witness. In an April 19, 2007 letter to Miglin, Mellon demanded that Miglin personally pay Mellon under both a promissory note and contract executed between AMP and Mellon.[3] Such claims are false and malicious because Mellon has no basis to hold Miglin personally liable for the debts of a corporation. Mellon also made a demand regarding property located in

---

    [3]     Not surprisingly, Mellon has not filed suit on those claims against AMP, a company he and his friend Landess still have significant shareholder interests in.

Chicago, Illinois. If this action is transferred to Nevada, Mellon will likely then file his counterclaim, which will require a Nevada court decide legal issues affecting property in Illinois. Certainly, Illinois has an interest in protecting its own residents from on-going fraud and in deciding issues affecting property in its own state.

Mellon also argues that this case should be before a Nevada judge because it is governed by Nevada law. Miglin disputes that the secretly-cancelled Stock Purchase Agreement requires that this action be governed by Nevada law. Mellon is not only seeking to bind Miglin to an agreement that he secretly cancelled with his key witness the day after it was signed, but the provision regarding choice of law is not applicable to a fraud action. Even if Nevada law applied, the legal issues are not so complicated that a judge sitting in the Northern District of Illinois could not adequately apply Nevada law.

The issue of access to proof also does not conclusively favor transfer to Nevada. A significant number of the witness are located in Illinois and California and potentially Michigan and Florida too. As admitted by Mellon in response to Miglin's motion to strike his affirmative defenses, Miglin has in her possession much of the physical evidence, including a copy of the signed Stock Purchase Agreement, the one secretly cancelled by Mellon the day after it was signed. Moreover, most of the witness and documents not located in Illinois are actually located in California. As such, the parties access to proof does not conclusively favor transfer to Nevada and Mellon's motion to dismiss should be denied.

## CONCLUSION

For the foregoing reasons, Miglin requests the court deny Mellon's Motion to Transfer this Matter to the United States District Court for the District of Nevada.

**MARILYN MIGLIN**


By: /s/ Rafey S. Balabanian
      One of Ms. Miglin's Attorneys

Cornelius P. Brown (ARDC no. 0312355)
Rafey S. Balabanian (ARDC no. 6285687)
COHON RAIZES & REGAL LLP
208 South LaSalle Street, Suite 1860
Chicago, Illinois 60604
312/726-2252 (office)