# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARILYN MIGLIN,                      )
                                     )
                    Plaintiff,       )        No. 2007 C 6863
                                     )
        v.                           )
                                     )        **Judge Kendall**
JAMES JOSEPH "TED" MELLON,           )
                                     )        Magistrate Judge Valdez
                    Defendant.       )

## AFFIDAVIT OF MARILYN MIGLIN

Marilyn Miglin, being first duly sworn on oath, states and affirms the following facts in support of her response to Mellon's Motion to Transfer:

1.    I am familiar with the material allegations of Miglin's Response to Mellon's Motion to Transfer heretofore filed in the above-entitled cause, and the allegations contained therein are true in substance and in fact and are incorporated herein as if fully set forth.

2.    I have personal knowledge of the facts contained in this affidavit and, if sworn as a witness in this cause, I could competently testify as to them.

3.    I met James Joseph "Ted" Mellon ("Mellon") in 1999.  When we met, Mellon represented to me that he was an old friend of my late husband Lee Miglin.

4.    Mellon also told me that he was related to the Pittsburgh Mellon family that made its fortunes in banking, oil, and aluminum.

5.    In 1999 and 2000, I met several times with Mellon in Chicago, Illinois.

6.    During one meeting in Chicago, Illinois, in February 2000, Mellon first told me about a device, invented by Dr. Dennis P. Gordon, which had the potential to be successfully used in the treatment of spider veins.  The device was named the Arachnophlebectomy Needle

(the "APN"). During that same meeting, in Chicago, Illinois, Mellon also informed me that the patent for the technology had been purchased by a company named Advance Medical Products Inc., ("AMP"). Mellon and I had further meetings in Chicago, Illinois to discuss the APN and my potential investment in AMP. See June 12, 2000 letter from Jason Landess to Ted Mellon attached to this affidavit as exhibit 1.

7.     Mellon represented to me that he was investing money in AMP.

8.     On August 15, 2000, defendant James Joseph "Ted" Mellon ("Mellon") and I entered into the Agreement for Sale and Transfer of Stock ("Stock Purchase Agreement") in which Mellon and I each agreed to purchase 625 shares of stock in AMP from Jason Landess ("Landess") and Jonathan Crain ("Crain") for $2.5 million. A true and correct copy of the fully-executed Stock Purchase Agreement is attached to this affidavit as exhibit 2.

9.     I executed the agreement based upon certain representations by Mellon, including that he was an acquaintance of my former husband, a member of the wealthy Pittsburgh Mellon family, and that Mellon himself was investing $2.5 million of his own money in AMP for the same number of shares I agreed to purchase.

10.     On August 16, 2000 (the day after I signed the Stock Purchase Agreement), Mellon, Landess, and Crain executed a separate agreement ("Mellon Recision Agreement") purporting to rescind and terminate the portion of the Stock Purchase Agreement obligating Mellon to purchase stock in AMP. At the time, I had no knowledge of and did not consent to the Mellon Recision Agreement. I was not a signatory to the Mellon Recision Agreement – only Mellon, Landess, and Crain signed such agreement. I was only subsequently made aware of the Mellon Recision Agreement. A true and correct copy of the Mellon Recision Agreement, with a

2

copy of Landess' cancelled shares in AMP is attached to this affidavit as group exhibit 3.

11.    Instead of purchasing shares in AMP for $2.5 million as Mellon represented to me that he would, Mellon secretly entered into an agreement on August 21, 2000 (the "Mellon Exchange of Stock Agreement") with Landess for an exchange of stock.  Under the Mellon Exchange of Stock Agreement, Mellon received 862.5 shares of AMP stock in return for Mellon giving Landess 1,250 shares of stock in his company, Mellon Investments Internationale., Inc.  A true and correct copy of the Mellon Exchange of Stock Agreement between Landess and Mellon is attached to this affidavit as exhibit 4.

12.    I would have never purchased shares in AMP for $2.5 million if I would have known that Mellon would thereafter, within one week, cancel his obligation to pay $2.5 million for 625 shares in AMP and instead exchange his shares in a closely-held business named Mellon Investments Internationale, Inc., for 862.5 of Landess' shares in AMP.

