# EXHIBIT 11

Marilyn Miglin
25 E. Scott St.
Chicago, Il 60610-5224

April 19, 2007

Dear Marilyn,

I was made aware about 6 months ago concerning the AMP/Dennis Gordon litigation, I remained out of the fray, however after reading the transcripts of the case I am truly saddened for all of us. What I am truly saddened about is the degree of deceit and conspiracy that was executed by you, Dennis Gordon and Duke. I would like to speak to you and you alone about three issues, copies enclosed.

Item one. The Promissory Note for One Hundred and twenty five thousand dollars (125,000.00) plus eleven and three quarter's percent (11.75%) interest. You can consider this the Demand for that Note.

Item Two. Marilyn you and I have a contract for three and half million dollars ($3.5) for my stock in AMP. This agreement was reached when you called me from Las Vegas from the meeting that you were in session with Jason Landess, Larry Siggelkow and the Malaysian group. Putting my trust and confidence that you were sincere, but little did I know that the conspiracy was already underway between you, Duke and David Tamayo. I feel that you took advantage of my health situations and other circumstances that I had to deal with. As you recall, my associates and myself were the only ones that had put together a marketing plan and actually sold needles. I also relocated from California to Michigan so that I could get involved in the marketing.

Item Three. There is an agreement between you, Doug Artusio and myself that if I brought the parties together to develop a hotel on Huron Street, which I did, and invested monies into the feasibility study, in return my percentage of ownership would be Twenty Five percent (25%). I was told by Doug Artusio and Duke Miglin that the project was not going forward. The facts show that was also deceitful. I was alerted to this just recently by a Chicago attorney and a local newspaper reporter that the hotel will open in October 2008. Marilyn this too is just another example in the manner that you treated your legal obligations to me. I do not have the appetite for litigation; however if you are looking for a global solution to all these situations that are not going to disappear, please call me.

I can be reached at 760-831-9418.

Regards,

Ted Mellon

## PROMISSORY NOTE

$125,000.00                    Las Vegas, Nevada                    September 26 2000.

Advanced Medical Products, Inc., a Nevada corporation, promises to pay to Ted Mellon in Cathedral City, California, at 30525 Avenue Del Padre, or such other place as the holder hereof may designate in writing, the principal sum of ONE HUNDRED TWENTY-FIVE THOUSAND DOLLARS ($125,000.00) together with simple interest thereon at the rate of eleven and one-half percent (11.5%) per annum from the date of this Note until paid in full. Principal and accrued interest shall be due and payable on demand.

This Note shall be construed, governed and enforced in accordance with the laws of the State of Nevada.

In the event it becomes necessary to institute an action to enforce the terms and conditions of this Note, the prevailing party shall be entitled to recover their reasonable attorney's fees and costs of suit. The "Prevailing Party" shall be that party who is entitled to recover his or its costs of suit.

ADVANCED MEDICAL PRODUCTS, INC.,
a Nevada corporation

JASON G. LANDESS, President

Ted Mellon CEO.
9-26-2000

LAW OFFICES

# BALLARD SPAHR ANDREWS & INGERSOLL, LLP

1225 17TH STREET, SUITE 2300
DENVER, COLORADO 80202-5596
303-292-2400
FAX: 303-296-3956
LAWYERS@BALLARDSPAHR.COM

PHILADELPHIA, PA
BALTIMORE, MD
CAMDEN, NJ
SALT LAKE CITY, UT
VOORHEES, NJ
WASHINGTON, DC

THOMAS H. DUNCAN
DIRECT DIAL: 303-299-7321
DUNCAN@BALLARDSPAHR.COM

March 12, 2002

**Via Federal Express**

Mr. Ted Mellon
4860 Turfway Trail
Harbor Springs, Michigan 49740

Re:  Stock Purchase Agreement

Dear Ted:

I have enclosed two execution copies of the Stock Purchase Agreement between you and Advanced Medical Products, Inc. (the "Company"). As we discussed, please execute both copies of the Agreement, and the related Stockholder Disclosure, on the tabbed pages. Then forward both of the executed Agreements to Dave Rubenstein in the enclosed FedEx envelope. Mr. Rubenstein will arrange for execution of the agreement on behalf of the Company and forward a copy to us.

Please give me a call if you have any questions in connection with this matter.

Yours truly,

Thomas H. Duncan

THD/lt
Enclosures

CO DOCS A #104793 v1

## STOCK PURCHASE AGREEMENT

STOCK PURCHASE AGREEMENT (the "Agreement") dated March _13_, 2002 by and between Advanced Medical Products, Inc., a Nevada corporation (the "Corporation") and Ted Mellon, an individual resident of California ("Stockholder").

WHEREAS, the Corporation owns the rights to U.S. Serial Application No. 09/421,611 (the "Patent"), and has the right thereunder to manufacture, sell and license arachnophlebectomy needles (the "Product"); and

WHEREAS, Stockholder owns 837.5 shares (33.5%) of the issued and outstanding common stock, no par value, of the Corporation (the "Purchased Shares"); and

WHEREAS, Stockholder desires to sell to the Corporation and the Corporation desires to purchase from Stockholder all of the Purchased Shares.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the parties agree as follows:

1.  Purchase of Stock. At the Closing, the Corporation shall purchase and redeem from Stockholder, and Stockholder shall sell, transfer and deliver to the Corporation, all of Stockholder's right, title and interest in and to the Purchased Shares free and clear of all options, warrants, liens, claims and encumbrances of any nature whatsoever. In addition, at Closing all indebtedness owing by Corporation to Stockholder (including the $125,000 advance) shall be deemed cancelled.

2.  Closing. The closing ("Closing") shall take place (the "Closing Date"), concurrent with the first to occur of the merger of the Corporation with and into Western Medical Devices, Inc. ("Western") or its affiliates or the sale of substantially all of the Corporation's assets to Western or its affiliates at the offices of Gardner, Carton & Douglas or at such other date and place as the parties may agree.

3.  Purchase Price and Payment. The Purchase Price for the Purchased Shares and in full satisfaction of that certain Promissory Note dated September 25, 2002 in the original principal amount of $125,000 (the "Note") shall be $2.00 for each unit of Product sold by the Corporation (not including any Product distributed without charge and less returns), up to a maximum payment of $3,145,000. The amounts payable pursuant to this Section 3 shall be payable quarterly commencing the last day of the first full calendar quarter following Closing and each payment shall be accompanied by a statement calculating the payment for such period. Stockholder shall have the right, at his sole expense and subject to reasonable notice, to audit such statements once each calendar year; provided, however, that any such audit shall be conducted in the manner so as not to unreasonably interfere with the business of the Corporation.

4.  Deliveries at Closing. At the Closing, Stockholder shall deliver to the Corporation (a) the stock certificate or certificates representing the Purchased Shares, duly endorsed in blank or with separate stock powers duly endorsed in blank, in proper form for

transfer and (b) all other property of the Corporation in Stockholder's possession, including all books and records, (c) a resignation from all positions with the Corporation and (d) the cancelled Note and an acknowledgment of the cancellation of any amounts owing to Stockholder by Company, including the $125,000 indebtedness.

