# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARILYN MIGLIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 07 C 6863 |
| v. ) | |
| ) | Judge Kendall |
| JAMES JOSEPH "TED" MELLON, ) | |
| ) | Magistrate Judge Valdez |
| Defendant. ) | |

**JAMES JOSEPH "TED" MELLON'S OPPOSITION TO MARILYN MIGLIN'S MOTION TO STRIKE DEFENDANT'S AFFIRMATIVE DEFENSES PURSUANT TO RULE 12(f) AND COUNTERMOTION TO AMEND ANSWER AS NECESSARY**

COMES NOW Defendant, James Joseph "Ted" Mellon ("Mellon"), by and through David R. Creagh and David J. Richards of the law firm of HINSHAW & CULBERTSON LLP, and hereby files this Opposition to Marilyn Miglin's Motion to Strike Defendant's Affirmative Defenses Pursuant to Rule 12(f) and, to the extent necessary, asks this Court for leave to amend the Answer to restate the affirmative defenses as directed by this Court. In support of his opposition and countermotion, Mellon states as follows:

## I. *STATEMENT OF FACTS*

Miglin agreed on or about August 15, 2000 to purchase 25 percent of stock in Advanced Medical Products, Inc. ("AMP"), an entity that owned the patent on a needle designed to perform cosmetic repair for a condition called "spider veins." At all times, Miglin was represented by legal counsel of her choice and her legal counsel did, in fact, prepare the agreement memorializing her investment in AMP. At the time, other investors in AMP included Mellon, Attorney Jason Landess, who had created the AMP legal entity and served as its president, and Larry Siggelkow.

Thereafter, Miglin and her son, Duke Miglin, were actively engaged in the management and operation of AMP. In late 2000 or early 2001, discussions were had between AMP representatives and certain parties living in California to create a California corporation known

as Western Medical Devices, Inc. ("WMD"). A proposal to negotiate and grant an exclusive distributorship agreement for the AMP needle was approved by the AMP Board of Directors, including Marilyn Miglin, in January, 2001.

Investor Larry Siggelkow ("Siggelkow") made an offer to purchase all the outstanding shares of AMP for the sum of $4 million. Rather than accept the $4 million offer from Siggelkow, which was advocated by Mellon and Landess, however, Miglin and her attorneys negotiated separate agreements to purchase the shares held by Mellon and Landess for the sums of $3.5 million and $3 million respectively. Miglin, Mellon and Landess were represented by independent legal counsel of their choice and the agreements were ultimately signed. Thereafter, Miglin, Duke Miglin, and other shareholders engaged in nefarious, illegal, and oppressive conduct toward Mellon and Landess culminating in the filing of no less than four (4) independent lawsuits in the Eight Judicial District Court in and for the County of Clark, State of Nevada against AMP, both Miglins, and other shareholders. A jury trial took place in the Eighth Judicial District Court in and for the County of Clark, State of Nevada in early 2007 concerning claims that the Miglins had engaged in fraud, civil conspiracy, breach of fiduciary duty, and intentional interference with contract, and intentional inference with prospective business advantage. After a trial lasting more than two (2) months, the jury returned a verdict against Marilyn Miglin and in favor of Landess and the other shareholders of AMP (including Mellon) in the sum of $16.5 million. The jury found that Marilyn Miglin had engaged in fraud, civil conspiracy, breach of fiduciary duty, intentional interference with contracts, and intentional interference with prospective economic advantage with regard to Landess and the other shareholders (including Mellon) of AMP. See Exhibit A.

The case brought by Miglin against Mellon will obviously involve issue preclusion and claim preclusion arising out of the Nevada state jury verdict. Miglin may disagree regarding the effect of a $16.5 million verdict against her in the Nevada action, but Mellon will contend that Miglin's claims in this action were raised and dismissed from consideration by the jury in the Nevada action. It is in the context of these facts that this Court must consider the Motion to

2

Strike certain of defendant's affirmative defenses.

