**EXHIBIT C**

December 10, 2001

Marilyn Miglin
112 E. Oak Street
Chicago, Illinois 60611

Dear Marilyn:

I am in receipt of your letter to me via fax dated December 5, 2001. In view of your rejection of the buyout proposal contained in my letter to you dated November 30, 2001, it is necessary for me to respond to various points raised in your letters to me dated November 28, 2001 and December 5, 2001. While those letters were obviously sent over your signature and were most likely reviewed and edited by you before they were sent to me, I am confident that the person responsible for the first draft of those letters is Michael McCarthy. That probably explains why they contain many incorrect statements of fact. After all, he has been your new trusted advisor in connection with AMP's affairs for only the past few months, which certainly prevents him from knowing what has actually transpired with the business and between us over the past eighteen months.

Let me first set the tone that I intend to communicate to you in this letter. Despite what you may have been told by Ted Mellon, Michael McCarthy or anyone else, I have *never* expressed any desire to get into an adversarial relationship with you through a course of militant dialogue, through arbitration, through litigation or any other way in which we would stand on opposite sides of the fence. And anyone who tells you anything to the contrary is a liar.

What would I gain by such idiocy? What would you gain? How would the company benefit? I am a professional litigator. I have been engaged in the practice of law for over twenty-three years, specializing in complex civil litigation. I am thus experienced enough to know that the only person(s) who are guaranteed to prosper from such conflict are the lawyers who get paid for their services. A perfect example of this is the mess that your son, Duke, is now trying to sort out in California. After years and years of litigation and hundreds of thousands of dollars have been spent in attorney's fees, Duke is still not any closer to owning the property he tried to purchase years ago and he now is facing the prospect of having to pay hundreds of thousands of dollars more in attorney's fees and possibly end up with nothing.

Marilyn Miglin
December 10, 2001
Page 2

I have seen this scenario repeated many times over the years; so you can rest assured that I have no intention of becoming embroiled with you or anyone else in such conflict. Because even though I have the capacity to avoid paying attorney's fees by representing myself, I have no desire to spend the time or energy necessary to engage in such a futile endeavor.

I will, however, defend myself when attacked, which is why I am taking the time to respond to some of the distasteful and erroneous statements contained in the aforementioned letters—statements that I attribute more to Mr. McCarthy's ignorance of the facts and his overzealousness in trying to make a good impression on you so as to garner your business for his current employer's real estate deals rather than actual hostility towards me and/or Mr. Mellon. I nevertheless sincerely believe that Mr. McCarthy is trying to work outside the bubble to find a workable solution to AMP's present financial dilemma; but I will not allow that to occur at my expense. And when someone accuses me of being less that candid in my business dealings, no matter how you want to try and dance around that kind of an allegation, it is nothing less than a personal affront and I will not stand idle in the face of such a threat.

Once again, in order to be completely clear in my communication to you in this letter: I am looking for solutions, not problems. I want to work for the common good of all the shareholders in AMP, not get bogged down in finger-pointing acrimony. I want to help yield the tremendous value that we have created in this company, not become embroiled in conflict which leads to nothing but the destruction of what we have all worked so hard to build. I hope you keep this desire and intention of mine in mind as you read my following response to some of the points raised in your letters to me. When certain criticisms were leveled at me during our conference call of November 20, 2001, you stated at one point during the conversation: "Don't take it personal, Jason; it's only business." I respectfully suggest you keep that same thought in mind when reading this letter.

Please, however, do not expect the tenor of this letter to be full of the kind of obsequiousness that you are accustomed to and perhaps expect from some of those around you. For example, your attempt to upbraid me in your letter dated December 5, 2001 by telling me that I had "misappropriately classified" certain comments of yours as observations rather than recommendations and that you expected certain specific actions (such as immediately terminating the services of Cameron Stuart and Jonathan Crain) to be taken because, after all, you are AMP's chairperson is an expression of assumed, not real, authority. Unlike most people around you, I do not work for you, I do not owe you anything more than I owe to all the other shareholders of AMP, nor am I trying to get anything from you.

Marilyn Miglin
December 10, 2001
Page 3

That is why I went to law school and why I have always worked for myself. That professional independence affords me the freedom to speak freely when I choose, which is what I intend to do in this letter. And if I offend your sensibilities because of indelicacy or a lack of the fawning attentiveness that I have seen others display towards you every time we have met, so be it. But do not team up with your advisors and lob mortars at me and then expect flowers in return.

For the record, as the CEO of AMP, I do not work for the chairman of the board. I work for the company and take my directions from the *entire board*, including myself since I am on the board. Each member of the board has one vote, including the chairman. Since I am not under contract with the company, I am an "at will" employee and can be terminated by a vote of the majority of the board. Until that happens, I will listen to the recommendations and suggestions from everybody and then, after weighing all the facts and circumstances, make my own decision as to what I think is in the best interest of the company. That is what a CEO who is not a lackey is supposed to do. I will not allow any one member of the board to have any greater influence over my decisions than any other member of the board.

