RPLY
DAVID R. CREAGH, ESQ.
DAVID J. RICHARDS, ESQ.
HINSHAW & CULBERTSON, LLP
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601
Attorneys for defendant,
James Joseph "Ted" Mellon

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| MARILYN MIGLIN, | ) |
| Plaintiff, | ) Case No.: 2007L009263 |
| v. | ) |
| JAMES JOSEPH "TED" MELLON, | ) |
| Defendant. | ) |

### AFFIDAVIT OF JAMES JOSEPH "TED" MELLON IN SUPPORT OF REPLY TO MIGLIN'S OPPOSITION TO MELLON'S MOTION TO TRANSFER

///
///
///
///
///
///
///

## AFFIDAVIT OF JAMES JOSEPH "TED" MELLON IN SUPPORT OF REPLY TO MIGLIN'S OPPOSITION TO MELLON'S MOTION TO TRANSFER

STATE OF CALIFORNIA)
                    ) SS:
COUNTY OF _Riverside_

James Joseph "Ted" Mellon, being first duly sworn deposes and says:

I became acquainted with Attorney Jason Landess in early 2000. Landess advised that he, an attorney in Clark County, Nevada, was seeking to develop and market a device for the treatment of spider veins. The device had been invented in Clark County, Nevada by Dr. Dennis Gordon and Landess had obtained FDA approval for the device.

I expressed an interest in becoming involved in the marketing of the device.

I met with the widow of an acquaintance of mine (Lee Miglin) in Telluride, Colorado and mentioned that I was involved in marketing the spider vein device. The widow, Marilyn Miglin, was the owner of a multi-million dollar international cosmetic and cosmetic device company and she advised that she was very interested in the device for its potential profit value.

After meetings in Colorado, Illinois, California, and Nevada, Marilyn traveled to Las Vegas in July, 2000 to have the spider vein treatment performed on her by Dr. Linda Woodson, a physician in Clark County, Nevada. Marilyn had discussions with Dr. Woodson in Las Vegas, prior to the treatment, concerning the product and the use of the product. Marilyn was very satisfied with the results of the treatment performed by Dr. Woodson and we had several meetings in Las Vegas with Landess (and Landess' assistant, Jon Crain) to discuss Marilyn and I purchasing some of Landess' shares of stock in AMP, a Nevada corporation.

After these discussions that took place in Las Vegas, Nevada, my independent

counsel and Marilyn's independent counsel negotiated a written Stock Purchase Agreement with Landess, a copy of which is attached to this Reply brief.

In the discussions that took place between Marilyn, Landess, and myself in Las Vegas, Marilyn and her counsel were aware that I was contributing stock in my own corporation as consideration for the Landess stock that I was receiving. Marilyn also knew that Landess was going to share with me some of the funds that he was to receive from Marilyn because I had introduced Marilyn to him in the first place. Despite the slanderous allegations and statements in Marilyn's Complaint, Marilyn acknowledged in writing that she was aware I was exchanging my stock for Landess' stock and that I was receiving some of Marilyn's money from Landess in a written document that is attached as Exhibit A to this Reply brief. Marilyn's efforts to say that she was confused about the content of Exhibit A are simply ludicrous because she knew what Exhibit A said and she actually struck out portions of the language on Exhibit A that she did not agree with.

Marilyn has attached minutes from various meetings of the board of directors that took place in Chicago, Illinois. There were as many, or more, board of directors meetings and strategy meetings that took place in Las Vegas, Nevada that are also memorialized by minutes, but I do not have copies of those minutes. Those copies are kept in and within the corporate books that are maintained in Las Vegas, Clark County, Nevada by Larry Siggelkow, the current president of AMP.

All of the books and records, computers, and materials concerning AMP are maintained at Clark County, Nevada because the principal place of business for AMP is, and was at all times pertinent to these proceedings, in Clark County, Nevada.

During calendar year 2001, differences of opinion regarding the development and marketing of the APN arose between the shareholders, directors, and officers. During this

time, your affiant was making considerable efforts to market the product, even moving to Chicago at one time, and Michigan at another time, to try and operate a Midwest presence for the marketing of the product. These stays in Chicago and Michigan lasted only a few weeks or months and ended due to the discord among the shareholders, directors, and officers of the AMP.

As of late 2001 or early 2002, it was plainly apparent that Marilyn and her son, Duke Miglin, wanted to separate Landess and I from AMP. It was apparently her belief that she could develop and market the product more successfully and reap all of the profits rather than share them with Landess or I.

A meeting took place in January, 2002 at The Orleans Hotel in Las Vegas. I was unable to attend that meeting, but I did attend by telephone. At that time, Marilyn Miglin, on behalf of AMP, agreed to pay Landess and I $3.5 million each for a reconveyance of our shares of stock to the corporation. Marilyn Miglin personally guaranteed these funds in verbal statements made to Jason Landess at the time of these meetings.

Thereafter, Marilyn Miglin, AMP, Landess and myself were represented by independent counsel who negotiated and prepared the second Stock Purchase Agreement for AMP to purchase Landess' and my stock for $3.5 million each. That agreement is also attached to this Reply as an exhibit.

As I understand Marilyn Miglin's claims in the Complaint, she wants to collect several million dollars from me because I supposedly got her involved in the AMP business. The several million dollars she is seeking to recoup represents settlement funds that she was forced to pay to Landess and AMP after a jury verdict was rendered against her in Las Vegas, Clark County, Nevada for compensatory damages in the amount of $16.5 million. The Court found that Marilyn Miglin had breached her fiduciary duties,

committed fraud and committed intentional infliction of emotional distress with regard to Landess and the shareholders of AMP by her activities and conduct after her acquisition of stock.

If Marilyn wants to complain about the discussions that took place during the acquisition of her stock and during her operation of AMP, the persons who have knowledge of those facts are located almost exclusively in Clark County, Nevada, save and except for Marilyn's son, Duke Miglin.

The attached Points and Authorities set forth the names of these witnesses as Jason Landess, Jon Crain, Cameron Stuart, Linda Woodson, MD, Dennis Gordon, MD, Larry Siggelkow and others who are all located in Clark County, Nevada and who can testify as to their personal knowledge of all discussions that took place before and during Marilyn Miglin's acquisition of stock in AMP from Jason Landess.

Unless this Court grants this Motion to Transfer Venue, I will have no means to compel the attendance of these important witnesses at the time of trial in the Northern District of Illinois. I will be severely hampered by my inability to present these witnesses personally for the consideration of the jury.

AND FURTHER AFFIANT SAITH NAUGHT.

*[signature]*
JAMES JOSEPH "TED" MELLON

SUBSCRIBED AND SWORN TO before me, a Notary Public, this 12th day of April, 2008.

*[signature]*
Notary Public

CAROL A. HEISS
COMM. #1567464
NOTARY PUBLIC-CALIFORNIA
RIVERSIDE COUNTY
My Comm. Expires March 6, 2009