13.    Upon information and belief, Mellon Investments Internationale, Inc. is a shell corporation used by Mellon to defraud investors.  See Indictment and Judgement, *United States of America v. Mellon*, case no. 01-CR-333, United States District Court for the District of Colorado, ¶1, and attached to this affidavit and Complaint for Fraud, *Tiffini R. Hughes v. Ted J. Mellon*, case no. BC24288, Superior Court of the State of California,¶¶4,14,15 attached as group exhibit 5.  See also print screen from the Nevada Secretary of State website showing that Mellon Investments Internationale, Inc.'s status as a corporation was revoked on June 1, 2002, attached to this affidavit as exhibit 6.

14.    Attached to this affidavit as exhibit 7, is a true and correct copy of a Receipt and Acknowledgment I signed in April 2001, approximately eight months after Mellon purportedly

3

cancelled the Stock Purchase Agreement. Jason Landess placed this document in front of me and told me it was a receipt acknowledging that I received a Promissory Note dated August 15, 2000 marked "paid in full" and AMP Stock Certificates. I did not realize until much later that it also contained language unrelated to the receipt, which referenced the cancellation of the stock agreement. Notwithstanding my signature, I still had no knowledge of the Mellon Recision Agreement or the Mellon Exchange of Stock Agreement.

15.    AMP's efforts to sell the APN were nationwide. Mellon's efforts to sell the APN primarily occurred in Chicago, Illinois and in the state of Michigan. Additional investors were sought in Florida and distribution efforts took place in California.

16.    After the Stock Purchase Agreement was executed, Ted Mellon operated a sales office for AMP out of my office in Chicago, Illinois.

17.    From 2000 through 2002, AMP held several Board of Directors meetings and shareholders meetings in Chicago, Illinois. A true and correct copy of notice and minutes of various shareholder and board meetings from September 22, 2000, October 19, 2000, November 16, 2000, January 15, 2001, May 30, 2002, and June 18, 2002 are attached to this affidavit as group exhibit 8.

18.    Western Medical Devices ("WMD"), a California Corporation, was the distributor of the APN and has many documents relevant to this litigation. All of its principals are residents of California, and can provide testimony to establish that AMP was a poorly conceived idea and the shares that I received in AMP were not worth my investment. Specifically, David Tamayo, Tim Connelly, Michael Torrell, Joe Daniels, M.D., are all residents of California and can testify about the business relationship between WMD and AMP, and the lack of success in marketing

4

and selling the APN. Joe Daniels, M.D. and Theodore Teruya, M.D. will also testify regarding tests of the APN performed by Kaiser Hawaii and the viability of the APN.

19.    Tests of the APN were also performed by doctors in the Department of Dermatology, Northwestern University Medical School in Chicago, Illinois.

20.    The following individuals, all residents of Illinois, were involved in testing the APN at Northwestern University and can testify to testify to the viability and marketability of the APN: Jean-Christophe Lapiere, MD, Charles Gambla, MD, and Dennis West, PhD.

21.    On or about July 25, 2001, Mellon resigned his position as one of the directors of AMP. See July 25, 2001 letter from Mellon to the Board of Directors of AMP and the August 7, 2001 letter from Jason Landess to AMP Shareholders, attached to this affidavit as group exhibit 9.

22.    Long after making my investment in AMP, I discovered that not only had Mellon not invested in AMP, but, he obtained my investment proceeds, or, a significant portion thereof, and used such proceeds for his own benefit and not to promote sales of the APN. For instance, I learned that Mellon received a check for $553,635.95 from Landess on or about September 20, 2000, which represents a portion of my investment proceeds, as payment for Mellon's efforts in inducing me to invest money in AMP. See Distribution of September 20, 2000 Payment from Marilyn Miglin and copy of September 20, 2000 check from Landess to Mellon, all attached to this affidavit as group exhibit 10.

23.    I have been informed by others and believe that Mellon is participating in a larger conspiracy to further defraud me and convert my assets for Mellon's own use and benefit by planning to initiate further litigation against me related to my former interest in AMP, all in an

5

effort to force me to pay him an exorbitant settlement to buy my peace.

24.    I received a demand letter dated April 19, 2007 ("Demand Letter") from Mellon. In the Demand Letter, Mellon threatened litigation against me and demanded payment from me personally on three false claims. A true and correct copy of the Demand Letter, and the attachments therewith, is attached to this affidavit as exhibit 11.