5.    Covenants of the Stockholder.

5.1.    Proprietary Information. "Proprietary Information" means all information pertaining in any manner to the business of the Corporation, unless (i) the information is or becomes publicly known through lawful means; (ii) the information was part of Stockholder's general knowledge prior to Stockholder's relationship with the Corporation; or (iii) the information is disclosed to Stockholder without restriction by a third party who rightfully possesses the information and did not learn of it from the Corporation. This definition includes, but is not limited to, (A) schematics, techniques, development tools, processes, computer printouts, computer programs, design drawings and manuals, electronic codes, formulas and improvements; (B) information about costs, profits, markets, sales, customers, and bids; (C) plans for business, marketing, future development and new product concepts; and (D) information on the Corporation's employees, agents, or divisions.

5.2.    Use of Information. Stockholder shall maintain in confidence and shall not, directly or indirectly, disclose or use, either during or after the term of this Agreement, any Proprietary Information, confidential information, or know-how belonging to the Corporation, whether or not it is in written or permanent form. At Closing, Stockholder shall deliver to the Corporation all material in Stockholder's possession, custody or control relating to the Corporation's business, including Proprietary Information.

5.3.    Nonsolicitation. Stockholder shall not, for a period of one year immediately after the Closing either directly or indirectly (a) call on, solicit, or take away any of the Corporation's customers or potential customers either for Stockholder or for any other person or entity, or (b) solicit or take away or attempt to solicit or take away any of the Corporation's employees or Stockholder either for Stockholder or for any other person or entity.

6.    Representations and Warranties of Stockholder. Stockholder hereby represents and warrants to the Corporation that, except as set forth in a disclosure letter from Stockholder to the Corporation, attached hereto as Exhibit A:

6.1.    Title to Shares. Stockholder owns the Shares free and clear of all options, warrants, liens, claims and encumbrances of any nature whatsoever and the Shares represent all of the issued and outstanding shares of capital stock of the Corporation owned beneficially or of record by Stockholder.

6.2.    Authorization. Stockholder has all requisite power and authority to execute and deliver this Agreement, to carry out his obligations hereunder and to consummate the transactions contemplated hereby. This Agreement constitutes the valid and binding agreement of Stockholder and shall be enforceable against him in accordance with its terms, subject to applicable bankruptcy and creditors' rights and applicable principles of equity.

-2-

6.3. _No Violation._ Neither the execution and delivery of this Agreement by Stockholder nor the consummation by him of the transactions contemplated hereby constitutes a violation of, or conflicts with, or constitutes a default under, or creates or causes the acceleration of the maturity of any debt, obligation or liability affecting the Shares or the Corporation, or results in the creation or imposition of any option, warrant, lien, claim or encumbrance of any nature whatsoever upon any of the Shares under (a) any contract, agreement or other commitment to which Stockholder (or, to Stockholder's knowledge, the Corporation) is a party or by which he (or, to Stockholder's knowledge, the Corporation) is bound; (b) any judgment, decree, order, regulation or rule of any court or governmental authority; or (c) any statute or law. No consent of any person or entity is required in connection with the execution, delivery and performance of this Agreement by Stockholder.

6.4. _Unknown Liabilities._ To Stockholder's knowledge, the Corporation is not subject to any liability, including without limitation unasserted claims, whether absolute contingent, accrued or otherwise, except those set forth in the financial statement of the Corporation attached hereto as Exhibit B. Other than arising under this Agreement, the Corporation has no liabilities, obligations or agreements to or with Stockholder or any person controlled by, controlling or under common control with Stockholder.

6.5. _Patent._ To Stockholder's knowledge, the Corporation owns and possesses all right, title and interest to the Patent and no claim by any third party contesting the validity, enforceability, use or ownership of the Patent has been made, is currently outstanding or is threatened. Stockholder has not received any notice of, nor is he aware of any facts which would indicate a likelihood of infringement or misappropriation by or conflict with any third party with respect to the Patent. To Stockholder's knowledge, the Corporation has not infringed, misappropriated, or otherwise conflicted with any rights of any third parties nor is it aware of any infringement, misappropriation or conflict which will occur as a result of the transactions contemplated hereunder. To Stockholder's knowledge, the Corporation is not party to or bound by any license or other agreements with respect to the Patent. Stockholder has assigned to the Corporation all his right, title and interest in the Patent, the Product and all goodwill associated therewith.

6.6. _Full Disclosure._ Stockholder's representations and warranties do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements herein not misleading. Stockholder acknowledges that he has been given access to all information about the Corporation and its business and prospects as is necessary to enable him to make a fully informed investment decision with respect to his sale of Shares.

7. _Representations and Warranties of the Corporation._ The Corporation hereby represents and warrants to Stockholder that, except as set forth in a disclosure letter from the Corporation to Stockholder:

7.1. _Corporate Organization._ The Corporation is a corporation duly organized, validly existing, and in good standing under the laws of the State of Nevada. The Corporation

has all requisite power and authority (corporate and otherwise) to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.

7.2. **Authorization.** The execution and delivery of this Agreement, the carrying out of the obligations hereunder and the consummation by the Corporation of the transactions contemplated hereby have been duly authorized by all necessary action (corporate and otherwise). This Agreement constitutes the valid and binding agreement of the Corporation and shall be enforceable against it in accordance with its terms, subject to applicable bankruptcy and creditors' rights are applicable principles of equity.

7.3. **No Violation.** Neither the execution and delivery of this Agreement, nor the consummation by the Corporation of the transactions contemplated hereby constitutes a violation of, or conflicts with, or constitutes a default under, or creates or causes the acceleration of the maturity of any debt, obligation or liability affecting the assets of the Corporation, or results in the creation or imposition of any lien, claim or encumbrance of any nature whatsoever upon any of the assets of the Corporation under (a) any term or provision of the Articles of Incorporation or by-laws of the Corporation; (b) any agreement, contract or other commitment to which the Corporation is a party or is bound; (c) any judgment, decree, order, regulation or rule of any court or governmental authority; or (d) any statute or law. No consent of any person or entity is required in connection with the execution, delivery and performance of this Agreement by the Corporation, which consent has not been obtained.

8. **Conditions Precedent.** It shall be a condition precedent to Stockholder's obligations hereunder that, at or prior to Closing, the Corporation shall have complied in all material respects with the covenants required to be performed by it at or prior to the Closing and that the representations and warranties of the Corporation shall be true and accurate in all material respects as of the Closing Date. It shall be a condition precedent to the Corporation's obligations hereunder that, at or prior to Closing, Stockholder shall have complied in all material respects with the covenants required to be performed by him hereunder at or prior to Closing and that the representations and warranties of Stockholder shall be true and accurate in all material respects as of the Closing Date.

9. **Survival and Indemnity.**

9.1. **Survival of Representations, Warranties and Covenants.** All statements made by Stockholder or the Corporation herein or in any other document, instrument or certificate delivered pursuant hereto shall be deemed representations and warranties of the party making such statements. The representations, warranties, covenants and agreements of all parties contained herein shall survive the Closing.