## II. *STATEMENT OF LAW*

Other Courts in the Northern District of Illinois have set forth the law that pertains to Miglin's Motion to Strike. In <u>Ortho-Tain v. Rocky Mountain Orthodontists</u>, 2007 WL 1238917 (N.D. Ill.) at *1, the Court said:

> "A motion to strike serves the 'useful purpose [of] eliminating insufficient defenses and saving the time and expense that otherwise would be spent litigating issues that will not affect the outcome of the case.' *U.S. v. Walerko Tool and Engineering Corp.*, 784 F.Supp. 1385, 1387-88 (N.D. Ind. 1992). Rule 12(f) motions to strike defenses, however, are not generally favored; they may be granted only if the defense is 'patently defective and could not succeed under any set of circumstances." *Home Depot*, 2007 WL 611279 at *1. An affirmative defense should not be stricken if it is sufficient as a matter of law or if it presents questions of law or fact."

In <u>Cohn v. Taco Bell Corp.</u>, 1995 WL 247996 (N.D. Ill.), the Court, quoting from another case, said:

> "In *Bobbitt v. Victorian House, Inc.*, 532 F.Supp. 734, 737 (N.D. Ill. 1982), the court outlined a three part test for examining an affirmative defense subject to a motion to strike:
> (1) Initially, the court must determine whether the matter is appropriately pled as an affirmative defense. Only matters that serve a clear 'no' answer will be stricken to make the pleadings more concise.
> (2) If a matter is appropriately pleaded as an affirmative defense, the court must determine whether it meets the pleading requirements of <u>Federal Rules of Civil Procedure</u> 8 and 9. Any defense inadequately pleaded will be dismissed without prejudice to enable defendants to correct the technical deficiency.
> (3) Finally, any matter permitted to stand as an affirmative defense will be tested under a standard identical to Rule 12(b)(6). If defendant can prove no set of facts in support of the affirmative defense that would defeat the complaint, the matter will be stricken as legally insufficient."

In <u>Bobbitt</u>, *supra*, the Court discussed the possibility of waiving affirmative defenses if they are not plead in the Answer and stated that:

> "...The cautious pleader is fully justified in setting up as affirmative defenses anything that might possibly fall into that category, even though that approach may lead to pleading matters as affirmative defenses that could have been set forth in simple denials...but if there is any real doubt about the defendant's right, under his denial, to offer proof of the matters, the affirmative defense should not be stricken."

3

532 F.Supp. at 736.

All of the cases cited herein above discuss that defenses are pleadings, and as such, leave to amend is freely granted as justice requires. Fed.R.Civ.P. 15(a).

Each of the affirmative defenses is discussed hereinafter.

### *First Affirmative Defense*

Miglin cites Cohn v. Taco Bell Corp., *supra*, in support of her Motion to Strike the affirmative defense of a failure to state a claim. The Cohn case, however, refused to dismiss a failure to state a claim affirmative defense on the basis asserted by Miglin. The Cohn Court specifically recognized that the Northern District of Illinois often allows failure to state a claim to be asserted as an affirmative defense as follows:

> "However, a number of courts in the Northern District of Illinois have refused to strike a failure-to-state-a-claim defense, simply because it responds to matters in the pleadings as opposed to raising new matters. *General Electric Capital Corporation v. Munson Marine, Inc.*, 91 C 5090, 1992 WL 24067 at *2 (N.D. Ill. Jan. 29, 1992); *Mendrala v. Crown Mortgage Company*, No. 88 C 7386, 1990 WL 60705 at *3 (N.E. Ill. April 23, 1990). These courts note that the defense of failure to state a claim upon which relief may be granted is specifically set forth as a possible defense in *Form 20 of the Appendix of forms of the Federal Rules of Civil Procedure. Id.* The use of these forms is explicitly authorized by Rule 84.[1] *Id.* In *Van Horn v. Chicago Roller Skate Company*, 15 F.R.D. 22, 23 (N.D. Ill. 1953), the court held that an affirmative defense presented as an example in *Form 20* was 'sufficient under the rules.' The *Van Horn* court noted that the Supreme Court Advisory Committee on Rules had stated that the pleadings suggested in the Appendix of Forms were per se sufficient to withstand procedural attack. *Id.*"

It is submitted that at the outset of this litigation, it is premature to strike the First Affirmative Defense and there is no legal authority asserted by Miglin that would require such a result.