For your information, I did not terminate Stuart Crain, LLC as you requested. After reviewing your letter November 28, 2001 (which you asked me to do with them when you called me on the phone that day while we were at lunch) they simply quit. Do you blame them? They had not been paid for over a month yet they were still willing to hang in there until this cash-flow problem was worked out because of their loyalty to, and belief in, the future of the company. They then receive a letter from you telling them, in essence, that they were an unnecessary obligation. You even say that in your most recent letter where you state, "While I am relieved to be out from under this monthly obligation...."

To put that in writing was nothing short of downright cruel. These two fine men have made *tremendous* sacrifices for the benefit of AMP, so many that it would take days to describe them in writing; and they were *invaluable* assets of the company. Yet you and your new business-school grad advisor have just dismissed them like they were unwanted stepchildren. I promise you that there will come a day in the not too distant future when you will look back on that decision with deep regret. I know I already do.

Marilyn Miglin
December 10, 2001
Page 4

In your letter dated November 28, 2001, you state that you "invested 2.5 million dollars in AMP". Mr. McCarthy stated during our conference call of November 20, 2001 that your investment was a "venture capital deal". That is completely and totally incorrect. You purchased stock from me, not AMP, for a price that was negotiated at arm's length while you were being assisted at every step by your legal counsel, Dennis Carlin. The agreement governing that transaction is entitled a "Stock Purchase Agreement". There is a world of difference between your having "invested the money into AMP" as venture capital that would be credited to the capital account of the company and your having purchased twenty-five percent (25%) of AMP's stock directly from me.

For example, if it were truly a venture capital investment into the company, the use of the money would have to be accounted for in the company's books. But we have known all along that the consideration you gave to me for that stock belongs to me to do with as I see fit; just as your now very valuable stock (stock that we came very close to selling to GMP, Inc. in March or April of this year for two to three times what you agreed to pay for it in a time period of less than one year of ownership and most likely would have sold for a tremendous profit had the bottom not fallen off the stock market in mid-March, thereby thwarting the launch of GMP, Inc.'s IPO which would have produced the cash necessary to do a deal with AMP) is free to do with as you see fit, including selling it for whatever you can sell it for to a third party or continuing to keep it in order to capitalize upon its increasing value (and it is obvious that since you have just turned down the opportunity to explore selling your stock to a very real—not "hypothetical"—prospective buyer for a sum just under $3,000,000.00 in cash, that you personally consider your AMP stock to be very valuable). So I frankly would appreciate it if you and/or your advisors would stop referring to your investment as a "venture capital investment" into AMP, because that is just not the truth.

In a start-up company the entrepreneurs usually finance the venture through debt or equity, or a combination of both. With AMP the "venture capital" that you, Mr. Mellon and I agreed to make available for AMP during our conversation in the Aristocrat Restaurant here in Las Vegas when you came to meet me and have the procedure done on you by Dr. Linda Woodson was debt through the $750,000.00 that we all agreed to loan to AMP, with each person being responsible for $250,000.00. In your own handwriting you itemized the various expenditures that would be needed to bring the Arachnophlebectomy Needle ("APN") to market, such as clinical studies, marketing studies, legal, accounting, salaries, etc. Instead of loaning the entire amount to AMP to begin with (which I was in favor of), you and Mr. Mellon suggested that we loan half that amount at first and the other half when and as needed. That is why we each loaned $125,000.00 to AMP. That was not just some arbitrary figure that we pulled out of a hat. It constituted half of the amount that we each verbally committed to loan to the company.

Marilyn Miglin
December 10, 2001
Page 5

This capitalization agreement was and is a pivotal event. It is the main reason that Cameron Stuart left gainful employment and agreed to come to work for AMP as its president. It is the reason we, at your recommendation, committed AMP to contract with Northwestern University for several clinical studies for a sum that would have exhausted the entire initial $375,000.00 had we gone forward with each clinical study recommended by Drs. West and Lapiere. It is the fundamental reason that I agreed to loan money to AMP in the first place. I would never agree to loan that kind of money to a venture destined to fail because of under-capitalization. And although he can speak for himself, I suggest that Larry Sigglekow invested $200,000.00 premised in part on the understanding that that agreement would be honored by the three founding shareholders of AMP.

A prudent business person who knows that a start-up medical device business needs approximately $750,000.00 to develop a proprietary product and bring that product to market is not going to say, "Well, why don't I just loan half that money to the company and hope that some unforeseen event will occur in the future that will make it unnecessary to loan the other half of the needed capital." And we certainly did not do that. You, Mr. Mellon and I specifically agreed to loan $750,000.00 to the company if needed (which it certainly has needed the second installment of $375,000.00 for several months); yet you for some inexplicable reason now want to be exempted from having to honor that original agreement. And make no mistake that shareholder relations are strained and AMP is now in financial distress as a direct result of that original agreement not being honored.