25.    In item one of the Demand Letter, Mellon demands that I personally pay Mellon $125,000 plus interest under a promissory note executed between AMP and Mellon which promissory note was attached to the Demand Letter. A review of the promissory note shows that I am not personally obligated to pay the promissory note under which he demanded payment.

26.    In item two of the Demand Letter, Mellon claims that I personally contracted to purchase Mellon's stock in AMP for $3.5 million and he attached to his letter the agreement on which his claim is based. This claim is false. A review of the contract under which he makes demand clearly shows it is between AMP and Mellon. Also in item two, Mellon states that part of his alleged damages arise from Mellon being "relocated from California to Michigan" to get involved in marketing the APN.

27.    In item three of the Demand Letter, Mellon makes another false claim regarding an interest he now claims in real property located in Chicago, Illinois, by reason of a non-binding letter of intent dating back to 2001.

28.    On information and belief, Mellon intends to file counterclaims against me based upon the demands in his April 19, 2007 letter if this court grants his motion to transfer venue to Las Vegas, Nevada.

29.    On information and belief, Mellon has delayed filing any counterclaims in this

action, including his threatened claims involving real property in Chicago, to avoid any negative impact such counterclaims may have on his motion to transfer venue.

30.    I have been involved in two actions related to the sale of the APN and WMD. The first action to go to trial was brought by WMD (at the direction of Jason Landess) in Superior Court of California, case no. 04CC02110, against myself and others. A directed verdict in favor of me and all of the defendants was entered in 2006 and that suit was dismissed with prejudice.

31.    The second action involving the APN resulted in another jury trial several months later, in early 2007. Jason Landess was one of the plaintiffs in that action, which took place in Clark County, Nevada, which action consolidated four other lawsuits related to the creation and attempted sale of the APN. Mellon was named as a defendant to that action but he filed a motion to dismiss, which was granted. The parties settled that case after the jury had rendered a verdict as to liability. At the time the parties settled that suit, there was pending a motion for new trial and a motion to enforce a prior settlement agreement against Landess (both of which the mediation judge opined would be granted). The action was settled before these motions were decided and before the verdict had been entered. The court entered the verdict only as an administrative act well after the case had been settled. Judgement was never entered against me or any of the defendants.

32.    I have learned through conversations with others, various articles (see exhibit A to the Complaint), and court documents that Mellon has lured others into other investment scams, involving Mellon Investments Internationale, Inc. and Mellon's representations that he is a member of the "Pittsburgh Mellon" banking family.  See group exhibit 5 to this affidavit.

7

33. Landess was and continues to be a close friend and business partner of Mellon. I have also read investigative news articles stating that Landess has great influence in the Las Vegas court system.   See article *In Las Vegas, They're Playing with a Stacked Judicial Deck*, Los Angeles Times, June 8, 2006, attached to this affidavit as exhibit 12.

34. Under penalty of perjury, the undersigned certifies that the statements set forth in this affidavit are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Affiant further sayeth not.

_____
Marilyn Miglin

# EXHIBIT 1



LANDESS & ASSOC
L & A
ATTORNEYS AT LAW

JASON G. LANDESS*

June 12, 2000

Mr. Ted Mellon
30525 Avenue Del Padre
Cathedral City, CA 92234



Re:  Arachnophlebectomy Needle

Dear Ted:

Enclosed are the materials you need in order to make an informed presentation to Marilyn Miglin this week. Exhibit "1" is the color photographs I took of Catherine Shelton's leg before and after Dr. Gordon treated her with the prototype of the Needle. The first photograph shows the spray of spider veins immediately prior to the procedure. The second photograph shows the same area immediately after treatment. The third photograph was taken approximately six weeks after treatment. The fourth photograph was taken approximately five months after treatment. It even looks better now. The same result was obtained with several other subjects. The present treatment is even more effective because we now have machined needles in two different diameters.

Exhibit "2" is an abbreviated business plan for Advanced Medical Products, Inc. I am the president of that corporation. Jonathan and I control a majority interest in that corporation. That corporation presently owns and controls all of the right, title and interest in the Needle.

Exhibit "3" is a confidential market study that I contracted for back in November of 1999. As you can see from reading that analysis, it is estimated that the worldwide market for treatment of spider veins by sclerotherapy (saline injection) is one billion dollars. That statistic does not take into account the other significant market of treatment by laser.