9.2. **Stockholder Indemnity.** Stockholder and his successors and assigns shall indemnify and hold the Corporation and its successors and assigns harmless from, against and in respect of any damage, loss, liability expense (including, without limitation reasonable expert witness and attorneys' fees), action suit, demand or judgment arising from or in connection with any inaccuracy, breach or violation by Stockholder of any of his representations, warranties, covenants or agreements contained in this Agreement or any document, certificate or schedule

delivered by Stockholder hereunder. The Corporation shall be entitled to recover the foregoing by offset against the payments to Stockholder otherwise due hereunder.

9.3. Corporation Indemnity. Corporation and its successors and assigns shall indemnify and hold Stockholder and its successors and assigns harmless from, against and in respect of any damage, loss, liability expense (including, without limitation reasonable expert witness and attorneys' fees), action suit, demand or judgment arising from or in connection with any inaccuracy, breach or violation by Corporation of any of its representations, warranties, covenants or agreements contained in this Agreement or any document, certificate or schedule delivered by Corporation hereunder.

10. General Provisions. The parties hereto further agree as follows.

10.1. Expenses. Each party shall pay all reasonable expenses incurred by or on behalf of him or it in connection with the authorization, preparation, execution and performance of this Agreement, including without limitation, all reasonable fees and expenses of agents, representatives, counsel and accountants. Stockholder shall pay all transfer taxes and title charges payable by reason of the transfer of the Shares hereunder.

10.2. Brokers. The parties each represent that none has retained nor used the services of any individual or entity so as to entitle such individual or entity to any compensation for a brokers', agents' or finders' fee or commission with respect to the transactions contemplated hereby.

10.3. Notices. All notices, requests, demands and other communications given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, given by prepaid telegram or mailed first-class, postage prepaid, registered or certified mail as follows:

If to the Corporation:

Advanced Medical Products, Inc.
Marilyn Miglin, L.P.
127 West Huron
Chicago, Illinois 60610
Attn: Duke Miglin

With a copy to:

Gardner, Carton & Douglas
321 North Clark Street
Suite 3400
Chicago, Illinois 60610
Attn: Dennis J. Carlin

If to Stockholder:

Ted Mellon
1350 Calle Rolf
Palm Springs, CA 92264


With a copy to:

Ballard Spahr Andrews & Ingersoll, LLP
1225 17th Street, Suite 2300
Denver, CO 80202
Attn: Thomas H. Duncan

or to such other person or address any party shall furnish to the others in writing.

    11.    **Mutual Release.**  Except with respect to the liabilities and obligations of the parties under this Agreement and the other documents and instruments to be delivered pursuant to this Agreement, effective at Closing the Corporation and Stockholder hereby release and discharge each other and each of their respective successors, assigns, shareholders, officers and directors from all claims, demands and causes of action which they might have against the other by virtue of any matter or state of facts existing on or prior to the date of this Agreement, including all unknown or unanticipated acts, injuries, damages or losses.

    12.    **Assignment; Western Transaction.**

        12.1.   **Assignment.**  Except as provided in Section 12.2 below, this Agreement may be assigned by the Corporation or Stockholder only with the prior written consent of the other party.

        12.2.   **Western Transaction.**  The Corporation and Stockholder anticipate that the Corporation will enter into a transaction (the "Western Transaction") with Western, or another entity controlled or designated by Western (together with Western, the "Successor Entity"), pursuant to which the Corporation will either (i) merge with and into the Successor Entity, or (ii) the Successor Entity will acquire substantially all of the assets of the Corporation. Stockholder hereby consents to the Western Transaction, provided that, in connection therewith:

- the Corporation shall assign this Agreement to, and the obligations of the Corporation under this Agreement shall assumed by, the Successor Entity; and

- the amounts due under Section 3 of this Agreement shall be treated as (i) merger consideration to be paid by the Successor Entity to the Stockholder in the event the Western transaction is structured as a merger or (ii) as the purchase price paid by the Successor Entity for the Shares in an acquisition of the Shares effected immediately prior to the sale of substantially all of the assets of the Corporation to the Successor Entity if the Western Transaction is so structured.

13.     Miscellaneous.  This Agreement shall be governed, construed and enforced in accordance with the laws of the State of Nevada. This Agreement and the documents, instruments and agreements referred to herein set forth the entire agreement of the parties in respect to the transactions contemplated hereby and supersede all prior agreements and understandings relating thereto.  This Agreement shall be binding upon, and inure to the benefit of and be enforceable by the parties hereto and by their respective heirs, executors, legal representatives, successors and permitted assigns.  Any term or condition of this Agreement may be waived or modified at any time by the party hereto which is entitled to the benefit thereof, but only in a duly executed writing.  No waiver by any party hereto of any condition, or of the breach of any term, covenant, representation or warranty contained in this Agreement shall be construed as a further or continuing waiver of any such condition or of the breach of any other term, covenant, representation or warranty of this Agreement.  The Corporation shall not merge with or into a third party, or sell substantially all of its assets to a third party, unless such third party assumes the Corporation's obligations hereunder; provided that consent is hereby given to a merger with or into, or a sale of assets to, Western or its affiliates.

14.     Counterparts.  This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15.     Further Assurances.  At and after Closing, if any further action is necessary to carry out the purposes of this Agreement, the Corporation and Stockholder, as the case may be, shall take all such action without any further consideration therefor.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

THE CORPORATION
Advanced Medical Products, Inc.

By: _____

Its: _____

STOCKHOLDER

_____
Ted Mellon

09/18/2021  11:18   18086671911          JASON LANDESS          PAGE  01/01

# NOTICE OF ASSESSMENT ON THE STOCK OF
## ADVANCED MEDICAL PRODUCTS, INC.

### TO: ALL SHAREHOLDERS

Please take notice that on this date the Board of Directors of Advanced Medical Products, Inc., deeming the best interest of the corporation to so require, have unanimously voted to assess the stock of the corporation the total amount of $30,000.00.

Each stockholder is responsible for paying their respective share of the $30,000.00. Based upon the number of shares owned the following amounts should be paid no later than October 1, 2001:

| Stockholder | % Shares | Assessment Amount |
|---|---|---|
| Ted Mellon | 33.5% | $10,050.00 |
| Marilyn Miglin | 25% | $7,500.00 |
| Jason G. Landess | 16.75% | $5,025.00 |
| Dennis P. Gordon | 16.75% | $5,025.00 |
| Jonathan Crain | 3% | $900.00 |
| Cameron Stuart | 3% | $900.00 |
| Larry Siggelkow | 2% | $600.00 |
| | 100% | $30,000.00 |

Executed this _18th_ day of September, 2001.

DIRECTOR

JASON G. LANDESS

# DELLISART

**DELLISART LODGING**
8975 NESBIT LAKES DRIVE
ALPHARETTA, GA 30022
TELEPHONE: (770) 558-4300
FACSIMILE: (770) 558-4301
E-MAIL: doug.artusio@dellisart.com

June 12, 2001

Ms. Marilyn Miglin
Owner & CEO
Marilyn Miglin Institute
111 Oak Street
Chicago, IL 60611

Re:   Proposed Staybridge Suites Hotel Project;
Southeast Corner of LaSalle and Huron,
Chicago, Illinois

Dear Marilyn:

This letter describes the terms and conditions on which an affiliate of Miglin Properties, L.L.C. ("Miglin") and Dellisart Lodging, L.L.C., a Georgia limited liability company ("Dellisart") and Ted Mellon ("Mellon") are prepared to negotiate the formation of a joint venture (the "Venture") for the proposed development, financing, construction and operation of a Staybridge Suites Hotel (the "Proposed Project") on the land, consisting of approximately one-half acre, at the southeast corner of LaSalle and Huron Streets in Chicago, Illinois (the "Land"). This letter supersedes any prior letter of intent, terms sheet or description of proposed terms between the parties.