### *Second Affirmative Defense*

This affirmative defense is estoppel. Mellon will present evidence regarding the findings of the Nevada jury indicating that it was Miglin who engaged in fraud, breach of fiduciary duty, conspiracy, intentional interference with contracts and with prospective business advantage with regard to the other shareholders of AMP, including Mellon. It was Miglin who directed her legal counsel to prepare documentation to memorialize her purchase of 25 percent of the shares

4

in AMP from Mellon and Landess. This evidence, obviously outside the facts set forth in Miglin's Complaint, are facts that would warrant a jury finding that Miglin is now estopped from bringing this action against Mellon when she has already been found guilty of wrongdoing in regard to Mellon and others and a jury has awarded $16.5 million against her as a result of her conduct. Mellon should not be foreclosed, at this early stage, from seeking to offer the claim of estoppel against Miglin.

### *Third Affirmative Defense*

The affirmative defense of laches is specifically set forth in F.R.C.P. Rule 8(c) as an approved and authorized affirmative defense. In this context, Mellon can amend the affirmative defense to state more particularly the defense of laches in this context as follows: (1) Miglin was involved as early as 2004 in the aforementioned litigation concerning her acquisition and operation of AMP. As such, Miglin has access to discovery, depositions, and documents that would clarify the relationships of the parties, but Mellon does not have the same access to discovery, depositions, and documents that Miglin has had for several years; (2) Miglin "sat on her rights" by not including Mellon directly in the underlying unsuccessful litigation if she had a good faith belief that Mellon had committed some wrongdoing in regard to the acquisition and operation of AMP. In this regard, Mellon has been prejudiced in his ability to gather documents and facts concerning events that occurred between 2001 and 2004, some three and one-half (3 ½) to six and one-half (6 ½) years prior to the filing of this litigation.

There is no question but that Mellon should be allowed to argue that he was prejudiced by Miglin's late filing of this action.

### *Fourth Affirmative Defense*

Miglin was beset by litigation as early as calendar year 2004 concerning her acquisition and operation of AMP and WMD. The serious nature of the claims made against Miglin are borne out by a jury verdict against her in the sum of $16.5 million for her intentional and fraudulent behavior with regard to AMP and its other shareholders. Miglin was obviously represented by very able counsel in the Nevada proceedings and it can certainly be surmised that

5

she discussed with her counsel her ability to deflect responsibility to Mellon if her claims and allegations made in this litigation are true.

A waiver is a free and voluntary relinquishment of a known legal right. Mellon should be free to argue that Miglin was represented by counsel at all times during her acquisition and operation of AMP. If she believed that the facts and claims she has made in this litigation were true, she could have raised them in the prior litigation to deflect responsibility. She did not. A jury would be entitled to find that there was a free and voluntary waiver of known legal rights when Miglin chose not to involve Mellon directly in the Nevada state cases.

### *Fifth Affirmative Defense*

Mellon agrees, after reviewing the authorities cited by Miglin that he will withdraw this defense and will seek to assert it in the future if the information learned during discovery warrants assertion of this defense.

### *Sixth Affirmative Defense*

Mellon agrees, after reviewing the authorities cited by Miglin that he will withdraw this defense and will seek to assert it in the future if the information learned during discovery warrants assertion of this defense.

### *Seventh Affirmative Defense*

This affirmative defense also involves presentation of evidence outside the scope of the facts contained in Miglin's Complaint. Mellon should have the opportunity to show that a jury considered Miglin's acquisition and operation of AMP and all the activities she engaged in during that period of time. The jury disbelieved and disregarded Miglin's testimony and found a verdict in the amount of $16.5 million against her for fraud, conspiracy, and breach of fiduciary duty with regard to AMP and its shareholders (including Mellon). By resort to facts outside the scope of the Complaint, Mellon should be allowed to present evidence that Miglin was the cause of her own misfortune and demise. The nature and scope of her fraud, misrepresentation, and breach of fiduciary duty will all be a subject of these proceedings and Mellon should not be foreclosed from presenting such evidence in the form of an affirmative defense.

*Eighth Affirmative Defense*

Mellon agrees, after reviewing the authorities cited by Miglin that he will withdraw this defense and will seek to assert it in the future if the information learned during discovery warrants assertion of this defense.