Over and over I have reminded you of that agreement and requested as earnestly as possible that we simply all live up to our original promise so that we can get on with the business at hand. You, however, have balked at that suggestion every time I make it. The only reason that I keep hearing from you and now from your new advisor, Mr. McCarthy, as to why you think you should be excused from having to perform the rest of that promise is because you purchased AMP's stock from me for 2.5 million dollars! But what does that have to do with your independent commitment and sensible obligation to participate with Mr. Mellon and me in making a capital loan to AMP in a sum sufficient to protect the value of the stock you were purchasing from me?

If I purchased 25% of your stock in Marilyn Miglin Cosmetics for 2.5 million dollars and simultaneously agreed with you to make sure that stock remained valuable by promising to match you by loaning Marilyn Miglin Cosmetics the sum of $250,000.00, half now and half later when and as needed, what would you think of me if after you and I loaned the first half I suddenly decided not to loan the other half when the company desperately

Marilyn Miglin
December 10, 2001
Page 6

needed it and I told you that the reason I was not willing to keep my original promise was because I bought your Marilyn Miglin Cosmetics stock for 2.5 million dollars in the first place? If I were to do that, what would you think of my integrity, of my honor, of the value of my word?

What does the stock purchase agreement have to do with the capitalization agreement? The answer is: obviously nothing because they are two separate and independent agreements with completely different terms and purposes. And with all due respect to you, telling AMP and the other shareholders who relied in good faith upon that fundamental capitalization agreement that you do not now want to loan the other $125,000.00 to AMP because you bought 25% of AMP's stock from me for 2.5 million dollars is more of an excuse than a reason.

This is the first agreement with me that you have, shall we say, "forgotten".

When the company ran out of money during the early part of this year, I tried to get you and Ted to put the other $125,000.00 apiece into the company because I knew that AMP needed it. On that subject, the minutes from the June 27, 2001 board meeting taken by the corporate secretary, Jonathan Crain, state that I informed everyone present (you, Mr. Mellon, Cameron Stuart and Jonathan Crain) that AMP was in need of further funding and that I reminded everyone present of the initial capitalization agreement made by you, Mr. Mellon and me and specifically stated that I "was not willing to bankroll the company."

However, after having made that statement, instead of offering to match additional loans to AMP that were desperately needed by the company, the minutes of that board meeting state, "Ms. Miglin stated that we all would appreciate it if Mr. Landess would keep the company funded *until the WMD deal comes through and he could then be paid back*." (Emphasis added.) The resolution that was adopted at the meeting reads: "RESOLVED: That Jason Landess and Ted Mellon be paid back for monies advanced (except for their loans of $250,000.00 and $125,000.00 respectively) out of the $100,000.00 proceeds of the WMD deal."

At that time you had not yet paid back to me the $125,000.00 that I loaned to you for the first half of your share of the initial capitalization loan to AMP. I nevertheless reluctantly loaned another $41,000.00 to the company in order to meet its current obligations. Mr. Mellon loaned another $10,000.00. We then closed the WMD deal and received the $100,000.00 as promised. And after paying off all the most pressing short-term debts, as agreed and even urged by you at the June 27, 2001 board meeting, Mr. Mellon was paid back that $10,000.00 and I repaid myself $30,000.00, leaving the other $11,000.00 in the company so that we had some operating capital.

Marilyn Miglin
December 10, 2001
Page 7

I was nothing short of stunned when Mr. Mellon and I were taken to task by you and Mr. McCarthy during the conference call on November 20, 2001 for Mr. Mellon having been repaid in full on his $10,000.00 loan and for AMP repaying me a portion of what was owed to me as specifically agreed. That is why when you asked me if I were willing to re-loan that $30,000.00 back to the company, I said I would have to think about it and I would let you know. I did not, as suggested by your letter of November 28, 2001, again unconditionally agree to make that loan to AMP.

This is the second agreement with me that you seem to have forgotten; and this agreement would never have to been made with me in the first place if you had not forgotten the first.

I have now had time to think about it and I am not willing to again make piecemeal priority loans to AMP for a variety of reasons. One reason is that despite what Mr. Mellon may have previously stated, he has since that November 20, 2001 telephone conference made it absolutely clear to me on more than one occasion that he does not intend to make any loans to AMP that are not equally matched by you and me. That would mean that I would be back in the business of trying to bankroll the company by myself, which I made it clear to you and everyone present at the June 27, 2001 board meeting that I was not willing to do. Secondly, to put that money back into the company under the present circumstances would be tantamount to admitting that I did something that I should not have done in the first place by paying myself back a portion of what I was owed as agreed and urged by you, which is of course ridiculous. Thirdly, there is no arrangement like the previously impending deal with WMD in place to ensure that I would be paid back such a priority loan. And more importantly, it would be a disservice to each other and to the company because it only postpones the inevitable need for all of us to come to grips with the real issue of providing the amount of capitalization that we carefully calculated and were all aware would be needed to take AMP from start-up to a meaningful marketing launch for the APN before you ever wrote out a single check to me.