Exhibit "4" is an excerpt from statistical studies published over the Internet by the American Academy of Cosmetic Surgery, comprised primarily of dermatologists. As you can see from reading that excerpt, the treatment of spider veins by saline injection is the second most popular cosmetic treatment in the United States. In 1994 there were 339,690 reported procedures. That figure increased in two years to 516,617, an increase of 52%. We do not have access to statistics after 1996, but I expect that the same upward trend will be experienced when those statistics are published due to the maturation of the baby-boom generation.

JL02052

6600 West Charleston Blvd. • Suite 118 • Las Vegas, Nevada 89102 • (702) 320-1411 • Fax (702) 320-1417 • E-mail: Jland@LVDI.net
* Licensed in Nevada, California, and Missouri

Mr. Ted Mellon
June 12, 2000
Two

Finally, I have enclosed one of the prototype needles. We have a smaller diameter for treatment of very small spider veins. But this needle should suffice because you can see its design with the naked eye. As I indicated, the final needle will be a sterilized, disposable, unitary device.

I have also enclosed for your perusal samples of a temporary letterhead that Jonathan came up with. Do you like any of these?

I wish you great success in your trip to Chicago. I am truly having more fun working with you than I have had in a long time. Should you require anything else please feel free to contact me.

Sincerely,

Jason G. Landess

Enclosures

**JL02053**

# EXHIBIT 2

## AGREEMENT FOR SALE AND TRANSFER OF STOCK

THIS AGREEMENT FOR SALE AND TRANSFER OF STOCK (this "Agreement") is made and entered into on the 15 day of August, 2000, by and between JASON G. LANDESS and JONATHAN D. CRAIN (hereinafter collectively the "SELLERS"), MARILYN MIGLIN, an individual, and/or her nominee ("MIGLIN"), and TED MELLON, an individual ("MELLON").

### WITNESSETH:

WHEREAS, JASON G. LANDESS ("LANDESS") is the holder of 2,375 shares of stock in Advanced Medical Products, Inc., a Nevada corporation ("Corporation") evidenced by Stock Certificate No. 1, which represents 95% of the issued and outstanding shares of the Corporation;

WHEREAS, JONATHAN D. CRAIN ("CRAIN") is the holder of 125 shares of stock in the Corporation evidenced by Stock Certificate No. 2, which represents 5% of the issued and outstanding shares of the Corporation;

WHEREAS, SELLERS desire to sell a portion of the Corporation's stock (hereinafter the "Stock") to MIGLIN by LANDESS transferring 600 shares of his Stock in the Corporation to MIGLIN, and by CRAIN transferring 25 shares of his Stock in the Corporation to MIGLIN, and MIGLIN desires to buy the Stock from SELLERS;

WHEREAS, SELLERS desire to sell a portion of the Stock to MELLON by LANDESS transferring 600 shares of his Stock in the Corporation to MELLON, and by CRAIN transferring 25 shares of his Stock in the Corporation to MELLON, and MELLON desires to buy the Stock from SELLERS; and

WHEREAS, MIGLIN, MELLON and SELLERS have reached an agreement upon terms and conditions by which SELLERS are willing to sell and MIGLIN and MELLON are willing to buy the Stock;

NOW, THEREFORE, subject to the following conditions and in consideration of the promises and agreements set forth below, SELLERS, MIGLIN, and MELLON hereby agree as follows:

1. MIGLIN'S PURCHASE PRICE AND PAYMENT. Subject to the terms and conditions set forth below, SELLERS hereby agree to sell the Stock to MIGLIN, and MIGLIN hereby agrees to buy the Stock from SELLERS, for a total Purchase Price (hereinafter the "Purchase Price") of TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00), to be paid as follows:

   A.    MIGLIN shall on or before August 20, 2000, pay the sum of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00) by personal check dated August 20, 2000.

1

B    MIGLIN shall on or before September 20, 2000 pay the sum of
ONE MILLION TWO HUNDRED FIFTY THOUSAND
DOLLARS ($1,250,000.00) by cashier's check and/or wire transfer
to Jason G. Landess, P.C.'s Trust Account, Bank of America
Account Number 014434096, ABA Routing Number 122400724.

C.    MIGLIN shall on or before June 20, 2001 pay the additional sum
of ONE MILLION DOLLARS ($1,000,000.00) by cashier's check
and/or wire transfer to Jason G. Landess, P.C.'s Trust Account,
Bank of America Account Number 014434096, ABA Routing
Number 122400724. As evidence of this obligation, MIGLIN
agrees to execute and deliver a promissory note in favor of
SELLERS in the sum of ONE MILLION DOLLARS
($1,000,000.00) (the "Note"). The Note shall bear interest at the
rate of 11.5% simple interest per annum and the entire balance of
unpaid principal and interest shall be paid on or before June 20,
2001.