1.   **Land Contribution.**  Miglin or its affiliate currently owns free and clear title to the Land at an estimated value of $5,600,000 and will cause it to be contributed to the Venture at a capital account value to be supported by a current MAI approved appraisal and agreed to by the parties. Any change in zoning shall be the responsibility of the Venture. Any environmental issues identified through due diligence shall be the responsibility of Miglin.

2.   **Capital Inducement.** Dellisart Lodging will endeavor to have a cash inducement ("Inducement") paid by Bass Hotels & Resorts for the development of the Proposed Project. Miglin Properties will receive 50% of the negotiated Inducement but not less than $400,000.00 to be paid upon the opening of the Proposed Project. Dellisart and Ted Mellon will be responsible to make up any shortfall of $400,000.00 upon opening of the "Proposed Project, in the event that 50% of the negotiated inducement is less than $400,000.00. Any amount above a $400,000.00 "Inducement" will be split evenly between Dellisart and Ted Mellon.

3.   **Joint Venture Structure.**  The Venture will be organized as a Delaware limited liability company. Dellisart will be controlled and majority owned by Douglas E. Artusio. Mellon will be solely owned and controlled by Ted Mellon. The ownership interests in the Venture will be as follows:

M. Miglin
June 12, 2001
Page 2

| | |
|---|---|
| Miglin | 50% |
| Dellisart | 25% |
| Mellon | 25% |

All money required to begin and continue the Proposed Project in excess of third party financing shall be contributed by all parties on an equal share basis.

4.    **Retail Component.**  A separate retail component shall be constructed on either the first or first and second floors.  This space shall be the responsibility of Miglin and shall be separated either by ownership or other method agreeable to all parties.   Any revenue and expenses of the retail component shall be for the benefit and responsibility of Miglin solely.  Any additional revenue sources such as billboards and rooftop leases shall belong to the Venture and shall be managed by Miglin.

5.    **Financing.**  Total development and construction costs of the Proposed Project (exclusive of Land value) are estimated to be approximately $22,400,000.  Dellisart shall be responsible for arranging a loan guarantee with Bass Hotels & Resorts in the amount of $3,000,000.00. In addition, Dellisart will work with Ted Mellon to secure construction and permanent financing. Miglin may refer additional lenders for consideration based on historical preferences and banking relationships.

6.    **Loan Guarantees.**  Any guarantees required for any of the various loans shall be borne equally in proportion to the parties' interest in the project and shall be several (not joint) personal guarantees by Marilyn Miglin (50%), Douglas Artusio (25%) and Ted Mellon (25%).

7.    **Development.**  Dellisart and Miglin will be jointly responsible for developing the Proposed Project.  Dellisart shall arrange the franchise agreement with Bass Hotels and Resorts for a Staybridge Suites and the marketing of the Proposed Project.

8.    **Developer.**  A Developer will be selected to manage the project and will report to the Venture all progresses in writing on a monthly basis. The Developer will oversee the preparation of a complete budget, architectural design of the Proposed Project ( final approval by Miglin), arranging for the general contractor, and local issues regarding the development of the Proposed Project and shall undertake the necessary rezoning of the property on behalf of the Venture. The expenses of such efforts shall be borne by the Venture. Miglin, Dellisart & Mellon, will split any Development fees that are remaining from the Lender approved budget evenly.

9.    **Management.**  Hotel management shall be handled by Dellisart to the extent not covered by Bass in its operation of the Staybridge Suites. Fees will be based on market rates with market standards for performance.  Retail management shall be handled by Miglin.

M. Miglin
June 12, 2001
Page 3

Additional revenue sources such as billboards and rooftop leases shall be managed by Miglin for fees based on market rates. Venture management shall be by both parties.

10.    **Due Diligence.** During the ninety-day period following the date hereof (the "Due Diligence Period"), the parties will negotiate and seek to agree upon and accomplish the following:

1.    Appraisal of the Land

2.    Feasibility Study for the Proposed Project

3.    Development Budget

4.    Preliminary Financing Plan

5.    Pro Forma Projections

6.    Preliminary Development Plan

7.    Form of LLC Operating Agreement for the Venture

The third party costs for the above due diligence items will be contributed equally by the parties, except that each party will bear its own legal fees in connection with the negotiation of the form of LLC Operating Agreement and the other due diligence items described above. Miglin, Dellisart & Mellon will bear costs, which will be reimbursed at the time of funding of the construction loan.

The LLC Operating Agreement will provide for the parties to seek the re-zoning of the Land for hotel use as required for the Proposed Project, and for the Venture to be terminated at either party's option in the event such re-zoning is not achieved within a specified time frame.

11.    **Non-Binding Letter; Termination.** This letter is not intended to create a binding obligation upon the parties, and the parties shall not be obligated to form or proceed with the Venture unless and until the parties enter into a definitive agreement; provided, however: (i) the parties shall contribute the funds for the due diligence activities described in paragraph 9 above; and (ii) Miglin shall not enter into any agreement or commitment with any third party in respect of the Land during the Due Diligence Period.

If for any reason the parties do not agree upon and accomplish the due diligence items described in paragraph 9 above during the Due Diligence Period, then either party may terminate this letter effective immediately by delivery of written notice, and thereafter neither party shall have any further obligation to the other in respect of the Land or the Proposed Project.

M. Miglin
June 12, 2001
Page 4

    Please confirm your agreement with the foregoing by signing below and returning a signed copy of this letter to us.

                     Very truly yours,

                     Dellsiart Lodging L.L.C.

                     By: _____

AGREED AND ACCEPTED:

MARILYN MIGLIN

By: _____
    Marilyn Miglin

TED MELLON

By: _____  6-25-2001
    Ted Mellon

CH01/12130392.2

# EXHIBIT 12

JUICE VS. JUSTICE | A TIMES INVESTIGATION

# In Las Vegas, They're Playing With a Stacked Judicial Deck

**Some judges routinely rule in cases involving friends, former clients and business associates -- and in favor of lawyers who fill their campaign coffers.**

By Michael J. Goodman and William C. Rempel
Times Staff Writers

June 8, 2006

LAS VEGAS — When Judge Gene T. Porter last ran for reelection, a group of Las Vegas lawyers sponsored a fundraiser for him at Big Bear in California. Even by Las Vegas standards, it was brazen. Some of the sponsors had cases before him. One case was set for a crucial hearing in four days.

"A Lavish Buffet Dinner will be catered By Big Bear's Premier Restaurant," invitations to Porter's fundraiser said. "There will be Food, Fun, Libations … a 7:30 p.m. Sunset Cruise on the Big Bear Queen … a Zoo Tour for the Little Ones." Porter, 49, a Nevada state judge, attended. The evening blossomed into a festival of champagne, lobster and money. Organizers said guests contributed nearly $30,000, dropping much of it into a crystal punch bowl.