*Ninth Affirmative Defense*

At this juncture, no discovery has been taken. As set forth herein above, Mellon has not had the opportunity to explore discovery depositions, or documents concerning Miglin's acquisition and operation of AMP that was also the subject matter of the Nevada state litigation. All of the documentation, depositions, and facts are in the possession of Miglin at the present time and discovery has not yet commenced in this matter. Under the circumstances, the affirmative defense of failure to mitigate is appropriate. In Cohn v. Taco Bell Corp., *supra*, the Court referenced Sanchez v. LaRosa DelMonte Express, Inc., 1994 WL 603901 and Mobley v. Kelly Kean Nissan, 864 F.Supp. 726 (N.D. Ill. 1993) stating that:

> "In *Sanchez*, the court concluded that the defendant's affirmative defense sufficiently informed plaintiff that defendant intended to argue plaintiff failed to mitigate her damages after being terminated. 1994 WL 603901 at *2. In denying plaintiff's motion to strike defendant's affirmative defense, both the *Sanchez* and *Carpenter* courts emphasized the fact that litigation was at an early stage and thus it would be unreasonable for the defendant to have detailed information about plaintiff's post-termination conduct. 1994 WL 603901 at *2; 761 F.Supp. at 65."

1995 WL 247996 at *5.

In this case, discovery has not yet commenced. Mellon is putting Miglin on notice that he will pursue discovery to establish a claim that Miglin failed to mitigate her damages in this matter. This type of defense would be particularly appropriate in a case wherein Miglin engaged in intentional and fraudulent conduct resulting in a jury finding against her for $16.5 million, a fact that would not indicate that she acted to mitigate any loss she might claim to have sustained. This affirmative should be allowed.

*Tenth Affirmative Defense*

Mellon agrees to amend his Answer and affirmative defenses to delete this defense.

### *Eleventh Affirmative Defense*

To the extent that prior affirmative defenses state claims for waiver, estoppel and laches, Mellon will amend his Answer to delete this defense.

### *Twelfth through Fourteenth Affirmative Defenses*

Mellon agrees, upon review of the authorities cited by Miglin, that the Amended Answer and affirmative defenses will not include these statements of law. These statements of law concerning limitations on punitive damages will be raised, if necessary, by Motion in Limine or for Dismissal or Summary Judgment.

### III. CONCLUSION

Mellon submits that while a Motion to Strike may be an appropriate vehicle to "eliminate clutter," the Motion to Strike cannot be utilized as a summary judgment tool by Miglin's counsel. The law is quite clear that if there are facts and law that would substantiate the affirmative defense, all inferences should be drawn in favor of including the affirmative defense as opposed to dismissal. F.R.C.P. Rule 15(a) allows amendment of the Answer freely when justice so requires and Mellon will prepare and file an Amended Answer including affirmative defenses that are sustained by this Court's decision.

Dated this 11th day of February, 2008.

David R. Creagh, Esq. (ARDC No. 6191452)  
David J. Richards, Esq. (ARDC No. 6230119)  
**HINSHAW & CULBERTSON LLP**  
222 North LaSalle Street  
Suite 300  
Chicago, IL 60601-1081  
Phone: (312) 704-3000  
Fax:   (312) 704-3001

Respectfully submitted,

**HINSHAW & CULBERTSON LLP**

By:  s/David R. Creagh  
One Of The Attorneys For Defendant,  
JAMES JOSEPH "TED" MELLON

Case 1:07-cv-06863   Document 32-7   Filed 03/20/2008   Page 10 of 14
02/11/08 14:47 FAX 702 457 '51    PICO ESCOBAR ROSENBERGE                    ☒001
         Case 1:07-cv-0_ 63   Document 23   Filed 02/11/2008   Page 9 of 13
                                                                        Page 1 of 4

reviewjournal.com – Search

# reviewjournal.com

Nevada News | Sports | Business | Living | Opinion | Neon | Image | Classifieds

**SEARCH**

March 20, 2007
Copyright © Las Vegas Review-Journal



## Legal battle over device turns, twists

Adrienne Packer

By ADRIENNE PACKER

REVIEW-JOURNAL

**CHANNEL DIRECTORY**

- Arts & Entertainment
- Auto Guide
- Books
- Casinos & Hotels
- Community
- Coupons
- E-forums
- Employment
- Food & Dining
- Fun & Games
- Health & Fitness
- Home & Garden
- Legal Center
- Money
- Obituaries
- Personals
- Real Estate
- Recreation
- Relocation
- Shopping
- Technology
- Traffic & Transportation
- Travel
- Weather
- Weddings
- About the site

Contact the R-J
- Subscribe
- Report a delivery problem
- Put the paper on hold

The lawsuit seemed fit for a soap opera story line: back-stabbings, shattered friendships, an office break-in and a wealthy Chicago socialite at the center of a battle over a potentially money-making invention.