If we intend to keep this company alive, putting Band-Aids on a festering wound is not the answer. Either *ALL* of us fund this company *NOW* in a real and meaningful way, or we fold up our tents and go our separate ways. To continue as we are will only lead to further finger-pointing and contention; and I am not interested in participating in such unpleasantness. Unfortunately, I believe that is has already adversely affected Dr. Gordon. He has little time and patience for this kind of nonsense; and I think he is just going to try and sell his stock in order to focus on other endeavors that are less contentious. And unless we fix this problem soon, it will only get worse.

Marilyn Miglin
December 10, 2001
Page 8

In August of 2000, Cameron Stuart agreed to accept the position of chief financial officer of the company and was assured by you, Mr. Mellon and me when we met at your house in Chicago that this company would be capitalized with at least $750,000.00. He left gainful employment with a very prominent accounting firm in Las Vegas to work for AMP. By board action in your office in Chicago on August 15, 2000, his salary of $5,000.00 per month was approved and he was authorized to open a bank account for the company and further authorized to pay normal administrative expenses of the company under the direction of the president, who at that time was me.

You and Mr. Mellon, over my objection, wanted to run an office for AMP out of Chicago. We thus rented an apartment in Chicago for Cameron and Jonathan and they traveled back and forth from Las Vegas to Chicago for several months, spending half the time in Las Vegas and half the time in Chicago. During that time you donated a small office in your cosmetics offices for their use when they were in Chicago and I donated my entire law office for their use while they were in Las Vegas. However, once we could no longer afford to fly Cameron and Jonathan back and forth to Chicago and to maintain an apartment there, we then decided to exclusively run the company out of my office in Las Vegas.

At the June 27, 2001 board meeting I informed the company that I was not willing to bankroll the company and that it would have to pay its own expenses, including the rent, utilities and phone expenses for the Las Vegas office because it was being used exclusively for AMP's benefit (you may remember that I voluntarily shut down my very successful law practice starting in August of 2000 to devote all my time and effort to AMP). You and Mr. Mellon readily acknowledged that AMP should pay its own way and directed Cameron to go ahead and pay the normal overhead and operating expenses of the company including, but not limited to, the rent, utilities, postage and shipping and phone expenses. We had already been paying Cameron and Jonathan's salaries since September of 2000.

To my total dismay, in your letter of November 28, 2001 you then take exception to the payment of rent, phone expenses, and approximately *one-half* of what the board had authorized to pay Cameron alone in the first place, let alone Jonathan, even though they continued to do the same amount of work as before in order to help the company! Marilyn, to effectively give them the bum's rush after all the complicated work they have done, the tremendous personal sacrifice they have made, and after having devoted their money, talent, integrity and dedication to this company is the most ill-conceived business decision I have ever witnessed in the twenty-plus years that I have been a business attorney and a businessman. It is truly a case of crawling over dollars to get to nickels and of throwing the baby out with the bathwater.

Marilyn Miglin
December 10, 2001
Page 9

You and I do have one very important thing in common: Our friends and family come before business. Cameron and Jonathan are two of my closest friends and have been so for many, many years. When you insulted them by telling them in writing that they were an unwelcome financial burden to AMP after all the sacrifice they had made for our common benefit, you also insulted me. If AMP's only "friends" are people who are willing to work for nothing, then you can staff the company with your friends in Chicago because that proposition is obnoxious to me and you can thus count me and my friends out. In my neck of the woods the laborer is worthy of his hire.

Mark my word that you and this company will indeed rue the day that Cameron and Jonathan were pushed out of AMP. And whoever it was (and I have a pretty good idea who it was) that told you that it would be in your overall best interest and in the interest of AMP to get rid of them (which effectively also terminated my services for AMP because I have better things to do with my time than, among many other things that they were doing, answer the phones and do my own secretarial work) and move the entire operation of the company to Chicago does not know what they are talking about. I cannot wait to see the qualifications and resume of this administrative person that you said you could hire to handle everything that Cameron and Jonathan were doing for somewhere between $28,000.00 and $30,000.00 during our November 20, 2001 conference call. The day that you can replace the two of them, let alone the three of us, with one person for $30,000.00 is the day that I will eat my shoe.

You also incorrectly state in your letter of November 28, 2001 that AMP was paying for a lease that was not approved by the board. AMP has never entered into a lease in Las Vegas. It simply paid the monthly rent under the lease for Jason Landess P.C. as we agreed. And Cameron was authorized by the board to pay all regular operating expenses of the company in the August 15, 2001 board meeting held at your office in Chicago; and I think everyone knows that paying monthly rent for an office is a regular operating expense.

This is the third agreement with me that you seem to have forgotten.