2.   MELLON'S PURCHASE PRICE AND PAYMENT. Subject to the terms and
conditions set forth below, SELLERS hereby agree to sell the Stock to MELLON, and MELLON
hereby agrees to buy the Stock from SELLERS, for a total Purchase Price (hereinafter the
"Purchase Price") of TWO MILLION FIVE HUNDRED THOUSAND DOLLARS
($2,500,000.00), to be paid as follows:

A.   MELLON shall on or before August 15, 2000, pay the sum of TWO
MILLION FIVE HUNDRED THOUSAND DOLLARS
($2,500,000.00) by cashier's check and/or wire transfer to Jason G.,
Landess, P.C.'s Trust Account, Bank of America Account Number
014434096, ABA Routing Number 122400724.

3.   EXECUTION, DELIVERY AND TRANSFER OF STOCK. Upon payment of the
consideration recited in Paragraph 1(A), SELLERS shall execute Stock Certificate No. 1 and
Stock Certificate No. 2 and turn those certificates over to the Corporation. The
Secretary/Treasurer of the Corporation shall then be authorized and directed to issue Stock
Certificate No. 3 for 625 shares to MIGLIN, which certificate shall represent 25% of the issued
and outstanding stock of the Corporation. Upon issuance of Certificate No. 3 to MIGLIN, the
Secretary/Treasurer shall deliver that certificate to Southwest Escrow Company ("Southwest") in
Las Vegas, Nevada to be held in escrow until MIGLIN pays all the amounts due under Paragraph
1. SELLERS shall execute a Safekeeping Agreement with Southwest for the purpose of
escrowing Certificate No. 3 until MIGLIN has paid all of the sums described in Paragraph 1.
Upon payment of all sums MIGLIN is required to pay under Paragraph 1, SELLERS shall
immediately direct Southwest to release and deliver Certificate No. 3 to MIGLIN. MIGLIN shall
enjoy all voting rights and other rights and privileges attendant to common stock ownership in
the Corporation during the time Certificate No. 3 is in escrow. Upon payment of the
consideration recited in Paragraph 2(A), SELLERS shall authorize and direct the

2

Secretary/Treasurer of the Corporation to issue Stock Certificate No. 4 for 625 shares to MELLON, which certificate shall represent 25% of the issued and outstanding stock of the Corporation. The Secretary/Treasurer shall thereafter issue the remaining 50% of the stock as directed by SELLERS.

4. SELLERS' REPRESENTATIONS: The following are representations, warranties and covenants of SELLERS to MIGLIN and MELLON, it being understood and agreed that MIGLIN and MELLON'S obligations hereunder are and shall be fully conditioned upon the truth and completeness of any representations and warranties set forth as follows:

   (a)    That the Stock as represented by the Certificates has been duly authorized and validly issued and is fully paid and non-assessable, with no personal liability attaching to ownership thereof;

   (b)    That there are only 2,500 shares of authorized stock in the Corporation;

   (c)    That the Stock is being sold to MIGLIN and MELLON is free and clear of all liens, claims and encumbrances of any kind whatsoever;

   (d)    That they are not a party to any agreement, arrangement or understanding with respect to the authorization, issuance, sale, redemption or other disposition of any shares of the Stock, including, without limitation, any options, warrants, calls, rights or other commitments relating thereto; and

   (e)    That the Corporation is the owner of all right, title, and interest in and to that certain medical device used for the treatment of spider veins known as the "Arachnophlebectomy Needle", and all of the patent rights appurtenant thereto.

5. DEFAULT: Should MIGLIN and/or MELLON default in payment of the amounts due under Paragraph 1 or Paragraph 2, MIGLIN and/or MELLON agree that any and all amounts previously paid to SELLERS shall be forfeited and belong to SELLERS and that MIGLIN and/or MELLON shall not be entitled to any pro rata interest in the stock of the Corporation. Such a default and resulting forfeiture would in no manner preclude SELLERS from pursuing any and all other remedies at law or in equity as described in Paragraph 13 of this Agreement.