Some lawyers considered it protection against ill fortune. Robert D. Vannah, a sponsor of the fundraiser whose firm had the hearing scheduled in Porter's courtroom in four days, would later explain his donation this way: "Giving money to a judge's campaign means you're less likely to get screwed.… A $1,000 contribution isn't going to buy special treatment. It's just a hedge against bad things happening."

Vannah and others in his law firm, along with one of their consultants, made donations worth a total of $13,500, fundraising reports show. It was the fattest combined contribution of the night.

On the other side of the case, counsel for Michael D. Farney, then a resident of Ojai, Calif., whose company was being sued, hadn't chipped in a dime. Worried that bad things might happen to him, the lawyer, Douglas Gardner of Las Vegas, asked Porter to withdraw from the case. "The timing of the campaign gala," Gardner's motion said, "is too close."

Porter refused, protesting he had "no bias or prejudice."

At the hearing four days after the fundraiser, Gardner requested a delay.

Porter refused that too.

The case went to trial, and Porter ordered Farney's company to pay $1.5 million in

damages.

The California businessman said his attorneys were appalled. " 'Hometown justice,' " Farney said they called it. "I don't plan to go back for more."

Porter's refusal to withdraw is hardly unusual in Las Vegas courts. This is a juice town, some Las Vegas attorneys openly concede. Financial contributions "get you juice with a judge — an 'in,' " Ian Christopherson, a lawyer in Las Vegas for 18 years, said in an interview. "If you have juice, you get different treatment. This is not a quid pro quo town like, say, Chicago. This town is a juice town."

Las Vegas is one of the fastest-growing metropolitan areas in the United States. Since 1960, census figures show, its population has exploded by 1,246%. But many of its courts have not grown with it, much less grown up. At the heart of the Las Vegas court system are 21 state judges who hear civil and criminal cases, and who can be assigned anywhere in Nevada, but who are called district judges because they work out of courthouses in the judicial districts where they are elected. These state judges often dispense a style of wide-open, frontier justice that veers out of control across ethical, if not legal, boundaries. The consequences reach beyond Nevada, affecting people in other states, especially California.

Some of the effect falls upon visitors from Los Angeles who come here to gamble, flirt with sin and have a good time. More than a quarter — about 29% — of the 38.5 million visits to Las Vegas in 2005 were made by Southern Californians, including many who came here more than once. By that estimate, published by the Las Vegas Convention and Visitors Authority, Southern Californians make more than 11 million visits to Las Vegas every year.

But the effect falls, as well, upon Californians in business. Like Michael Farney of Ojai, who owned Elite Marine, a boat company that served southern Nevada and Lake Mead, an uncounted number of people from Southern California hold financial interests in Las Vegas and its surrounding metropolitan area. Of all businesses that relocate to Nevada, according to the state Commission on Economic Development, at least 36% come from California.

Whether they want to play or do business, all who come to Las Vegas, from Southern California or elsewhere across the nation, expect a fair shake, especially from its courts. Las Vegas is a town, however, where some judges, operating in a new $185-million Clark County courthouse two blocks from casinos, wedding chapels and strip clubs, routinely rule in cases involving friends, former clients and business associates, even in cases touching people to whom they owe money.

In 1990, Porter borrowed $15,000 from attorney George P. Kelesis. While he owed Kelesis the money, Porter ruled in at least six cases involving the law firm of Cook & Kelesis. A recent search found no statement in court records that he told opposing attorneys about the loan. Kelesis says he had left the firm but allowed it to continue using

his name to boost its stature. Porter promised to repay the money in 1993, according to county records. But when he retired from the bench in 2003, his disclosure statements show, he still owed Kelesis at least $5,000.

Porter, who has joined a Los Angeles-Las Vegas law firm, declined to be interviewed for this story and would not respond to written questions.

Las Vegas is a town where James C. Mahan, 62, who served initially on the state bench and is now a federal judge, awarded more than $4.8 million in judgments and fees during more than a dozen cases in which a recent search of court records found no statement that he disclosed his ties to those who benefited. Mahan, who sometimes wears a holstered semiautomatic pistol on his right hip while sitting at his desk in the U.S. courthouse, approved court fees for a former business associate who twice served as his judicial campaign treasurer and was instrumental in his federal appointment.

Mahan approved additional fees for his former law partner, who was providing free legal services for the judge's wife and the judge's executive judicial assistant and with whom he still had financial ties, including property ownership and a profit-sharing arrangement.

In an interview, Mahan said the relationships made no difference in his decisions. "I don't care who the attorneys are," he said. He denied seeing any conflict of interest and grew angry at being questioned.

Las Vegas is a town where District Judge Nancy M. Saitta, 55, running unopposed in 2002, raised a political war chest totaling $120,000. She received nearly $70,000 from 140 attorneys and law firms. All 55 lawyers or law firms giving $500 or more had cases assigned to her courtroom or pending before her, according to court and campaign records. Her campaign collected donations at fundraisers hosted by lawyers, also with cases before her.

In one instance, Saitta awarded more than $1 million in fees for a certified public accountant and his attorneys, two of whom held a fundraiser for her while she was ruling on their case.

In an interview, Saitta said, "People who appear in my courtroom are all on equal footing." She said she came up with likely contributors to invite to her fundraisers by finding out who gave readily to other judicial campaigns. Did she take names from her court docket? "Oh," she said, "I would never do that."

Las Vegas is a town where District Judge Sally Loehrer, 59, also running unopposed in 2002, collected about $80,000 in campaign funds. Of 54 attorneys and law firms contributing $500 or more, fundraising reports and court records show that 51 had cases pending before her or assigned to her courtroom. On the eve of one fundraiser, according to the reports, four law firms gave her 12 bottles of wine, a 13-inch TV, two DVD players, a gas grill, dinner for four at Zefferino's restaurant, two theater tickets, two golf lessons and a pool float with two beach towels. All four firms, court records show, had

cases pending before her.

In response to written questions, Loehrer said: "I do not keep a list of persons who have contributed in my head, in my desk nor on my computer.... My decisions are based solely upon my understanding of both the facts and the law at the time of the decision and nothing more." She said the wine, beach towels and other items were given away as door prizes.

Loehrer publicly donated $3,300 of her campaign contributions to other candidates, records show. They included candidates for district attorney and attorney general, both of whom try cases before her. Nevada judicial canons say judges shall not "publicly endorse" another candidate.

She responded that her "best analysis" of the canons and a subsequent advisory ruling by Nevada's Standing Committee on Judicial Ethics and Election Practices was that judges may buy tickets to campaign functions regardless of cost. She did not say whether her donations, ranging from $150 to $900, were for tickets.

But the ethics committee noted that any donation of more than $100 had to be reported publicly. Hence, it said, if a ticket cost more than $100, then buying it constituted "a public endorsement" and was "in violation of the Nevada Code of Judicial Conduct."