But to Las Vegas attorney Jason Landess, the ordeal has been a true-life drama. Last week, a District Court jury awarded Landess and his company a preliminary judgment of $16.8 million. Attorneys will fight over the final judgment later this month.

What began as two old friends embarking on an exciting new business venture in 1999 ended in a web of lawsuits by 2002.

"It's amazing how terribly erosive and corrupt greed can be, and it can destroy friendships forged 20 years ago," said Landess, a Las Vegas attorney and the plaintiff in the case. "The betrayal was, for me, literally biblical."

The legal wrangling is over a specialized needle used to remove spider veins, vessels that most typically plague women. It offers a promising alternative to laser or more invasive surgery.

Las Vegas orthopedic surgeon Dennis Gordon invented the device and brought Landess on board to help secure a patent and market the needle. Together, they started the company Advanced Medical Products.

What happened after they joined forces in 1999 depends on which side is telling the story. Jurors who heard the case last month sided with Landess.

According to Landess, he was so convinced the needle would be a huge success he shut down his law office to focus on the venture.

In early 2000, investor Ted Mellon offered to buy Gordon and Landess out for $400,000. Mellon later introduced into the project **Marilyn Miglin**, a cosmetics queen who hawks her products on the Home Shopping Network and owns a boutique in downtown Chicago.

**Miglin** offered to invest $2.5 million in the needle project. The wealthy socialite is the wife of the late real estate tycoon Lee **Miglin**, who in 1997

http://nl.newsbank.com/nl-search/we/Archives?p_action=doc&p_docid=1180418B51BB9...



EXHIBIT

A

Case 1:07-cv-06863   Document 32-7   Filed 03/20/2008   Page 11 of 14
02/11/08 14:48 FAX 702 457 '51   PICO ESCOBAR ROSENBERGE   ☒002
Case 1:07-cv-0  _33   Document 23   Filed 02/11/2008   Page 10 of 13   Page 2 of 4
reviewjournal.com -- Search

- Advertise with us
- Report a news tip/press release
- Send a letter to the editor
- Print the announcement forms
- Jobs at the R-J

was murdered by Andrew Cunanan, the same man who killed fashion designer Gianni Versace.

Landess said Gordon was skeptical of Miglin's offer and bowed out of the enterprise, selling his stock to Landess for $190,000.

"Gordon ... scoffed at and rejected the proposal, stating that 'no one is going to invest that kind of money in this product because it is unproven and the patent has not even been issued,'" Landess' complaint filed in District Court said.

But Miglin followed through with her promise. She visited Las Vegas in June 2000 to have the spider vein removal procedure done and test the product.

By late 2000, the company, backed by Miglin, was negotiating with a global medical device company in Florida to sell the rights to the needle for between $25 million and $30 million.

"When Gordon learned about the success of AMP, he began to question his decision," Landess' complaint said. "Those complaints increasingly became more hostile and threatening in nature."

Landess said out of kindness, he gave Gordon half of his interest in the company.

After the Sept. 11, 2001, terror attacks, the stock market plummeted, and negotiations to sell the rights to the needle fell through.

According to Landess, that is when Miglin and Gordon plotted a scheme to squeeze him out of the company and move forward with the invention by themselves.

During a January 2002 meeting, Miglin offered to buy out Landess, and he agreed. Under the deal, Landess said he was set to receive $3 million -- $3 for each of the first million needles sold. They also promised to return his $125,000 used to start the company. In exchange for the money, Landess said he would turn over all of the company's records and documents.

"I could tell there was friction between Marilyn and me, and the company was running out of money," Landess said in an interview. "I learned a long time ago, never fall in love with a deal."

While waiting for the $125,000 in exchange for the records, Landess packed his home and prepared to move to San Diego.

In March 2002, Landess said he learned that Gordon, with the assistance of Landess' former legal assistant, broke into his office and stole the records. Landess never received the $125,000.

"Since Gordon inexplicably videotaped himself committing the burglary, conversion and trespass, he is going to have a hard time convincing the jury that he did not engage in tortious (sic) conduct," Landess wrote in the lawsuit.