Before you ever bought stock in AMP I retained patent attorneys to help me obtain a patent for the APN. I have never filed a patent application in my life. It is a highly specialized field; and you knew before you bought stock from me that I had retained patent attorneys to help me obtain a patent for the APN because we discussed it at length and I forwarded copies of the patent application filed by Philip Anderson, Esq. to Dennis Carlin. Your legal counsel reviewed and evaluated that patent application and discussed it with you. I have a copy of their opinion letter given to you in my file. And you were

Marilyn Miglin
December 10, 2001
Page 10

completely informed of the fact that AMP had not yet been granted a patent on the APN when you first agreed to by stock in AMP from me. We discussed at length how valuable it would be if that patent application were ever in fact approved, which of course it was during the first part of this year.

Our first major marketing strategy was to present the APN to the dermatology community at their annual convention in March of this year. One of our primary concerns was that we did not want to unveil the APN without the protection of a patent. We were very concerned about protecting the uniqueness of this product. So you, Mr. Mellon and I agreed in December of 2000 that we would offer Mr. Anderson a $10,000.00 bonus if he could somehow secure a Notice of Acceptance for the APN before the March convention. Mr. Anderson agreed to this and hired a patent attorney in Washington D.C. at his own expense to help him secure this approval on an expedited basis. We were all literally ecstatic when that Notice of Acceptance was secured approximately one month before the convention, thereby allowing us to unveil this device with a certain amount of legal protection for the idea. You said you were delighted because, among other things, you were able to prove your attorneys wrong.

Yet during the conference call on November 20, 2001, and in a telephone conversation with me once thereafter, you incredibly complained to me about having to pay this legal expense and criticized me for "not doing all the legal work"! This complaint is so confusing to me that it defies description. It is *virtually impossible* for you to not understand that this is a valid debt and for you to have not known about Mr. Anderson's work for AMP from the day you first met me.

This is the fourth agreement with me that you seem to have forgotten.

Another thing I find unbelievable is that you would write me a letter at this point in time telling me that we need a detailed, professional business/marketing plan containing the issues set forth in your letter of November 28, 2001 as though I am somehow unaware of this need. Perhaps I need to remind you so that you can pass this information on to your advisors that I am the one that suggested that we hire a professional for this very purpose in the first place. Cameron was hired to be the CFO of AMP, not an independent business consultant. And although Cameron is certainly capable of preparing business plans, he has never before prepared a business/marketing plan for a medical device and, more importantly, he was not hired for that purpose nor as president did I want him to devote his time to this task because he was needed for several other important matters.

Marilyn Miglin
December 10, 2001
Page 11

I recognized from the outset that this company would be a marketing-driven company. I knew that if and when we ever completed the development stage of the company, that it was all for naught unless we had a very detailed, professional marketing plan in place for the APN. This need was one of the first items I brought to the board's attention in my capacity as AMP's president. And I was determined to find for AMP the best talent I could find for preparing a marketing plan for a very specialized and unique medical product.

Accordingly, after spending an inordinate amount of time researching this issue and after interviewing several companies, I finally focused my attention on Medical Marketing Research, Inc. ("MRI"), an extremely professional marketing research group out of Raleigh, North Carolina that has been conducting qualitative and quantitative research in the medical market since 1988. Steve Wilson, one of the principals of MRI, and I negotiated a price for a comprehensive marketing study that included, among several other things, conducting focus groups in strategic markets such as Los Angeles, New York, Dallas and Miami. The price for this comprehensive study was approximately $56,000.00, plus reimbursement for actual travel costs.

This suggestion was presented to the board (consisting then of you, Mr. Mellon and me) at the September 22, 2000 meeting held at your office in Chicago. After considerable discussion of the matter, a resolution was adopted that MRI be retained to conduct a marketing study for AMP as follows: "RESOLVED: That the corporation retain Medical Marketing Research, Inc. to conduct a marketing study for the corporation."

Shortly thereafter at Mr. Mellon's suggestion I invited Mr. Wilson to come to Chicago to meet with the board so that we could discuss timing and strategy and finalize our agreement with MRI. Mr. Wilson came to Chicago as requested and was prepared to meet with you, Mr. Mellon and me at your office. However, before that meeting occurred, you and Mr. Mellon had a private meeting and then you both met with me and to my utter amazement you told me that you did not want to retain MRI. You said that we did not need to spend that much money on a marketing plan because you considered yourself quite knowledgeable in marketing and in your opinion focus groups were a waste of time and money. You said that you would help AMP with marketing and thereby save us a lot of money.

In front of Cameron and me, yet outside your presence, Mr. Mellon said that he could not agree to hire MRI because Mr. Wilson was not (and these are his exact words) "Marilyn Miglin material". Mr. Mellon said that Mr. Wilson was too "redneck" and that you would never approve of such a person being involved with the company. I therefore had the unpleasant task of going to the Four Seasons Hotel two blocks away from your office and telling Mr. Wilson that the board had changed its mind and that the board would not

Marilyn Miglin
December 10, 2001
Page 12

even agree to meet with him. Needless to say, I was extremely embarrassed and apologized profusely to Mr. Wilson for this discourtesy. In fact, I sent him a letter of apology and urged him to submit an invoice for his travel expenses, which he graciously did not do.