6    SURVIVAL: The parties hereto agree that all of their respective representations, warranties and covenants shall survive the closing of this transaction as well as the delivery of the SELLERS' stock certificates and consideration therefore. All representations and warranties as made herein have been relied upon by MIGLIN and MELLON and MIGLIN and MELLON

3

have made no independent inquiry into the truth and accuracy of such warranties and rely solely upon their truthfulness and accuracy in entering into this Agreement.

7. INDEMNIFICATION OF MIGLIN AND MELLON: SELLERS agree to indemnify MIGLIN and MELLON and hold them harmless from and against any and all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, interest and penalties, costs and expenses (including, without limitation, reasonable legal fees and disbursements incurred in connection therewith and in seeking indemnification therefore, and any amounts or expenses incurred as a result of any such proceeding, claim, demand, assessment or judgment) resulting from, arising out of, or imposed upon or incurred by MIGLIN and/or MELLON by reason of:

   a)      Any breach of any representation or warranty of SELLERS set forth in the immediately preceding paragraph of this Agreement; or

   b)      Any other acts or omissions of SELLERS, either before or subsequent to execution of this Agreement, that may cause damages or impose liability upon MIGLIN and/or MELLON as a result of MIGLIN and/or MELLON'S purchase hereunder.

8. AMENDMENTS: This Agreement may be amended, modified or supplemented only by a written instrument executed by the parties hereto. This Agreement may not be assigned nor may any of MIGLIN'S rights to purchase the Stock be sold, hypothecated, transferred, pledged, or assigned to anyone without the prior written consent of SELLERS. SELLERS shall be entitled to sell, hypothecate, transfer, pledge, or assign any of their stock in the Corporation without MIGLIN'S consent and without offering MIGLIN an opportunity to sell any or all of her stock to prospective purchasers of SELLER'S stock.

9. WAIVER: The provisions of this Agreement may be waived only by an instrument in writing executed by the party granting the waiver. No failure on the part of either party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

10. TIME IS OF THE ESSENCE: All obligations to be performed under this Agreement including, but not limited to, MIGLIN'S payment under Paragraph 1 must be made in a timely fashion, time being of the essence.

11. ENTIRE AGREEMENT: This Agreement and the documents executed pursuant hereto set forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede any prior negotiations, agreements, understandings or arrangements between the parties hereto with respect to the subject matter hereof.

4

12. BINDING EFFECT: This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns.

13. REMEDIES: Should any party to this Agreement default in the performance of their obligations, the non-defaulting party shall be entitled to resort to any and all legal and equitable remedies to enforce this Agreement including, but not limited to, specific performance. Each and every remedy shall be cumulative and shall be in addition to any other remedy given hereunder which now or hereafter exists at law or in equity or by statute or otherwise, and the election by a party of one or more remedies shall not constitute a waiver of that party's right to pursue other available remedies.

14. APPLICABLE LAW: This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the internal laws of the State of Nevada applicable to contracts made and to be performed wholly in such state. Any legal action or other proceeding for the enforcement of this Agreement shall be brought only in the County of Clark, State of Nevada.

15. ATTORNEYS' FEES: In the event that legal action is brought with respect to this Agreement, or the rights and obligations of any party thereto, the prevailing party in said action shall be entitled to costs and reasonable attorneys' fees from the non-prevailing party, the amount of which shall be determined by the Court in said action. For the purposes of this paragraph the "prevailing party" shall be that party which is entitled to an award of his or her costs of suit.

16. ADDITIONAL DOCUMENTS: The parties agree to execute such additional documents and to furnish such additional data as may be necessary or desirable to evidence or consummate the transaction provided for herein and specifically vest title or ownership in MIGLIN and MELLON of the Stock which is being acquired by MIGLIN and MELLON under this Agreement.

EXECUTED as of the day and year first above written.

"SELLER"
JASON G. LANDESS

By
Jason G. Landess

"MIGLIN"
MARILYN MIGLIN

By
Marilyn Miglin

"SELLER"
JONATHAN D. CRAIN

By
Jonathan D. Crain

"MELLON"
TED MELLON

By
Ted Mellon

# EXHIBIT 3

<u>AGREEMENT</u>

THIS AGREEMENT (this "Agreement") is made and entered into on the 16th day of August, 2000, by and between JASON G. LANDESS (hereinafter "Landess"), JONATHAN D. CRAIN (hereinafter "Crain"), and TED MELLON (hereinafter "MELLON").