Las Vegas is a town where District Judge Joseph S. Pavlikowski, 78, officiated on May 4, 1969, at the wedding of Frank "Lefty" Rosenthal, notorious as a front man for the Chicago mob — and then accepted a discounted wedding reception for his own daughter at a casino where Rosenthal was a top boss. Pavlikowski subsequently ruled for Rosenthal in three cases when authorities attempted to bar him from running a casino.

Today, Pavlikowski is a senior judge, commissioned by the Nevada Supreme Court to serve at its pleasure without accountability to the voters.

He declined to be interviewed and would not respond to written questions.

Las Vegas is a town where District Judge Donald M. Mosley, 59, gave unspent campaign funds to a girlfriend. He called it a loan. She said it was a gift. Canon 7 of the state Code of Judicial Conduct said a judge or a candidate for judicial office "should not use ... campaign contributions for purposes unrelated to the campaign." Mosley acknowledged six years ago in a deposition that he provided her with $10,000 of his political money. Mosley said it was restored to his campaign fund, but his girlfriend said she did not repay it.

Mosley's campaign fundraising reports leave the matter unresolved. They show that the money was neither withdrawn nor paid back.

In a written statement, Mosley said he had been subjected to absurd and unsupported allegations by political opponents and by the girlfriend, with whom he eventually fought

for custody of their child. "Neither these individuals nor their attacks," he said, "deserve the dignity of a response."

Judicial campaign rules vary from state to state. The Nevada Supreme Court, the top court in the state, whose justices collect money from lawyers and casinos for their own campaigns, allows district judges to accept campaign donations from people who might appear before them. State judicial canons encourage the judges to solicit and accept the donations through campaign committees, but the canons also allow the judges to do it personally.

U.S. and Nevada judicial canons say judges should withdraw from cases where their impartiality might reasonably be questioned. Nevada canons also say judges must avoid even the appearance of impropriety and should reveal on the record anything that they think anyone in court could reasonably consider relevant to disqualification — even if the judges do not think they should withdraw.

Nevada, however, does not require judges to reveal when their donors appear before them.

When lawyers in California and Nevada, along with a number of Nevada district judges, both sitting and retired, were asked about how this affected justice in Las Vegas, many spoke openly about its pernicious effects — particularly about how lawyers and their clients sometimes must pay to play on a level field.

They also told how the effects of judicial corruption seep from Nevada across the state line into California.

Federal and state rules are often ignored, some lawyers said. They cited a good-old-boy culture of cronyism and chumminess that accepted conflicts of interest as "business as usual" and as part of Nevada's maverick history of government-sanctioned prostitution, gambling, drive-through marriages and quickie divorces.

"The common excuse is that this is the way it's always been done — fast and loose — the wild, wild West," said Las Vegas attorney Charles W. Bennion. "But the people making those excuses are the only ones that benefit, and they want it to stay that way."

A common perception among a dozen out-of-state lawyers interviewed about their experiences in Nevada courtrooms is that justice in Las Vegas is just another form of legalized gambling.

"I don't think what goes on in Nevada bears any resemblance to a justice system," said John C. Kirkland, a Santa Monica attorney. He said he had clients who were victimized in Las Vegas courts. "It's an old-boy network. It's not a legal system."

Justice in Nevada, conceded Cal Potter III, a veteran Las Vegas lawyer, is such that "outside law firms just don't trust Nevada courtrooms."

Many blame the campaign funding practices of district judges who have to run for office. "There should be a provision in the law prohibiting judges from directly soliciting a campaign contribution," said state Judge Brent Adams of Reno. "The one standard for a judicial candidate in Nevada today is, 'How much money can you raise?' "

During the most recent Nevada election in which all district judgeships in Las Vegas were on the ballot, 17 incumbents raised more than $1.7 million in campaign funds, collecting much of it from lawyers and casinos with cases pending before them, campaign financial reports and court records show. At least 90% of all contributions for the election, held Nov. 5, 2002, came from lawyers and casinos.

Frequently, a donation was dated within days of when a judge took action in the contributor's case, the records show. Occasionally the contribution was dated the same day.

"It can seem like a shakedown," conceded Jeffrey Sobel, a judge who lost his seat — and that was the point. Sobel collected donations of $1,000 to $5,000 each from 39 attorneys or law firms while their cases were pending in his courtroom, records show. The Nevada Commission on Judicial Discipline investigated him after learning that he had discussed campaign contributions during a conference on a case pending before him. Commission records show Sobel told one attorney that "he was f---ed because he hadn't contributed while others had."

Sobel later said he was joking, but the commission ruled last July that he had violated the state Code of Judicial Conduct, censured him publicly and "permanently barred [him] from serving as an elected or appointed judicial officer in Nevada." The commissioners recommended that "judges should avoid, even during normal campaign activities, soliciting campaign help from attorneys" with cases pending before them, and even from attorneys with "the reasonable likelihood of future litigation" in their courts.

Nonetheless, the commission allowed Sobel to continue to mediate and arbitrate cases, which comprised the majority of his law practice, and it allowed him to continue to be appointed as a special master, who investigates claims in lawsuits and makes recommendations to judges.

Because of campaign contributions from lawyers and casinos appearing before them, said Don Chairez, a former Las Vegas state judge, "Nevada judges find themselves losing or bargaining away their integrity or independence."

Some lawyers, said Steve Morris, a prominent Nevada attorney with 35 years of experience, "are in almost terror of not giving" to judges seeking campaign contributions. His law firm spread about $7,500 in contributions among 11 candidates in the 2002 election, fundraising reports show.

"If it's a close call," Morris said, "asking judges to treat lawyers who contribute money

the same as lawyers who don't is asking for the superhuman. When judges come around and say, 'I need money,' it's a nasty bit of business."

At the very least, some lawyers said, pay-to-play can get them favorable court dates on crowded dockets.

Each state judge in Las Vegas handles more than 2,700 cases a year. A contribution of $500 to $1,000 might not "get you a favorable ruling, [but] it can grease the skids … get your case called first," said former prosecutor Ulrich Smith, in private practice since 1995.

Bucking this system can be the "kiss of death," some lawyers said. "If you speak out, certain judges take it personally," said Grenville Pridham, a state deputy attorney general for 11 years who is now in private practice in Las Vegas. "You'll pay dearly when you visit their courtroom."

In 2002, Pridham ran for district judge. During his campaign, he denounced fundraising by judges. He accepted no donations.

He lost by more than 160,000 votes.

It got worse, Pridham said. Since the election, he said, regardless of when his cases are scheduled, some judges "call the lawyers around me, even if it's out of order, until I'm the last private attorney left in the courtroom."

Some lawyers are particularly critical of the way judges use leftover campaign money.

Thirteen of the 17 incumbent judges in 2002 ran unopposed, but they collected $967,000 anyway, in both cash and checks, according to fundraising reports. After the election, 11 of the unopposed judges reported they were sitting on a total of about $634,000 in unspent contributions.

"It's scandalous how much unused campaign money is allowed to pile up," said Sobel, the former judge who was defeated. "There's no limit on how much you can keep…. There is no watchdog and no real definition of what exactly is or isn't proper. You can return [unspent money], or save it for a future campaign, or you can give it to a charity, or spend it for some political purpose.

"That leaves a good deal of room for interpretations of all kinds. You could argue that [having] dinner on the Strip gives you a chance to talk to waiters and maitre d's — so, technically, you're campaigning."