Case 1:07-cv-06863   Document 32-7   Filed 03/20/2008   Page 12 of 14

02/11/08  14:48 FAX 702 457  51      PICO ESCOBAR ROSENBERGE          ☒003
Case 1:07-cv-0C 33   Document 23   Filed 02/11/20.. 8   Page 11 of 13
reviewjournal.com -- Search                                        Page 3 of 4

Miglin and Gordon abandoned Advanced Medical Products and tried to form a new company to sell the needle. They lured the marketing strategist working with AMP to help sell the needle for their new company.

Landess sued them both.

Landess said the jury found that Miglin and Gordon breached their fiduciary duty to Advanced Medical Products and its shareholders. He said jurors also agreed that Landess suffered emotional distress from the events.

Trial briefs filed on behalf of Gordon and Miglin outline their side of the story, one that varies greatly from Landess' account.

Gordon alleges that Landess concealed Miglin's investment, leaving him to believe Mellon's $400,000 offer to buy the rights to the needle was the only option on the table.

"Unbeknownst to Gordon, at the time he entered into the Mellon agreement, Mellon had already secured a new investor for AMP — Marilyn Miglin," according to court documents filed by Gordon.

"The Miglin purchase would have been of significance to Gordon for obvious reasons."

Gordon filed a lawsuit against Landess alleging civil conspiracy and fraud.

According to Gordon, he and Miglin were frustrated with Landess' failure to market the needle. Miglin and Gordon were not the only AMP shareholders who sought to remove Landess from the company as it prepared to merge with the marketing company Western Medical Devices, according to Gordon.

"The parties were generally in agreement that if the merged company were to be successful, it would need to proceed without Jason Landess and Ted Mellon, both of whom are perceived to be disruptive influences," Gordon's trial brief said.

According to Gordon, Landess' claims that millions of dollars were lost because of the legal battles are bogus. In his trial brief, Gordon said there was not a single successful sale of the needle.

The trial brief also said Landess was aware of Gordon's plan to take records from his law office. The law office and headquarters of AMP were one in the same.

"Landess both knew and consented to the removal of the property," according to Gordon.

Gordon claims Landess destroyed their friendship.

"The evidence will show that Landess was solely looking out for himself and took advantage of Gordon's trust and reliance," the trial brief said.

Case 1:07-cv-06863   Document 32-7   Filed 03/20/2008   Page 13 of 14

02/11/08 14:49 FAX 702 457 51   PICO ESCOBAR ROSENBERGE   ⌀004
Case 1:07-cv-06863   Document 23   Filed 02/11/2008   Page 12 of 13   Page 4 of 4

reviewjournal.com - Search

The jury is expected later this month to consider punitive damages. Attorneys on both sides are expected to file motions on the final judgment.

Even when the dusts settles, it's unclear what will happen to Gordon's needle invention.

"You can't beat a chicken to death and expect it to lay eggs the next day," Landess said.

Text

Get up to date Health and Fitness information
reviewjournal.com

Nevada News | Sports | Business | Living | Opinion | Neon | Classifieds
Current Edition | Archive | Search | Print Edition | Online Edition
Contact the R-J | HOME

Copyright © Las Vegas Review-Journal, 1997 - 2004
Stephens Media Group Privacy Statement

lasvegas.com

## PROOF OF SERVICE

I, the undersigned, a non-attorney on oath, certify that I filed and served the above and foregoing <u>Opposition to Marilyn Miglin's Motion to Strike Defendant's Affirmative Defenses Pursuant to Rule 12(f) and Countermotion to Amend Answers as Necessary</u>, via electronic delivery pursuant to the Court's electronic filing and service system, addressed to the persons referenced below, on the <u>11th</u> day of <u>February</u>, 2008:

| Rafey S. Balabanian, Esq.<br>Cohon Raizes & Regal LLP<br>208 South LaSalle Street<br>Suite 1860<br>Chicago, IL 60604<br>Phone: (312) 726-2252<br>Fax:    (312) 726-0609 | Cornelius P. Brown, Esq.<br>Cohon Raizes & Regal LLP<br>208 South LaSalle Street<br>Suite 1860<br>Chicago, IL 60604<br>Phone: (312) 726-2252<br>Fax:    (312) 726-0609 |
|---|---|
| [x]Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, I certify that the statements set forth herein are true and correct. | s/Joseph D. Niemeier |