Since that day you have never provided one single written suggestion as to exactly how AMP should market the APN. You have left that to Cameron, Jonathan and me to figure out for ourselves how to market the APN without the aid of a professional such as Mr. Wilson. And although I recognized the need for this at the very beginning and tried at the outset to bring in exactly the type of person we needed to help us formulate such a plan, you and your new advisor now have the audacity to complain in writing that we do not have a detailed, professional marketing plan for the APN.

It is once again apparent to me that you have carelessly adopted the unfounded criticisms of outside advisors who are fresh upon the scene and thus ignorant of all the facts and circumstances surrounding this business and of the board's previous actions and/or inactions. The indisputable fact is that on September 22, 2000 you agreed to allow me to retain a professional marketing firm to prepare a detailed marketing plan for AMP and then for reasons known only to you changed your mind when the marketing consultant came to Chicago to consummate the deal.

This is the fifth agreement with me that you seem to have forgotten.

In your letter of November 28, 2001, you complain about not being consulted before I decided to sell a few points of my stock to my friend, Larry Sigglekow for the same price you paid for your stock, $100,000.00 per point. This criticism is wholly unfounded for several reasons. First of all, what would have been the point? You did not even have title to your stock at the time I sold this stock to Mr. Sigglekow because the "nuance" you are referring to is that you had not yet paid the full purchase price for your stock so you therefore did not own any stock to sell. All I had was an unsecured note promising that you would pay. And to tell me that I should have known that you would have paid the remaining portion of the purchase price because you are Marilyn Miglin is nothing but circular reasoning because I had never met nor heard of you before you came to Las Vegas in the summer of 2000 to have the procedure done. It is also an unpersuasive argument because if someone had invented a revolutionary method for treating spider veins (such as some amazing pill or new laser technique) before the due date of your note, thereby making the APN far less valuable, I sincerely doubt that you would have wanted to put good money after bad. I therefore bore the risk of payment of that note until it was paid.

Moreover, suppose I had called you and asked you for your blessing in selling this stock to Mr. Sigglekow, would you have prematurely paid off your million-dollar note to me with interest so you could have participated in this sale to Mr. Sigglekow when to do so would not yield you any profit whatsoever? I hardly think so.

Despite the foregoing, one of the reasons I agreed to an installment purchase arrangement for the stock you purchased in the first place was because you specifically agreed that until you made the final installment payment for your stock I would be free to deal with the remainder of my stock as I saw fit without needing to first consult with you or obtain your consent—including the deal I made with Mr. Mellon and any subsequent dispositions of my stock, whether that be a sale, or a gift, or pledging my stock as security for a loan, or whatever I chose to do with it. The reason for this is obvious: I did not want you to have a veto power over my business decisions regarding my AMP stock while you were in the process of paying me for your stock. That understanding is memorialized in the following language from our Stock Purchase Agreement: "SELLERS shall be entitled to sell, hypothecate, transfer, pledge, or assign any of their stock in the Corporation without MIGLIN'S consent and without offering MIGLIN an opportunity to sell any or all of her stock to prospective purchasers of SELLER'S stock."

So if I did not need your consent to sell any of my stock to whomever I wanted to and for whatever price I wanted to sell it for, and if I was under no obligation whatsoever to offer you an opportunity to participate in such a sale, why in the world are you now complaining about it? You do not complain in your letters about me not consulting with you when I decided to give 16.75% of AMP's stock to Dr. Gordon, which obviously benefited everyone in the company to have the inventor of the APN in the deal. Yet you criticize me for selling a few points to one of my friends at a time when we were on the verge of selling to GMP, Inc. for a huge profit and I simply wanted to give my friend an opportunity to participate in this sale (who would ever guess that a few weeks later the bottom would fall off the stock market?). Again, this appears to be a case of ignorance of all the facts by the person who crafted the first draft of your letters.

This is the sixth agreement with me that you seem to have forgotten.

As you know, Mr. Mellon first introduced us. I had only known Mr. Mellon for a few months before we met. When you first came to Las Vegas it was apparent to me that you enjoyed his company. It is common knowledge that you and he have spent a lot of time together since this business was formed. You two were even on public television a few weeks ago dining at one of your favorite haunts, The Pump Room.

Marilyn Miglin
December 10, 2001
Page 14

I am old enough and experienced enough to know that sometimes personal relationships just do not turn out the way you would like, or that relationships sometimes just change for no particular reason. Knowing this, and knowing that I was introduced to you by Mr. Mellon, I have never wanted our business relationship to be dependent upon the success and/or failure of your personal relationship with Mr. Mellon. That is why I asked you to join me for lunch in March of this year when we were in Washington D.C. for the dermatology convention. That was the first time that I was ever around you without Mr. Mellon being present.