<u>W I T N E S S E T H</u>:

WHEREAS, Landess, Crain and Mellon have entered into an Agreement dated August 15, 2000, (the "Sale Agreement") for the sale of a portion of Landess and Crain's stock in Advanced Medical Products, Inc., a Nevada corporation ("AMP");

WHEREAS, Landess, Crain, and Mellon intend to terminate their respective rights, obligations, and duties arising under the Sale Agreement;

WHEREAS, good and valid consideration has been given by all parties to this Agreement for the termination of the Sale Agreement;

NOW, THEREFORE, subject to the following conditions and in consideration of the promises and agreements set forth below, Landess, Crain, and Mellon hereby agree as follows:

1. The Sale Agreement is hereby rescinded and terminated in all respects as to the rights, obligations, and duties of Landess, Crain, and Mellon towards one another. The intention of the parties to this Agreement is to extinguish any legal rights arising out of the Sale Agreement against one another and to place the parties in the same position they were prior to the execution of the Sale Agreement. The Sale Agreement as to Landess, Crain, and Mellon is to be considered void *ab initio* and of no effect. All other terms and conditions and the rights, obligations, and duties under the Sale Agreement by and between Landess, Crain, and Marilyn Miglin shall remain in full force and effect. This novation and rescission agreement is not intended in any way to affect the legal enforceability of the Sale Agreement as to Landess, Crain, and Marilyn Miglin.

EXECUTED as of the day and year first above written.

"LANDESS"
JASON G. LANDESS

By _____
Jason G. Landess

"CRAIN"
JONATHAN D. CRAIN

By _____
Jonathan D. Crain

"MELLON"
TED MELLON

By _____
Ted Mellon

1





0600053

Number 5

Shares 237.5

INCORPORATED UNDER THE LAWS OF THE
STATE OF NEVADA

## ADVANCED MEDICAL PRODUCTS, INC.

This Corporation is authorized to issue 2,500 Common Shares at No Par Value

THIS CERTIFIES THAT _____ Ted Mellon _____ is the owner of
_____ Two Hundred Thirty-Seven and One-half _____ fully paid and nonassessable
shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or
by duly authorized Attorney upon surrender of this Certificate properly endorsed

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized
officers and its Corporate Seal to be hereunto affixed this 11TH day of August A.D. 2000.

President

Secretary/Treasurer

PASTE CANCELLED CERTIFICATE IN THIS SPACE

PASTE REVENUE STAMPS FOR ORIGINAL ISSUE IN THIS SPACE

RECEIVED CERTIFICATE No. _____ 5

FOR _____ 237.5

THIS _____ 27th _____ DAY OF _____ FEB.

SHARES
2001
2000
19

TRANSFER DETAILS FOR SURRENDERED CERTIFICATES

NEW CERTIFICATE ISSUED TO:

| | NO. OF SHARES TRANSFERRED | NO. OF NEW CERTIFICATES |
|---|---|---|
| Larry Siegelkow | 25 | 10 |
| Ted Mellon | 212.5 | 11 |
| | | |
| | | |

04000090

CERTIFICATE No. _____ 5

FOR _____ 237.5 _____ SHARES

ISSUED TO

Ted Mellon

DATED _____ August 16 _____ 19-2000

TRANSFER FROM ORIGINAL ISSUE BELOW

FROM WHOM TRANSFERRED:

| | NO. OF SHARES TRANSFERRED |
|---|---|
| | |

DATED _____ 19

| NO. ORIGINAL CERTIFICATE | NO. ORIGINAL SHARES |
|---|---|
| | |

PASTE CANCELLED CERTIFICATE IN THIS SPACE

PASTE REVENUE STAMPS FOR ORIGINAL ISSUE IN THIS SPACE

RECEIVED CERTIFICATE No. _____

FOR _____ SHARES

THIS _____ DAY OF _____ 19 ___

CERTIFICATE No. _____ 4 _____

FOR _____ 625 _____ SHARES

ISSUED TO

Ted Mellon

DATED _____ August , _19__ 2000

TRANSFER FROM ORIGINAL ISSUE BELOW

FROM WHOM TRANSFERRED:

| NO. ORIGINAL CERTIFICATE | NO. ORIGINAL SHARES | DATED | 19 | NO OF SHARES TRANSFERRED |
|---|---|---|---|---|
| | | | | |