Disclosing the size of an unspent bankroll is mandatory, said Dean Heller, Nevada's secretary of state and chief elections officer. But the requirements for specifying what happens to it, he said, are vague. "It's pathetic … a system designed by politicians to work for them."

Heller said the Legislature gave him only seven people to monitor elections and the campaign reporting of up to 1,000 candidates statewide. Worse, he said, legislators "won't give us authority to audit or even look for reporting irregularities unless we receive a complaint in writing. We get a lot of complaints over the phone, but not many want to put it in writing."

He said the Legislature had rejected his attempts to toughen requirements to disclose unspent contributions. "They want to raise as much money as possible," Heller said, "and tell the public as little as possible."

The public information officer for state courts in Las Vegas, Michael Sommermeyer, advised judges to say nothing in response to questions from The Times. "My recommendation is for all of the judges to refuse to comment," he said in an April 28 memo to Saitta.

Saitta was among three state judges who chose to ignore Sommermeyer's memo. "My job as a public servant has to be open to scrutiny by the public," she said. "I have to be answerable and subject to that scrutiny. I can't hide. I don't have anything to hide."


**Case Study**

**Gene Porter**

The lawyers who filled the crystal punch bowl with money at Judge Gene Porter's fundraiser at Big Bear certainly had reason to believe that he would not hesitate to hear their cases.

A Times review of lawsuits that came before Porter during his eight years on the bench shows that 61 presented possible conflicts of interest. In 50 of them, there is no statement in court records that he withdrew or disclosed the possibility of a conflict.

The 61 cases were found in a review of more than 2,000 legal actions involving members of his former law firm as well as his former legal clients, political allies, business associates and creditors.

One example involved Desert Springs Hospital in Las Vegas. Porter's law firm had listed the hospital as one of its "representative clients" in the Martindale-Hubble legal directory the year Porter was appointed to the bench. Porter had been the hospital's attorney of record in at least three lawsuits, court records show.

When six cases naming Desert Springs as the plaintiff or defendant came before Porter as a judge, there is no statement in court records that he revealed his former relationship to the hospital.

In a seventh case, in January 1997, he withdrew, saying, "Because this court represented Desert Springs at the time of this incident ... this court hereby disqualifies itself."

But Porter did not withdraw from the other cases.

Similarly, in at least 15 cases, Porter did not disclose his longtime friendship with attorney Matthew Callister when he presided over Callister's cases. He and Callister had been friends since high school, and Callister became his close political ally when they served together in the state Assembly. Callister also served as a resident agent for a real estate company formed by Porter's wife.

In a lawsuit involving two business executives from California, Porter appointed Callister as a $200-an-hour receiver, or caretaker of assets. One of the executives, Irenemarie Kennedy of Laguna Niguel, had sued Ashik Patel of Orange, her partner in Seaspan Inc., a hotel management firm incorporated in Nevada.

Porter instructed Callister to run the company during the dispute, replacing another receiver appointed two weeks earlier by another judge. "I wasn't happy," Patel said in an interview. Soon, Patel said, he learned "that the judge and Callister were buddies." Then, Patel said, he made another discovery: "Callister had an association with the other side."

According to court documents submitted by Patel's lawyer and records in the Nevada secretary of state's office, while Callister was serving as receiver in the Seaspan suit, he or his law firm were resident agents for two other corporations and a partnership formed by Kennedy — and he had been doing legal work for Kennedy and her family lawyer.

Patel's lawyer, Samuel B. Benham, asked Porter to allow Callister to withdraw. Court records show that Porter denied the request without comment.

Callister declined to be interviewed and did not respond to written questions.

Kennedy did not return phone calls. Instead a man identifying himself as "Mike Walker, an advisor to the Kennedys," responded, saying: "I don't know if the relationship between Callister and the judge was disclosed at the time, but afterward we did learn they had a relationship. But I met with Callister at least five times, and he was objective and is doing a good job."

In 2002, Porter was reelected to a six-year term. In a campaign fundraising report filed Jan. 10, 2003, he said he still had $32,816 "cash on hand." Porter resigned that September, saying financial considerations forced him from the bench.

As of this week, Secretary of State Heller said, Porter had not met a requirement to file an accounting of his unspent campaign money.

Licensed to practice in Nevada and California, Porter has joined a Las Vegas-Los

Angeles law firm and serves as a private judge for Alternative Resolution Centers, a mediation and arbitration firm that provides settlement and fact-finding services in Las Vegas and Los Angeles.

## Case Study

### Nancy Saitta

The fight was over a company with a subsidiary that made a liposuction machine, which guzzles fat from loins, necks, thighs and waists.

The company was Medical Device Alliance Inc., incorporated in Nevada but whose subsidiary was based in Carpinteria, Calif. Minority shareholders said Donald McGhan, its founder and chief executive officer, should be removed. McGhan fought back. The dispute landed in the courtroom of Judge Nancy M. Saitta.

In June 1999, she appointed George C. Swarts, a certified public accountant, as a receiver — someone to run the company while it was embroiled in the dispute.

Within six months, McGhan and a second, separate group of stockholders filed complaints that Swarts' decisions were biased, lacked expertise and often were unauthorized by Saitta.

Privately, attorneys expressed dismay. "George [Swarts] had inordinate power" with the judge, Alfred E. Augustini, a Los Angeles attorney and legal advisor to McGhan, said in an interview. Swarts "would threaten us, tell us, 'The judge will do anything I ask, whatever I present to her.' George was running the case. We had to yield to George ... comfort George ... agree with George. He was God ... the great pooh-bah ... the big Jabba the Hutt."

What Swarts wanted most of all, Augustini said, was "to keep the meter running." The case was in limbo, he said, and "limbo was paying very well."

Swarts' fees were mounting.

"We tried to get Saitta to fire Swarts," Augustini said, "but that only made things worse."

McGhan tried to disqualify Saitta from the case.

"Judge Saitta has publicly pronounced McGhan guilty three times without hearing the evidence or the testimony of witnesses," said his Nevada attorneys, Steve Morris and Todd L. Bice, in a motion filed in August 2000. "By passing judgment ... without a trial, Judge Saitta can no longer be considered a fair and neutral arbiter.... Under the law, she is required to step aside."

Swarts' attorneys countered that the real target of the attack was Swarts.

The request to remove Saitta went before Lee Gates, the chief judge in Las Vegas at the time.

But Gates had a possible conflict. An attorney from the Frank Ellis law firm, which often represented Swarts, was defending Gates' wife, Yvonne Atkinson Gates, a county commissioner, against a recall, including a lawsuit that court records show was on appeal before the state Supreme Court.

A recent search found no statement in court records that Judge Gates disclosed the relationship or similar relationships in two other cases involving his wife and the Ellis law firm.

Within two weeks, he denied the motion to disqualify Saitta, declaring that she "is not biased or prejudiced concerning any party."

By now, Saitta had come under attack for refusing to let anyone examine paperwork supporting the first bill submitted by Swarts and his lawyers: $524,680 in fees from June 29, 1999, to May 30, 2000.