You may recall that we went to a nice Italian restaurant for lunch. Over lunch I waxed bold and told you that I was aware of your infatuation with Mr. Mellon. I told you how important our business relationship was to me and I specifically asked you if you would promise me not to allow our business relationship to be undermined if things did not turn out with Mr. Mellon the way you hoped it would. You promised me that you would not let that happen and we even shook hands on it.

Now that your personal relationship with Mr. Mellon has taken a turn for the worse, you suddenly decide after almost one and one-half years has gone by that you are not as happy with your purchase of AMP's stock from me as you were previously and you start taking pot shots at me in writing! In so many words, albeit politely, you have suggested that I am both a thief and a liar. And you wonder why I am upset?

This is the seventh agreement with me that you seem to have forgotten.

Regarding your new and shocking accusation that Mr. Mellon and I failed to disclose the details of my stock purchase arrangement with Mr. Mellon to you at the time you agreed to purchase my stock, I choose not to dignify that inflammatory remark with a detailed response because I meant what I said earlier in this letter about not wanting to become embroiled in conflict with you lest we completely destroy this valuable company and because of your candor in stating in your December 5, 2001 letter that you would not at the time of purchase have had any objection to the details of my independent agreement with him and that the details of that independent agreement was not a significant and meaningful factor in your investment decision because you were greatly excited about purchasing stock in AMP for other reasons. However, my silence on this subject is not in any way to be construed as an adoption of, or agreement with, your accusation. I just deem it to be prudent for several reasons not to respond in any detail at this juncture. And I think your honesty about your thoughts and intentions at the time of purchase makes the subject moot anyway.

Marilyn Miglin
December 10, 2001
Page 15


Some of the more important promises that I made to you when we first went into business were as follows:

- That when you paid for your AMP stock I would deliver that stock certificate to you and that there were no claims outstanding against me or the company and that should any ever be asserted regarding the true ownership of that stock that I would defend you against any such claims.
- That I would shut down my successful practice of law to devote all my professional time and energy to AMP's business.
- That I would not take a salary from AMP until AMP could afford to pay me one.
- That I would make my law office and all the computers, office equipment, furniture and supplies available for AMP's use without asking for any compensation for that very valuable personal property.
- That I would not charge AMP for professional services when I did legal work for the company.
- That I would be happy to field any legal questions that you or your son may have regarding business matters unrelated to AMP.
- That I would invite my closest friends to get involved and help us bring the APN to market.
- That I would make Jonathan, my paralegal of over ten years, available to AMP and promised that he would devote himself above and beyond duty to AMP's affairs because that is just the way he works for everyone.
- That I would protect the company from any attacks from outsiders, such as has occurred of recent with T.K. Crabb.
- That I would do everything in my power to get the APN patented to prove that your attorneys were wrong when they opined that the APN was not patentable.
- That I would loan you $125,000.00 so you could loan it to the company and not take any security for the repayment of that loan.
- That I would travel to locations convenient for you for regular shareholders and/or board meeting instead of your having to go out of your way by traveling to Las Vegas for those meetings.
- That I would match you and Mr. Mellon in making another $125,000.00 to AMP in accordance with our initial capitalization agreement.
- That should you ever become disenchanted with your involvement with AMP, that I would make a bona fide effort to find someone who would buy your AMP stock for just what you paid for it.

Which one, if any, of these promises have I failed to keep Marilyn? Frankly, I think I have kept them all. But if there is an important promise that I have failed to keep, I would sincerely appreciate knowing about it, because I cannot honestly think of one promise that I have made to you that I have failed to live up to.

I learned a long time ago that a person is only as good as his word. All the written agreements in the world mean nothing unless the people making those agreements intend to keep their promises at the time the agreements are made. I think I have kept all of the important promises that I made; and if I have not, I would like to know which one it is and see the evidence of it as I have tried to do for you in this letter regarding several of the important promises that you have made to me over the past sixteen (16) months. And until you can show me some evidence that I have indeed been less than candid with you or broken some fundamental promise, I would appreciate not being lectured any more on "honesty" and "integrity".

Regarding your statement in your letter December 5, 2001 that I have "profited greatly" and that you have not made anything, let me just make a few brief observations. First of all, I probably have not profited anymore from the money I received from the sale of my AMP stock to you than I would have had I continued to practice law for the past sixteen (16) months. After you deduct the amount of money that was paid to Dr. Gordon for his interest in the APN, and the money that Jonathan received because you bought stock from me *and* Jonathan, and the amount of money that I paid to attorneys and consultants to get the patent for the APN filed and to get it cleared for marketing by the FDA before we even met, and the money that Mr. Mellon received as a result of our stock trade, and the money I have loaned to AMP and spent traveling all over the country for the company without being reimbursed for it, I am left with just about the same amount of money before taxes that I would have earned had I continued to run my law practice and collect the amount of money that I have averaged over the past several years.

For your information, when I am in trial my billings average around $50,000.00 per month. And my collection rate over the years has been second to none. Since I am a trial lawyer, what do you think I would have been doing over the past sixteen (16) months? You also fail to take into consideration the select personal injury cases I have taken on over the years. The last one settled for approximately $2,000,000.00, and the legal fee was all paid at the time of settlement. Are you seriously going to suggest that I could not have earned any more fees from such cases?

I am therefore not persuaded that your purchase of stock from me has allowed me to profit to any greater degree than I would have had I continued doing just what I was doing before we met. The only thing your purchase has done is allow me to take an interim break from the practice of law, which I now wonder whether I should have done or not.

Marilyn Miglin
December 10, 2001
Page 17

Regarding your not having received any return on your investment yet, how can you complain about this when you knew that it would take the company some time to bring the product to market? We did not even receive the patent for the APN until the spring of this year. How quickly do you think the company can turn a profit if you choose not to pay the help? And how do you expect to receive a return on your investment from this company if you are not willing to live up to your fundamental agreement for the company's capitalization and thus allow the company to go broke?

You indicated during our November 20, 2001 conference call that you were willing to "make a gift" of an office for AMP in Chicago in order to reduce our expenses and from reading your letter dated December 5, 2001 appear disappointed that this has not already been done. In view of recent developments, I have decided as the CEO for AMP to accept your gift and we therefore need to make *immediate* plans to relocate AMP's administrative offices and operations to wherever you intend to put it in Chicago. I think it is imperative that we do this before you leave for your annual two-week vacation in Hawaii. A few of the more pressing matters requiring prompt attention of whomever it is that you intend to hire or appoint to take over the administration and operation of AMP are as follows:

- Open Chicago office with address, telephone, files, and computer.
- Transfer telephone so that it can be answered without interruption.
- Open Chicago bank accounts (Wells Fargo does not have commercial banking in Chicago).
- Obtain Chicago business license and registration as foreign corporation doing business in Illinois (this may have Illinois state income tax ramifications to the corporation and the shareholders).
- Change address:
    - Update stationery and website.
    - Notification of change of address to post office, vendors, product liability carrier, creditors, etc.
- Transfer website hosting.
- Maintain website.
- Change FDA registration information (Inform GeoTec, Inc. of change of address so that they can update all product labeling).
- Be responsible for completion of FDA Quality Surety Regulation information and file maintenance.
- Review personnel requirements in light of FDA regulations that require qualified personnel be responsible for compliance issues.
- Hire office manager who is capable of doing the following:
    - Basic bookkeeping, including all accounts payable, accounts receivable, check register and financial reporting to board and/or CPA firm.

Marilyn Miglin
December 10, 2001
Page 18

- Quick study on learning about the Miglin Method, the APN, all the key personnel, the history of the project, the vendors, contractees, etc.
- Assist corporate officers with the organization of corporate files, schedules, deadlines, etc.
- Maintain regular communications with distributors.
- Being the contact for, and negotiating with, certain major vendors who have past due balances (including Northwestern University, GeoTec, Inc., etc.).
- Fielding inquiries from prospective purchasers, distributors, and manufacturers (foreign and domestic).
- Maintain FDA required database for tracking all APN distribution channels (both through sales and sampling).
- Maintain database of all sales inquiries and promotional mailings.
- Arrange for the shipping and receiving of business files from Las Vegas.

Although Cameron and Jonathan no longer work for AMP, I am sure that they will be happy to aid in this transition as time permits. They of course have to focus on making money to feed their families, so we will have to work around their new schedules.

I too remain willing to provide whatever help and information I can to aid in this transition as time permits. Please have whomever it is that you intend to handle this matter fax to me a phone number, address and fax number so that I can send them the information and records that they need in order to implement an orderly transition. I will continue to serve as the CEO for AMP until a president is hired (assuming that AMP somehow finds the money to hire someone). And should someone not be hired to pick up the reins, I will be glad to assist in winding up the affairs of the corporation in accordance with law.

Smarter men than me have fallen victim to the mysterious matters of the heart. I do not want to be counted among them, so I am sending a copy of this letter to Duke in the hope that he may be able to sort through the emotional quagmire surrounding things and provide a welcome voice of reason to all this. I sincerely like and admire him and I would do business with him anytime because he strikes me as an honorable man.

In conclusion, I spent almost twenty-five (25) hours drafting this letter (which includes the time for reviewing all the corporate documents, the corporate minutes and the correspondence referenced in this letter to make sure that almost everything I have stated herein is based upon events or statements memorialized in writing), and I think it is a

Marilyn Miglin
December 10, 2001
Page 19


total waste of my time to respond to any more unfounded criticisms or accusations. I thus do not want to hear anything more from Mr. McCarthy because he is speaking out of school and I do not have the time nor desire to debate with him anymore. So if you or Duke would like to speak with me, personally write to me (I will recognize your vernacular and style Marilyn), or feel free to call me on my cell phone.

After all, as you said Marilyn, it's not personal; it's just business. Until then, I remain,

Respectfully Yours,


Jason G. Landess
CEO