TRANSFER DETAILS FOR SURRENDERED CERTIFICATES

NEW CERTIFICATE ISSUED TO:

| | NO. OF SHARES TRANSFERRED | NO. OF NEW CERTIFICATES |
|---|---|---|
| | | |

06000052

PASTE CANCELLED CERTIFICATE IN THIS SPACE

PASTE REVENUE STAMPS FOR ORIGINAL ISSUE IN THIS SPACE

CERTIFICATE No. ___ 11

FOR ___ 212,5 ___ SHARES

ISSUED TO

Ted Mellon

DATED ___ 3/9/01 ___ 19 ___

TRANSFER FROM ORIGINAL ISSUE BELOW

FROM WHOM TRANSFERRED:

DATED ___ 19 ___

| NO. ORIGINAL CERTIFICATE | NO. ORIGINAL SHARES | NO. OF SHARES TRANSFERRED |
|---|---|---|
| | | |

RECEIVED CERTIFICATE No. ___

FOR ___ SHARES

THIS ___ DAY OF ___ 19 ___

TRANSFER DETAILS FOR SURRENDERED CERTIFICATES

NEW CERTIFICATE ISSUED TO:

| NO. OF SHARES TRANSFERRED | NO. OF NEW CERTIFICATES |
|---|---|
| | |

19000090

# EXHIBIT 4

# AGREEMENT

THIS AGREEMENT (this "Agreement") is made and entered into on the 21st day of August, 2000, by and between JASON G. LANDESS (hereinafter "Landess") and TED MELLON (hereinafter "MELLON").

## W I T N E S S E T H

WHEREAS, Landess is the holder of 1,725 shares of stock in Advanced Medical Products, Inc., a Nevada corporation ("AMP");

WHEREAS, Mellon is the holder of 2,500 shares of stock in Mellon Investments Internationale, Inc., a Nevada corporation ("MII");

WHEREAS, Landess and Mellon entered into an Agreement on August 15, 2000, providing for Mellon to purchase 25% of AMP's stock from Landess for the sum of TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00);

WHEREAS, Landess and Mellon have now agreed to rescind that portion of the August 15, 2000 Agreement relating solely to Mellon's purchase of AMP's stock from Landess by substituting instead an exchange of stock for equal value;

NOW, THEREFORE, subject to the following conditions and in consideration of the promises and agreements set forth below, Landess and Mellon hereby agree as follows:

1. The parties hereby agree that the August 15, 2000 Agreement is hereby rescinded with respect solely to the sale of Landess' stock in AMP to Mellon and Mellon's obligation to pay the sum of TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00) for said stock. All other terms and conditions of that Agreement are to remain in full force and effect.

2. Mellon hereby agrees to transfer 1,250 shares of his stock in MII to Landess in exchange for Landess transferring 862.5 shares of his stock in AMP to Mellon.

3. Both parties agree to authorize the Secretary/Treasurer of the respective corporations to immediately issue new stock certificates in the aforementioned amounts to each party, or, if necessary, surrender their stock certificates to the Secretary/Treasurer of their respective corporations so that new stock certificates can be issued in order to effectuate the terms of this Agreement.

4. Both parties stipulate and agree that the stocks being transferred under this Agreement are of equal value, said value being TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00).



PENGAD 800-631-6989    EXHIBIT

5. This Agreement may be amended, modified or supplemented only by a written instrument executed by the parties hereto.

6. This Agreement and the documents executed pursuant hereto set forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede any prior negotiations, agreements, understandings or arrangements between the parties hereto with respect to the subject matter hereof.

7. This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the internal laws of the State of Nevada applicable to contracts made and to be performed wholly in such state. Any legal action or other proceeding for the enforcement of this Agreement shall be brought only in the County of Clark, State of Nevada.

8. In the event that legal action is brought with respect to this Agreement, or the rights and obligations of any party thereto, the prevailing party in said action shall be entitled to costs and reasonable attorneys' fees from the non-prevailing party, the amount of which shall be determined by the Court in said action. For the purposes of this paragraph the "prevailing party" shall be that party which is entitled to an award of his or her costs of suit.

EXECUTED as of the day and year first above written.

"LANDESS"                              "MELLON"

JASON G. LANDESS                       TED MELLON

By _____                 By _____
Jason G. Landess                          Ted Mellon