"Unconscionable ... exorbitant ... outrageously excessive," said lawyers for McGhan and one of the stockholder groups. Attorney Matthew Callister, who represented a second group of stockholders, said in a motion that if Saitta did not deny Swarts' fee or require him to account for its size, then "a great injustice will occur in this case."

Nonetheless, Saitta approved Swarts' request for $524,680, as well as a second request, this one for fees totaling $662,411 for him and his attorneys covering June 2000 through September 2001, court records show.

Attorney Daniel J. McAuliffe, representing McGhan and other defendants, complained in a motion that Swarts had filed the second request 13 months late, "in violation of this court's order."

In yet another motion, Swarts asked that fees be doubled for his attorneys through 2001 and requested 18% interest on unpaid fees since his appointment in 1999.

McGhan's attorneys protested that Swarts' requests "provide for the looting of [the company] to line the pockets of various and numerous counsel — all with no accountability." The request for 18% interest, they said, was "astonishing.... Even Visa and MasterCard charge less."

Nonetheless, Saitta approved both of those requests as well.

In 2002, according to a report McGhan entered into court records, she approved $588,000

for Swarts and $630,000 for his lawyers.

When she was asked about the fees during her interview, Saitta said: "I handle 2,400 cases a year. You're asking me for details on one case. I don't have time to go back and look up every case."

Neither Swarts nor Judge Gates responded to written questions.

In 2002, an election year, Saitta announced that she would seek another term on the bench. Nevada judges seeking reelection historically try to scare off potential opponents by raising large war chests quickly. By March, however, Saitta had raised less than $5,000, campaign records show.

She got help from J. Randall Jones, one of Swarts' attorneys in the ongoing Medical Device Alliance case.

With major decisions in the case still pending, Jones, of Harrison, Kemp & Jones, held a fundraiser for her. The fundraiser was set for May 2 at Jones' home in Las Vegas. Invitations said, "Minimum Suggested Contribution: $500." A cohost was Mark James, an attorney for Medical Device Alliance shareholders. James had played a key role in persuading Saitta to appoint Swarts.

In the 60 days leading up to the fundraiser, Jones, as Swarts' lawyer and a Saitta defender against the accusations of bias, appeared before her at least four times and received favorable rulings, which included her approval of a hotly contested $4-million "good faith settlement" sought by Jones' and James' clients against Wedbush Morgan Securities, based in Los Angeles.

During the fundraiser, Saitta personally greeted about two dozen contributors. Court and campaign records as well as interviews show that at least 18 of the contributors were lawyers with one or more cases pending before her at the time.

The event collected about $20,000 on her behalf.

At election time, she ran unopposed.

Jones and James were asked in separate telephone interviews why they held the fundraiser.

"I think it is incumbent upon attorneys to support good candidates for the bench and retain qualified judges," James said. He added, "That's all I have to say."

Jones said, "I have nothing to say to you." He hung up.

In her interview, Saitta said Jones "asked if he could do the party." Attorneys attended from both sides of the Medical Device Alliance case, she said. "As a candidate, you just

show up. You meet with the people. You shake their hands. There's a bowl for the checks."

She said her campaigns do not accept cash. If anyone tries to hand her a check personally, she said, an aide standing beside her takes it instead. "I don't want anything to do with the money."

Saitta and Swarts served as judge and receiver in the case until Medical Device Alliance was sold in January 2004 for $60 million and all claims were settled, court records show.

When Swarts and his lawyers originally persuaded Saitta to name him the receiver, they dismissed predictions that the "costs of Mr. Swarts' appointment would be in excess of $1 million." Such claims, they said, were "hyper-alarmist arguments" and were "grossly over-exaggerated."

In fact, the cost of Swarts' receivership topped $1 million within its first three years, court records show.

### Case Study

### Donald Mosley

Donald Mosley, the judge who turned over $10,000 of his unspent campaign money to his girlfriend, testified in 1999, nine years after he did it, that it was "the only cash I had available at the time."

He said he did not seek any legal opinions about the legality of what he did.

"I don't know that it's a direct violation to borrow against [campaign funds] on occasion and return the money plus interest," Mosley said during a deposition in an unrelated defamation suit and counterclaim. "I'm not too concerned about that as an infraction of ethics."

Mosley said he gave the money to Terry Figliuzzi (who later changed her name to Mosley). "The situation was that it was early in December and her parents were coming out from Minnesota to visit us ... [and] she wanted to buy Christmas gifts and show her parents a good time."

Mosley said he loaned his girlfriend the money because she expected to win a lawsuit over an unpaid real estate commission of more than $600,000. "It was thought at the time that it was just a matter of several weeks or a month or so and she would have this enormous judgment and so the money would be available."

Eventually, the judge said, the $10,000 was restored to his campaign fund when he

received $20,000 from a claim against the judgment.

In an interview, Terry Mosley disputed the judge's version, saying that she had regarded the $10,000 as a gift — "Christmas money. He brought it home in cash and tossed it on the table. It wasn't a loan. I never signed anything."

She said the $20,000 was unrelated to the gift. "I never paid Don back for that — not to this day."

Judge Mosley's campaign funding reports do not resolve the conflicting versions. His 1990 reports say he raised $56,811 and spent $27,573 — leaving $29,238 unspent, but the reports show no $10,000 withdrawal or loan.

The reports he filed in 1996, before his next campaign — one year after Terry Mosley won her $606,877 judgment — reflect no loan repayment.

In 1990, the year Mosley said he withdrew the money from his campaign fund, Canon 7 of the Nevada Code of Judicial Conduct held that a judge or candidate for judicial office "should not use ... campaign contributions for purposes unrelated to the campaign."

Today, the question is covered by Canon 5, which says judicial candidates "shall not use or permit the use of campaign contributions for the private benefit of the candidate or others."

Since 1991, Nevada state law has banned personal use of campaign donations by any state or local candidate. In its most recent formulation, Nevada Revised Statute 294A.160 states: "It is unlawful for a candidate to spend money received as a campaign contribution for his personal use."

Apart from what Mosley did with his campaign money, his girlfriend's real estate lawsuit entangled him in a conflict from which he did not withdraw.

To provide her with a $100,000 security bond for her suit, Mosley put up his house as collateral — giving him a direct stake in the outcome of her case. He arranged for his girlfriend to hire attorney Jason G. Landess, who was appearing before him in another case. While Landess represented Mosley's girlfriend, court records show the judge made several rulings favoring Landess' other client.

The opposing attorney in that case, Richard McKnight, said in an interview that he was never informed about Mosley's stake in Landess' case on Terry Mosley's behalf. "I kept getting my brains beat out in Mosley's court," he said. "It felt sometimes like Mosley and Landess were teaming up against me."

*

*Goodman's e-mail address is mj.good@yahoo.com; Rempel's is william.rempel@latimes.com*

\*

*Times researcher Nona Yates contributed to this report.*

\*

*About This Series*

*Three articles examining the Las Vegas judiciary:*

**Today**: *Justice crippled by conflicts.*

**Friday**: *A judge and his friends.*

**Saturday**: *Special rules for senior judges.*

---

Copyright 2007 Los Angeles Times | Privacy Policy | Terms of Service
Home Delivery | Advertise | Archives | Contact | Site Map | Help

PARTNERS: